**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| HAYWARD INDUSTRIES, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 3:20-CV-710 -MOC-DSC |
| BLUEWORKS CORPORATION, BLUEWORKS INNOVATION CORPORATION, NINGBO C.F. ELECTRONIC TECH CO., LTD; NINGBO YISHANG IMPORT AND EXPORT CO., LTD. | |
| Defendants. | |
| ------------------------------------------------------- | |
| NINGBO C.F. ELECTRONIC TECH CO., LTD, | |
| Counterclaim-Plaintiffs, | |
| v. | |
| HAYWARD INDUSTRIES, INC., | |
| Counterclaim-Defendant | |

## PLAINTIFF HAYWARD INDUSTRIES, INC.'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL DISCOVERY

At first glance, Defendants' motion (Doc. No. 94) reads like a spy thriller. Indeed, Defendants use the word "spy" at least 40 times to paint a fantastical story of secret agents and espionage. The truth is far less exciting. Once past their unsubstantiated conspiracy theories, Defendants' motion is nothing more than an improper attempt to obtain Hayward's privileged materials relating to its legitimate pretext intellectual property investigation.

Defendants do not identify any specific document from Hayward's privilege log (or anywhere else, from that matter) that they seek to compel the production of. Conspicuously absent from their supporting declarations is a statement identifying the purported trade secrets that Mr. Chen and other employees allegedly disclosed to the investigator, either verbally or in writing. Instead, Defendants make a sweeping demand for all "investigation information" that is clearly privileged material. Defendants state that they seek only factual evidence obtained by Hayward's investigator and are not looking for "production of any legal opinions or work product" (Doc. No. 94, Defendants' Motion to Compel, at 1). Importantly, Defendants omit that Hayward **has already provided the underlying factual evidence** of its investigation at Ningbo, C.F. throughout this litigation: in the Amended Complaint (Doc. No. 57), in declarations, and in responses to Defendants' discovery requests.

Hayward's investigator's actions and his communications with counsel are protected by the work product doctrine and attorney-client privilege. Defendants have not, and cannot meet, their burden to show that they have a "substantial need" for this information. Defendants have surveillance camera videos, stills from which they have filed in this action, and they know what, if any, documents were shown to the investigator because they are all in their possession, custody and control. Defendants' possession of this security footage and any trade secret documents obviates any justifiable "substantial need" for Hayward's privileged documents.

Furthermore, Hayward has not waived, in whole or in part, the attorney-client or work product privileges due to the purported crime-fraud exception or by disclosure to third parties. Defendants' arguments to compel production of Hayward's privileged documents lack the basic predicates to warrant an order undoing this absolute protection afforded all clients and their counsel.

# I.  FACTUAL BACKGROUND

This case arises from Defendants' advertising and selling "knock-off" salt cells on various websites, including via international websites such as Amazon.com and Alibaba.com. Hayward's claims include, *inter alia*, infringement of registered and common law trademarks, passing-off, false advertising, counterfeiting, and false designation of origin. Defendants misrepresent that their salt cells are the "same" as Hayward and are compatible with Hayward's automation systems. Defendants' advertisements misleadingly state their salt cells come from the same source that makes Hayward's salt cells. *See* (First Amd. Compl. ("FAC"), Doc. No. 57 ¶¶ 58, 60, 64, 70 - 73, 84-86, 88-90, 99, and 102.

Before filing its complaint, Hayward conducted its due diligence by investigating Defendants' infringing activity and false advertising. During the investigator's two visits to Defendants' offices, Defendants did not provide any trade secrets (and Defendants have never said what those trade secrets could be). Furthermore, Hayward verified in its response to Ningbo's interrogatories that no communications regarding the investigation were shared with Hayward. Specifically, Hayward stated that "no Hayward employees, executives or agents had communications with or received communications from the Investigation Agency concerning Ningbo C.F. except Hayward's outside and in-house counsel." Excerpt from Response to Ningbo CF's Interrogatories No. 17:

<u>**INTERROGATORY NO. 17:**</u>

Identify all Hayward employees, executives, and agents who had Communications with the Investigation Agency concerning Ningbo C.F., including all Hayward employees, executives, and agents who directly or indirectly received from the Investigation Agency any of Ningbo C.F.-related information including Ningbo C.F. Trade Secrets, regardless of whether you agree with Ningbo C.F.'s designation of such information as trade secrets.

**RESPONSE:**

Subject to and without waiving the foregoing objections or privileges, no Hayward employees, executives, or agents had Communications with or received Communications from the Investigation Agency concerning Ningbo C.F. except Hayward's outside and in-house counsel.

## A. Hayward's Intellectual Property Investigation into Defendants' Conduct

Hayward retained an investigator in the fall of 2020 to (1) investigate the relationship among the four Defendants and (2) ferret out the facts related to Defendants' intellectual property infringement and false and misleading advertising, including advertising their salt cells as "T-Cell-15," "same cell supplier as the original," "Made in the USA same as Hayward," and "Now we branch and warranty center in North Carolina," among others. *See* FAC at 14, 66, 80, 84-86, 88, 96. Between October and December 2020, the investigator communicated via calls, emails and messages with the Chinese Defendants acting as a company interested in ordering salt chlorinators, as allowed under Chinese law. *See* (Declaration of Daniel Plane, dated December 15, 2022 ("Plane Dec.") ¶¶ 13-14).

The investigator visited Defendants' offices on November 3, 2020, during which he was not required to sign *any* agreement, let alone a non-disclosure agreement, and confirmed the connection between the North Carolina and Chinese companies (i.e., Blueworks and Ningbo C.F.). *See* (Declaration of Tiberius Dinu ("Dinu Dec.) ¶ 4 and Doc. No. 10-2). Richard Chen, a co-owner of Ningbo and CEO of Blueworks, told the investigator that the titanium plates/parts for use

4

of in the pool salt chlorinators were imported from a factory in the United States. *See* (Dinu Dec. ¶ 12); *see* also (Doc. No 31, Order denying Defendants Motion to Dismiss, p. 12). The investigator also communicated via email with Defendants concerning the veracity of the statements made in their advertisements. Specifically, when asked whether all products, including the blades, offered in Ningbo C.F.'s catalogue are manufactured by it in China. Ms. Holly Chen of Ningbo, responded via email with "For salt chlorinator cell plates are made in China." *See* (Doc. No. 10-2, ¶¶ 24-25). Clearly, the investigator was not seeking to identify and steal proprietary information but rather to confirm whether Defendants had the "same cell supplier as the original," as asserted in Defendants' misleading advertisements. At no point did the investigator receive any confidential information. *See* (Doc No. 10-2 ¶3); *See* (Plane Dec. ¶2); *See* (Dinu Dec. ¶ 2). Nor have Defendants alleged that any particular information or documents was shown to the investigator.

After establishing that Defendants may be engaged in infringing conduct, the investigator returned to Ningbo C.F.'s facility for the second visit on January 5, 2021, accompanied by two notaries public to pick up sample products the investigator had ordered in the presence of the Chinese notaries, who intended to witness and notarize the process of preserving evidence. *See* (Dinu Dec. ¶ 5). In China, notaries are quasi-governmental officials in nature. *See* (Plane Dec. ¶ 1)1. Upon entering the facility, the investigator was asked to sign a "sign in" sheet by the doorman of Ningbo C.F. who explained that this new requirement was to comply with "epidemic prevention" requirements implemented by the Chinese government, most factories, office buildings, and other facilities to record their contact information. Therefore, the investigator did not flip over the "sign in" sheet to see that the alleged "Non-disclosure agreement" was printed on the back. Ningbo C.F.'s doorman did not mention that there was a purported agreement printed on the back or

otherwise direct the investigator to read the contents on the back of the "sign in" sheet. *See* (Dinu Dec. ¶ 6). As is clear from the below that this presentation of the "sign-in" sheet was a setup.

During the visit, the investigator asked for the name of Ningbo C.F.'s supplier of the blades used in their salt cells. The Ningbo C.F. staff refused to disclose the names of their suppliers, claiming that information was the company's confidential information. The investigator did not observe any documents that would identify the suppliers, either. *See* (Dinu Dec. ¶ 7).

After paying Ningbo C.F. for the ordered products, the investigator and notaries waited in an office for the sample products. Instead, seven Chinese officers of the Ningbo Public Security Bureau (PSB) entered the office and split the investigator and notaries up in separate offices for 2 ½ hours. *See* (Dinu Dec. ¶ 8). During the questioning, the PSB officers told the investigator that the "factory boss" suspected the investigator of "stealing" the company's secrets and called the police. The PSB officers also asked on whose behalf he was making the visit, to which he replied that he was conducting an intellectual property infringement investigation on behalf of Hayward. At the request of the PSB officers, the investigator handed over his two phones, providing the officers with the password for both. The PSB officers did not ask any questions about the contents of his phones and returned the phones to the investigator. *See* (Dinu Dec. ¶ 9).

At the PSB officers' request, the investigator provided a handwritten statement describing the purpose of his visit and his investigation, a copy of which he did not retain. The investigator confirmed that the contents in the typed report in Chinese attached to the Declaration of Scott Sherwin as Exhibit 2 ("Mr. Dong's self-report to the Ningbo Police") are not completely consistent with those in his handwritten statement he gave the PSB officers. The investigator is unaware how this typed report in Chinese was generated and from where it came. *See* (Dinu Dec. ¶ 10). The PSB officers let the investigator and the notaries public leave the factory without charging them

with any offense or issuing them any summonses or other documents. The PSB has never contacted the investigator about the matter again. *See* (Dinu Dec. ¶ 11).

Moreover, Defendants, allegedly, have security camera surveillance footage of the investigator viewing a binder at their facility but do not identify any confidential information--let alone salt cell design or coating formula. Specifically, Hayward requested this information from Defendants in its interrogatories and document requests. Ningbo responded that it would produce a document reflecting the specific product design that was allegedly misappropriated, but Defendants have yet to produce this alleged document.

### B.     No Trade Secrets Were Taken from Defendants

Not only does Hayward not possess this purported confidential information, there is no need for Hayward to obtain this information. Hayward does *not* manufacture ruthenium coated blades for its salt chlorinators, *nor does it provide specifications to its supplier* other than the surface area of the blade and the number of hours needed for the life of the salt cell. Importantly, Hayward does not specify, and is *not* aware of, the chemical composition of the ruthenium coating used on the blades, which De Nora considers proprietary. (Declaration of Troy Renken, dated December 15, 2022 ("Renken Dec.") at ¶ 3-7). Therefore, Hayward has no need to discover the specifications or coating used in Defendants' salt cells. *See id.*

Hayward has repeatedly informed Defendants in letters, privilege logs from April and June 2021, and in discovery responses to interrogatories and document requests, that (1) Hayward does not have any trade secret information from Defendants and "no employees, executives or investigators had communications with or received communications from the Investigation Agency concerning Ningbo C.F. except Hayward's outside and in-house counsel" and (2) "an additional Ningbo C.F. product brochure was provided to the investigator but no other documents were obtained from the Investigation Agency aside from those documents produced in Doc. No.

7

10-2." (*See* Donoian Declaration, dated December 16, 2022 (Donoian Dec.), ¶¶ 2-3.) The additional product brochure was produced with the document production number Hayward0016069 on February 25, 2022.

## II. ARGUMENT

### A. The Investigative Documents Are Work Product and Privileged

Under Federal Rule of Civil Procedure 26(b)(3), Defendants "may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer or agent)." Yet, that is exactly what Defendants are trying to do here.

The documents and communications pertaining to the investigation of the Ningbo entities are protected from disclosure under both the work product doctrine and the attorney client privilege, which Hayward has asserted to Defendants' counsel numerous times over the past 10 months in telephone conversations, discovery responses, letters and, most importantly, a privilege log that set forth the document type, subject line/file name, subject matter, date, author/recipient, and privilege asserted. Hayward's privilege log included 20 documents related to the investigation.[1] Yet Defendants waited seven months after receiving the log and two days *after* the deadline to serve all discovery[2] to raise this issue with Hayward or the Court. Indeed, Defendants have not even identified specific documents in Hayward's privilege log that are allegedly not

---

[1] Defendants' argued in their motion to compel the privilege log that they needed this privilege log related to the investigation so they could "adequately assess Hayward's basis for withholding these highly relevant documents and communications" and to determine if "[the investigator] transmitted any messages or attachments during or following" his visits to Ningbo's offices. (Doc. No. 75, p. 8). On May 11, 2022, Hayward served the requested log and included the same log in Hayward's opposition (Doc. No. 77-2) to Defendants' motion.

[2] A deadline Defendants set forth in their most recent motion for an extension of time (Doc. No. 93), the reason for which is now clear.

privileged. Nor have Defendants explained why this Court should force their disclosure or provided this Court any legitimate reason for overriding the work product and attorney-client privileges that protect these documents and communications.

Other than their prolific use of "spy," Defendants have failed to meet the basic threshold in seeking this extraordinary relief. Rather, they simply claim the burden is Hayward's to prove the privileges apply to these documents (a burden Hayward met on its privilege logs). This is not sufficient. The Local Rules of this Court provide that "[u]nless made during a hearing or trial, all motions must be put in writing and shall state with particularity the grounds of the motions and shall set forth the relief or order sought." *See* Local Civil Rule 7.1(A). "Parties moving to compel responses to discovery requests in this Court typically **identify by number each response they deem to be deficient, along with the reasoning for their position**." *See Hounds Design, Inc. v. Brezinski,* No. 3:13-CV-101-RJC-DCK, 2014 WL 1713785, at *3-4 (W.D.N.C. May 1, 2014) (Emphasis added) (noting that moving party "shall specifically identify in writing for Plaintiff which Interrogatories they contend the answer cannot be determined by examining documents Plaintiff provided in lieu of written responses."). Defendants' Motion should fail for its procedural deficiency alone.

The attorney-client privilege applies to the communications between attorney and client for the purpose of securing an opinion on law, legal services, or assistance in some legal proceeding, as long as the privilege has been claimed and not waived by the client. *Better Gov't Bureau v. McGraw*, 106 F.3d 582, 600 (4th Cir. 1997). The guiding principle for this sacred privilege is to promote full and frank communications between attorneys and their clients. The attorney-client privilege's protections are absolute. *See Frammel v. United States*, 445 U.S. 40, 50

9

(1980)("When applicable, the privilege protects completely from disclosure all confidential communications between a lawyer and his or her client.")

Here, all communications regarding the investigation include only Hayward's outside counsel in the United States and Asia and Hayward's in-house counsel. (Doc. No. 77-2). Any "investigation information" that Defendants seek to compel that includes any communications between Hayward's counsel and Hayward and any Hayward investigator are thus afforded protection under the attorney-client privilege and can only be waived by Hayward.

The work product doctrine protects "documents and tangible things that are prepared in anticipation of litigation or for trial by or for [a] party or its representative." Fed. R. Civ. P. 26(b)(3)(A). That protection includes materials prepared by a party's investigator. *Roa v. Tetrick*, No. 1:13-CV-379, 2014 WL 695961, at *2-3 (S.D. Ohio Feb 24, 2014). Opinion work product, reflecting the party or representative's mental impressions, opinions, and conclusions is "absolutely immune from discovery." *Nat'l Union Fire Ins. Co. of Pittsburgh Pa v. Murray Sheet Metal Co., Inc.*, 967 F.2d 980, 984 (4th Cir. 1992). Here, the investigation reports were prepared by Hayward's representatives at the direction of counsel and in anticipation of this litigation regarding Defendants' infringing conduct, false advertising, and other unfair practices, and they contain the mental impressions, conclusions, and opinions of Hayward's representatives. As a result, they are opinion work product and are "absolutely immune from discovery." *Id*.

The recent decision in *Lively v. Reed*, No. 1:20-CV-119-MOC-WCM, 2021 WL 664853, at *2 (W.D.N.C. Feb. 19, 2021) is directly on point. There, the court found that reports prepared by an investigator retained by Defendants' counsel were protected from disclosure under the work product doctrine. The *Lively* court cited and relied upon case decisions in this circuit as well as

10

across the country that "applied work product protection to private investigator's reports." *Id* at

*2, citing:

> *Costabile v. Westchester, New York*, 254 F.R.D. 160, 164 (S.D.N.Y 2008) (explaining that "[a]gents include those who are enlisted by legal counsel to perform investigative or analytical tasks to aid counsel in preparing for litigation," and finding, following in camera review, that a private investigator's report was a document prepared in anticipation of litigation and therefore subject to work product protection."; *Gutshall v. New Prime, Inc.*, 196 F.R.D. 43, 46 (W.D. Va. July 19, 2000) ("New Prime prepared, or commissioned the preparation of, the surveillance materials in anticipation of trial in this case. Consequently, those materials constitute 'work product' that New Prime ordinarily would not be compelled to produce"); *see also Southern Scrap Metal Co. v. Fleming*, Civ.A. 01–2554, 2003 WL 21474516, at *6 (E.D. La. June 18, 2003) ("The [work product] doctrine protects not only materials prepared by a party, but also materials prepared by a co-party, or representative of a party, including attorneys, consultants, agents, or investigators"); *accord United States v. Nobles*, 422 U.S. 225, 238-239, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975) ("[A]ttorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial ... [and] the doctrine protect[s] material prepared by agents for the attorney as well as those prepared by the attorney himself").

Like the reports in *Lively,* the investigative reports here were conducted by an investigator at the request of Hayward's counsel, specifically in anticipation of this litigation to enforce Hayward's intellectual property rights and to establish the relationship of the Defendants for purposes of asserting jurisdiction over the Chinese defendants. Furthermore, the reports reflect mental impressions, opinions and conclusions of Hayward's agent working at the direction of Hayward's counsel. Specifically, the substance of the reports summarizes and explains the investigator's opinions and conclusions of his investigation. Therefore, the "investigation information" Defendants seek to compel is clearly work product and privileged.

### B. Defendants Have No "Substantial Need" For the Investigation Information They Seek

As a threshold matter, Defendants have not sufficiently shown that the documents and information Hayward allegedly stole were trade secrets. Nor have they asserted, at a bare

11

minimum, which documents or information they shared with the investigator. Their supporting declarations lack any facts to establish that any trade secrets were actually shown or told to the investigator. Indeed, Defendant Ningbo C.F. refused to disclose the source or suppliers of the blades used in their salt cell products, advising the investigator that the information was the company's confidential information. *See* (Dinu Dec. ¶ 7). The investigator has also confirmed that he did not see or take any documents related to Defendants' suppliers. *See id.*

Hayward has repeatedly informed Defendants, through discovery responses and written communications, that Hayward and its employees do not have any documents related to the investigation other than those that have already been produced. *See* (Donoian Dec. ¶¶ 2-3).

Therefore, Defendants cannot meet their burden to show that they have a "substantial need" for the investigation documents. *See* Fed. R. Civ. P. 26(b)(3)(A)(ii). Although certain factual portions of opinion work product may be discoverable upon a showing of "substantial need," no such need has been demonstrated here. The underlying facts of the investigation have already been produced and Defendants may discover the facts through deposition of fact witnesses, including Hayward's investigator. Moreover, Hayward's investigator did not take any documents other than those Hayward has already produced, and none of which contain a trade secret.

Courts in this circuit have recognized that generally there is no substantial need for a document protected by the work-product doctrine when the requesting party can gather the information contained within the document by way of deposition. *Lewis v. Richland Cty. Rec. Comm'n*, 2018 U.S. Dist. LEXIS 163801, *21-22, 2018 WL 4596119 citing *Trammell v. Anderson College,* 2006 U.S. Dist. LEXIS 48775, 2006 WL 1997425, *2 (D.S.C. July 17, 2006) (denying motion to compel where investigator's report was work product, and employee of investigator could be deposed); *Hohenwater v. Roberts Pharmaceutical Corp.*, 152 F.R.D. 513, 516-17

12

(D.S.C.1994) (finding no substantial need or undue hardship where requesting party could depose those who participated in preparation of work product memorandum); *United States v. Bertie Ambulance Serv., Inc*., No. 2:14-CV-53-F, 2015 U.S. Dist. LEXIS 83537, 2015 WL 3932167, *7 (E.D.N.C., June 25, 2015) (declining to compel production of interview notes of two deceased witnesses based on the parties' failure to show substantial need or undue hardship when they "failed to show any measures taken to try to obtain the information from another source"); *Long*, 204 F.R.D. at 138 (holding the plaintiffs failed to show undue hardship to obtain an interview transcript because the plaintiffs could discover the names of the individuals interviewed and conduct their own interviews or depositions); *See also Revak v. Miller*, No. 7:18-CV-206-FL, 2020 WL 1164920, at *10 (E.D.N.C. Mar. 9, 2020) (Court declined to compel production of interview and memorandum on the basis that they are protected work product and Plaintiff did not show substantial need as Plaintiff may depose witnesses to obtain substantially equivalent information without undue hardship).

Following the analysis in *Lively*, *supra*, the court assessed whether the opinion work product was nevertheless discoverable to plaintiff if it could show that it had substantial need for the materials to prepare its case and could not, without undue hardship, obtain their substantial equivalent by other means. *Lively*, at *2. The Lively court found that plaintiff did not show a substantial need for the document at issue, mainly because plaintiff could discover facts known to the investigators, as well as the methods used by the investigators, noting that "[s]uch discovery efforts, however, should seek only the investigators' factual knowledge; for example, questions directed to an investigator during a deposition should be 'carefully tailor[ed] . . . so as to elicit specific factual material and avoid broad based inquiries . . . which could lead to the disclosure of trial strategies.'" *Id*., (quoting *Bear Republic Brewing Co. v. Central City Brewing Co*., 275 F.R.D.

13

43, 45-46 (D. Mass. 2011)) (stating that plaintiff was "entitled to discover the facts which were learned by the investigator during the course of his investigation" but, under work product privilege (and absent waiver), not documents or other tangible things that investigator prepared in anticipation of litigation).

Like the plaintiff in *Lively*, Defendants here are free to depose Hayward's investigator to inquire about any *observations* he made during his visit to Ningbo, C.F. Defendants have not done so, despite having over a year to conduct such discovery.[3]

Further, Defendants not only fail or neglect to identify specific trade secrets allegedly stolen by Hayward's "spy," they fail to advise the Court that they possess this information themselves. They have surveillance camera videos, stills from which they have filed in this action, and they know what, if any, documents were shown to the investigator because they are all in their possession, custody and control. *See* (Defendant Ningbo C.F.'s Answer and Counterclaims (Doc No. 59) at pp. 49 and 52). Defendants' possession of this security footage and any trade secret documents diminish any justifiable "substantial need" for privileged opinion work product by Hayward.

Thus, the information contained in the investigative reports or correspondence relating to his investigation has either already been disclosed or equally available to Defendants and there is

---

[3] Ningbo, C.F. filed its answer and counterclaims in September 2021 and asserted, *inter alia*, claims for misappropriation of trade secrets and fraudulent misrepresentation. After serving discovery on Hayward, Ningbo then received Hayward's initial privilege log listing documents concerning the investigation in February 2022. Over seven months later, on September 16, 2022, Defendants finally served notices of deposition for Zhenyu Dong and Tiberius Dinu, Operations Managers at Panoramic Consulting Limited (PCL). But Defendants did not subpoena them. On December 7, 2022, Defendants served another set of deposition notices to Mr. Dong and a notice of depositions to "employees of Panoramic Consulting Limited," none of whom are employees of or controlled by Hayward. Again, they did not subpoena them.

14

no "substantial need" to necessitate production of the documents at issue much less to order the production of mental impressions and opinions contained in the investigative reports.

### C. The Crime-Fraud Exception Has No Application Here

#### 1. Hayward's Pretext Investigation Was Legal

Defendants' sole argument for invoking the crime-fraud exception is premised upon the investigator entering Ningbo C.F.'s facilities and speaking with Ningbo's employees under the guise of a potential customer. Defendants then make the conclusory allegation that the investigator somehow "assessed Ningbo C.F.'s confidential trade secret information, including customer and supplier lists, product formulas and designs, and other sensitive business information" and that such behavior is within the crime-fraud exception. (Doc No. 94, Defendants' Motion to Compel, 9-10). Not only is this pure speculation, it is false. Tellingly, Mr. Chen's declaration does not identify any of these trade secrets in sufficient detail or state that they were even shown to the investigator. This is only because the investigator did not observe or take any trade secrets. There is also no explanation why the investigator would hire and bring two quasi-governmental notaries public to witness and record an alleged trade secret heist.

##### a. Pretextual investigations are essential in litigating Intellectual Property cases

As for the investigation into Defendants' infringement of Hayward's intellectual property and Defendants' false advertising of its products, including misrepresentations as to the origin and manufacture of Defendants' products, it is common in trademark infringement litigation to engage in pretext investigations of the apparent infringement to make reasonably sure that the facts support the allegations. Private investigators hired by counsel are among the prototypical "representatives" covered by the work product rule. This was established decades ago by the Supreme Court in *U.S. v. Nobles,* 422 U.S. 225 (1975): "[A]ttorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that

15

the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself." Cases since then have consistently followed this holding. *See Costabile v. Co. of Westchester, New York,* 254 F.R.D. 160, 164 (S.D.N.Y. 2008) (denying adversary's motion to compel production of investigator's report, citing cases, and noting: "The work product doctrine protects not only materials which are prepared by attorneys themselves, but also by their agents . . . include[ing] those who are enlisted by legal counsel to perform investigative or analytical tasks to aid counsel in preparing for litigation.").

Furthermore, the majority of federal cases confirming the propriety of litigants using "undercover" investigators to develop evidence for intellectual property cases have held that such investigative techniques are both proper and often necessary, particularly where the relevant information being sought is difficult or even impossible to obtain through other means. *See, e.g. Gidatex S.r.L. v. Campaniello, Imports, Ltd.*, 82 F.Supp. 2d 119, 123 (S.D.N.Y. 1999), citing and quoting *Apple Corps. v. International Collectors Society*, 15 F.Supp.2d 456, 475 (D. N.J. 1998):

> The prevailing understanding in the legal profession is that a public or private lawyer's use of an undercover investigator to detect ongoing violations of the law ***is not ethically proscribed,*** especially where it would be difficult to discover the violations by other means.

(Emphasis added.)

In *Gidatex*, counsel for a furniture manufacturer retained private investigators who secretly taped conversations with a terminated distributor's salespeople in an effort to gain evidence in a trademark infringement suit. The Court held that this conduct did not violate New York's rule against attorney misrepresentations, noting that "hiring investigators to pose as consumers is an accepted investigative technique, not a misrepresentation." The Court concluded that ethical rules "should not govern situations where a party is legitimately investigating potential unfair business

practices by use of an undercover posing as a member of the general public engaging in ordinary business transactions with the target." In *Apple Corps Ltd. v. Int'l Collectors Society*, 15 F.Supp.2d 456 (D.N.J. 1998), a trademark, copyright, and right of publicity case, the court found using undercover investigators posing as customers to identify ongoing violations of a consent decree did not violate New Jersey's prohibition on attorney misrepresentations, observing that "[t]he prevailing understanding in the legal profession is that a public or private lawyer's use of an undercover investigator. . . is not ethically proscribed, especially where it would be difficult to discover the violations by other means." *See also Nikon, Inc. v. Ikon Corp.*, 803 F.Supp. 910, 921-922 (S.D.N.Y. 1992), *aff'd*, 987 F.2d 91, 95-96 (2d Cir. 1993) (evidence of investigators' interviews with non-party sales clerks admitted as the only way to show "passing off" and actual confusion among consumers); *see also Louis Vuitton S.A. v. Spencer Handbags Corp.*, 597 F. Supp. 1186, 1188 (E.D.N.Y.1984), aff'd, 765 F.2d 966 (2d Cir. 1985) (affirming permanent injunction issued after considering secretly recorded videotape of defendants' principals meeting with undercover investigator hired by plaintiff to discuss counterfeiting scheme); *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*, No. 96 Civ. 9721 PKL THK, 2002 U.S. Dist. Lexis 16323 (S.D.N.Y. Sept. 3, 2002) (investigator who posed as a buyer and recorded video of employees, did not violate any laws or rules of ethics).

   b. <u>Use of pretext investigations is accepted in China</u>

   Similarly, to the extent it is relevant here, it is common practice in China for investigators to conduct investigations posing as a buyer as a pretext to support administrative and criminal raids and civil litigation against Chinese infringers. These investigations are regularly acknowledged and approved in favorable civil judgments issued by Chinese People's Courts, which recognize the validity and necessity of these investigations due to the covert nature of the infringers' activity.

*See* (Plane Dec. ¶¶ 5-7) (citing Article 7, paragraph 1 of the Several Provisions on Evidence in Civil Litigation of Intellectual Property, issued on November 18, 2020) ("Where a rightsholder, in order to uncover or prove intellectual property rights infringements, poses as an ordinary buyer and itself purchases or entrusts others to purchase infringing goods from an alleged infringer, the samples, invoices, etc., it obtains can be used as evidence to prosecute the alleged infringer for infringement.").

It is also customary for investigators to have notaries public accompany them to witness and formally preserve evidence of infringers' activity. Notarization of evidence is performed to certify the authenticity and legality of a civil legal act, a document or a fact of legal significance. *See* (Plane Dec, ¶¶ 8, as noted in Article 2 of Notary Law of the People's Republic of China (2017 Amendment)) (the "Notary Law"). Notaries are appointed in accordance with the Notary Law and are permitted to sign and issue notary reports pursuant to Article 5 of the Notary Law and the Notarial Procedure Rules (2020 Amendment) (the "Notarial Procedure Rules")Notarial Procedure Rules. *See* (Plane Dec., ¶¶ 9 and 10). A notary's application is approved by the local judicial department and appointment is made by the judicial department of the State Council. Further, "[t]he notarized civil legal act, fact and document of legal significance shall be considered as the basis for determining facts, unless there is contrary evidence which suffices to overturn the notarization." *See* (Plane Dec. ¶¶11-12). If Hayward were truly trying to steal Ningbo's secrets, why would the investigator bring notaries to authenticate the evidence?

Here, Hayward hired investigators in China to confirm the Defendants' infringing conduct, false advertising, and the relationship among the Defendants Ningbo and Blueworks and their

common ownership or control by Mr. Chen. [4] *See* (Dinu Decl. ¶ 2); (Doc. No. 10-2 ¶ 3); (Plane Decl. ¶ 14). Indeed, the Court's order, dated May 28, 2021, (Doc. No. 31), found the Defendants were alter egos based in large part on Hayward's declarations, including its investigator, in opposition to Defendants' Motion to Dismiss (Doc. No. 23).

If an attorney's retention of private investigators does not violate any ethical norms or is not proscribed for attorneys under ethical rules of conduct or codes of professional responsibility, it is difficult to imagine it constitutes a fraud or other crime. To hold otherwise would disregard the code of ethics and pervert the privileges Hayward is asserting here.

### 2. Defendants Cannot Make a Prima Facie Showing of Fraud

Defendants try to place the burden on Hayward to prove its privileged documents are privileged yet fails to acknowledge that the initial burden is on ***Defendants*** as the movant to make a *prima face* showing of any purported crime or fraud in order to apply the crime-fraud exception. The obvious reason for this failure is that the exception simply does not apply.

"The crime-fraud exception to the attorney-client privilege provides that a client's communications with an attorney will not be privileged if made for the purpose of committing or furthering a crime or fraud." *In re Grand Jury Subpoena,* 884 F.2d 124, 127 (4th Cir.1989). "The **burden rests with the moving party of proving that the crime/fraud exception applies to the non-moving party's privileged documents."** *In re Grand Jury Proceedings #5 Empaneled Jan. 28, 2004,* 401 F.3d 247, 251 (4th Cir. 2005) (emphasis added). The "party invoking the crime-fraud exception must make a *prima facie* showing that (1) the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme, and (2)

---

[4] As an initial matter, Hayward is not aware of the chemical composition of the coating used on the blades in its salt cells as this information is proprietary to its sole supplier of ruthenium coated blades. Renken Dec. ¶¶3-7.) Hayward, therefore, has no desire or need to discover this information, legitimately or surreptitiously, from Defendants or from any other company.

19

the documents containing the privileged materials bear a close relationship to the client's existing or future scheme to commit a crime or fraud." *Id.* (citing *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir.1999)).

In assessing whether the movant has established a *prima facie* case, "the pleadings are not evidence. Bare allegations will not supply the prima facie predicate necessary to invoke the crime-fraud exception to the attorney client and work-product privileges." *S. Scrap Material Co. v. Fleming*, No. CIV.A.01-2554, 2003 WL 21474516, at *8 (E.D. La. June 18, 2003) (emphasis added); *In re Grand Jury Subpoena,* 419 F.3d 329, 336 (5th Cir. 2005) ("Allegations in pleadings are . . . not sufficient to make a *prima facie* showing."). Thus, Defendants' attempt to use the crime-fraud exception fails for that reason alone.

Here, Defendants have not made a *prima face* showing that Hayward engaged in criminal or fraudulent activity. Defendants rely solely upon their conclusory allegation that Hayward allegedly misappropriated Ningbo C.F.'s trade secrets but put forth no concrete evidence to support their speculative claim (there is none). This is insufficient to make the requisite showing that Hayward or any of its agents sought legal advice in furtherance of a planned or continuing illegal or fraudulent scheme or activity. *See Mfg. Automation & Software Sys. Inc. v. Hughes*, No. CV 16-8962-CAS (KS), 2017 WL 11630961, at *12 (C.D. Cal. Dec. 1, 2017) (finding, where plaintiff's investigator was hired before litigation commenced and nothing in the record suggested the client sought legal advice in furtherance of an illegal scheme or activity, there was insufficient evidence to invoke crime-fraud exception and denied motion to compel privilege documents.)

Defendants' reliance on *Sunrise Assisted Living, Inc. v. Sunrise Healthcare Corp.*, No. CIV.A. 98-1702-A, 1999 WL 33798757, at *2 (E.D.V.A. Apr. 9, 1999) and *Flexible Benefits Council v. Feltman,* No. 1:08 CV 371 JCC, 2008 WL 4572511, at *4 (E.D.V.A. Oct. 8, 2008), to

support their position is misplaced. In *Sunrise*, the alleged fraud arose from an elaborate, multi-layered scheme and apparently pursued on the advice of defendants' counsel. *Id*. at *1. After review of the evidence, the court found that the plaintiff had made out a *prima facie* case that, during defendants' acquisition of the plaintiff's corporate mark, defendants and their agents misrepresented material facts to plaintiff, and that the record indicated the defendants' attorney may have participated in the alleged scheme. *Id*.at *2. Thus, the crime-fraud exception applied. Similarly, in *Flexible Benefits*, the defendants engaged in fraudulent acts in furtherance of their scheme to steal plaintiff's corporate identity, including reserving similar trade names, acquiring a confusingly similar domain name and website, filing misleading trademark applications for plaintiff's name and logo, and actively concealing all of these actions. *Id*. at *5. The Court held that the plaintiff met its burden of proof and showed that the documents plaintiffs sought to compel involved communications between the defendant and his attorney intended to further a present scheme of fraudulent or tortious act. *Id*.

*Sunrise* and *Flexible Benefits* stand in stark contrast to the facts before this Court. Hayward and Defendants did not engage in any negotiations. Hayward did not acquire anything from Defendants. Hayward did not misrepresent any material facts. There are no communications with counsel in furtherance on any alleged fraudulent acts. There was no elaborate scheme.

Simply put, the crime-fraud exception does not apply here because there was no crime and there was no fraud. Although Defendants called the police to their offices in China, Hayward's investigator was not detained once police learned he was conducting a trademark investigation, and he was never arrested or charged with a crime.

**D.     Hayward Has Not Waived Any Privilege by Partial Disclosure to Third Parties**

Lastly, Defendants argument that Hayward waived privilege over its attorney-client communications and opinion work product by disclosing facts to Ningbo, C.F. in court pleadings or to Ningbo Police Officers is nonsensical.

Defendants point to Hayward's submission of the Declaration of Mr. Tiberius Dinu as an example of this purported waiver. The Dinu Declaration was submitted in support of Hayward's Motion for Alternative Service (Doc No. 10). In the declaration, Mr. Dinu attested to the facts uncovered when his investigative agency sent an investigator to Ningbo C.F. to confirm the relationship between Ningbo and Blueworks. Defendants disingenuously state that the Dinu Declaration "appears" to refer to additional unproduced communications, but they do not point to any paragraph in the declaration to support this suspicion. Instead, Defendants cite to Hayward's privilege log. (Doc No. 94, Defendants' Motion to Compel, at 12). Defendants do not cite to the declaration itself because Mr. Dinu's declaration only sets forth *the facts* uncovered in the investigation. That is not a disclosure of privileged information nor a basis that any privilege is waived. *See In re Fluor Intercontinental, Inc.*, 803 F. App'x 697 (4th Cir. 2020) (finding privilege not waived where contractor did not disclose protected communications by quoting or substantively summarizing them, but rather disclosure merely covered same topic as internal investigation or stated that it was made pursuant to advice of counsel, and disclosure did no more than describe contractor's general conclusions about propriety of employee's conduct); *see also DGM Invs., Inc. v. New York Futures Exch., Inc.,* 224 F.R.D. 133, 141 (S.D.N.Y. 2004) (New York Board of Trade did not waive investigatory privilege as to pending disciplinary action as result of its vice president's sworn statement concerning his involvement in investigations and analyses of trading in futures contracts, where statement did not specifically refer to business

conduct committee report in question, or reveal details of any underlying investigation related to report.).

Defendants' reliance on *Brown v. Town of Front Royal*, No. 5:21-cv-00001, 2022 WL 992740, at *6 (W.D.V.A. Mar. 31, 2022) does not support their position. *Brown* involved claims of discrimination, retaliation, and harassment that arose out of the termination of plaintiff's employment with defendant. After plaintiff complained about harassment, defendant hired counsel to advise the defendant as it related to plaintiff's complaint. During discovery, plaintiff sought to obtain information about defendant's attorney's role in both the investigation of the plaintiff's complaint and plaintiff's termination through deposition of defendant's 30(b)(6) witness. Plaintiff asserted the attorney-client privilege because the attorney conducted the investigation and the defendant had voluntarily disclosed portions of the advice it received from the attorney, citing to the EEOC Position Statement. The Court found that the defendant's statement to the EEOC did not disclose the contents of its attorney's advice. The Court also found that the defendant's statement to the EEOC did not put advice of counsel "at issue" as to plaintiff's termination as it did not assert reliance on the advice of counsel as an affirmative defense. Similarly here, nothing in Hayward's statements in pleadings and in declarations submitted to this Court or in any responses to discovery reveal the content of legal advice. Thus, there is no waiver of privilege.[5]

_____

[5] Defendants citations to *Doe 1 v. Baylor Univ.*, 335 F.R.D. 476, 488 (W.D. Tex. 2020) and *Windsor Secs, LLC v. Arent Fox LLP*, 273 F. Supp. 3d 512, 519 (S.D.N.Y) are similarly inapposite. In contrast to Hayward, the defendants in *Doe 1* relied extensively on elements of its counsel's work in defending the litigation and negating liability. This reliance upon a law firm's investigatory work to defend itself was central to its defense, as it repeatedly referenced the investigation in answers to the plaintiffs' complaints and opposing a motion to dismiss, "repeatedly invoked [the investigation] to limit questioning in depositions," and even published a 755-page external report about the investigation and recommendations. *See id.* at 482, 485-86, 488-490 (noting that referring to work product in pleadings can be interpreted as "relying on" work product). This even led the judge to warn that it would "risk waiving work product protection if it directly invoked [the investigation] as part of a substantive defense to Plaintiffs' claims in the future." *Id.*

Hayward's investigator's statement to the Ningbo Police Officers also is not a waiver of any privilege. There, the investigator explained to the police, called by Ningbo to its premises, that he was retained to investigate and confirm information concerning Ningbo, C.F., namely the relationship between Ningbo and Blueworks. Again, the investigator in no way disclosed any privileged or confidential information. Defendants' citation to *Chestnut v. Kincaid*, No. CV LKG-20-2342, 2022 WL 294532, at *3 (D. Md. Feb. 1, 2022) does not help them either. The court in *Kincaid* only waived work product privilege over a letter sent by the investigator to a receiving party who possessed adverse interests to those of the plaintiff, noting that the "Letter was thus not sent between two parties with a common interest," waiving work product protection *Id*. Notably, plaintiff offered no argument as to why the Letter was protected as work product, and in fact failed to mention the Letter at all in its response. *Id*. Additionally, the court also denied defendant's motion to compel plaintiff's investigator's notes from witness interviews where defendants had access to the witnesses at issue. *Id*. at 4.

III.    **CONCLUSION**

For the foregoing reasons, Hayward respectfully requests that this Court deny Defendants' Motion to Compel Discovery.

---

at 490. The court in *Windsor* found no waiver, holding that case law "frequently ends the inquiry into 'at issue' waiver once it is established that the party does not intend to use [privileged] materials as proof." The court noted that an "at issue" waiver might occur "where a party affirmatively places the subject matter of its own privileged communication at issue in litigation, so that invasion of the privilege is required to determine the validity of a claim or defense of the party asserting the privilege, and application of the privilege would deprive the adversary of vital information." Id. at 518. Defendant's illogical assertion that Hayward's mere reference to the investigation that was conducted results in a finding that Hayward placed the subject matter of its own privileged communications at issue and waived privilege is not bound by reasonableness.

Respectfully submitted this the 16th day of December, 2022,

**HAYWARD INDUSTRIES, INC**.


 s/  *Russ Ferguson*
Russ Ferguson (N.C. Bar No. 39671)
**Womble Bond Dickinson (US) LLP**
One Wells Fargo Center
Suite 3500
301 South College Street, Suite 3500
Charlotte, NC 2202
Russ.Ferguson@wbd-us.com

Erik Paul Belt*
Anne E. Shannon*
Alexander Ried*
James Donoian*
**MᶜCARTER & ENGLISH, LLP**
265 Franklin St.
Boston, Massachusetts 02110
Tel: (617) 449-6500
ebelt@mccarter.com
ashannon@mccarter.com
aried@mccarter.com
jdonoian@mccarter.com

* Admitted *pro hac vice*

*Attorneys for Plaintiff Hayward Industries, Inc.*

25