# EXHIBIT A

# Exhibit 1, Part A

**STATEMENT OF RESPONSIBILITY**

My name is Nicholas Michael Didow, PhD, and I am responsible for the design, conduct, and analysis of the study summarized and reported in this document.

This study was designed and conducted consistent with general survey research and consumer measurement practices documented in established treatises including Churchill, G. A. and Iacobucci, D. *Marketing Research: Methodological Foundations* (9th ed.) Thomson South-Western (2005); Fowler, F. J. *Survey Research Methods* (3rd ed.) Sage Publications (2002); and Nunnally, J. *Psychometric Theory* (2nd ed.) McGraw Hill (1978). This study was also designed and conducted consistent with survey research standards as documented in Morgan, F. W. "Judicial Standards for Survey Research: An Update and Guidelines" *Journal of Marketing*, 1990, *54*, 59-70, and Diamond, S. S. "Reference Guide on Survey Research" *Reference Manual on Scientific Evidence* (2nd ed.) Federal Judicial Center: West Group (2000), 229-276.

The direct cost of this study was $27,332.86.

My professional qualifications, publications, and recent testimony are included in a section of the report titled, "Expert Qualifications."

Nicholas Michael Didow, PhD
September 30, 2008



CaseCase 3:20-cv-00741-00168-DMS-DTO DoDocument 135-3-1 FileFiled 12/06/08/23 PagePage 23 of 84

**EXECUTIVE SUMMARY**

This study investigates the cookware trade dress infringement issues claimed by Meyer Corporation US against Belk's private label Biltmore Estate cookware. The double blind study uses a series of cookware pictures and actual cookware items and their boxes as stimuli to briefly examine the question of secondary meaning for Anolon Advance's claimed unique features and distinctive designs, and to extensively examine the question of likelihood of confusion between Anolon Advanced and Biltmore using multiple measures in 42 twenty-five minute one-on-one personal interviews conducted at a professional research facility in Raleigh, NC, on August 18 and 19, 2008.

The study finds evidence of secondary meaning for Anolon Advanced cookware coming from the unique features or distinctive designs of its handles that particularly identify it and its maker to most consumers and ordinary buyers.

Using different research stimuli and multiple measures of the likelihood of confusion, this study results in eighteen numerical estimates of the likelihood of confusion between Anolon Advanced and Biltmore, ranging from a low of 19% to a high of 78.6% likelihood of confusion. It is possible to calculate a point estimate or mean using the average of the distribution, as well as a standard deviation to enable the calculation of confidence intervals for the mean. The mean or average of these eighteen estimates is a 56.6% likelihood of confusion between Anolon Advanced and Biltmore, with a standard deviation of 21.1%.



Case 3:20-cv-00710-MOC-DSC Document 135-13 Filed 12/06/23 Page 4 of 84

## TABLE OF CONTENTS


| **Section** | **Page** |
|---|---|
| Statement of Responsibility | 1 |
| Executive Summary | 2 |
| Table of Contents | 3 |
| Introduction | 4 |
| Method | 4 |
| Summary of Findings | 6 |
| Secondary Meaning Measures | 6 |
| Questions 4-6 | 6 |
| Overall Conclusion on Secondary Meaning Measures | 7 |
| Likelihood of Confusion Measures | 7 |
| Questions 7-11 | 7 |
| Questions 12-17 | 9 |
| Questions 18, 19, and 20 | 11 |
| Viewing Biltmore and Anolon Advanced Side by Side | 12 |
| Questions 21-28 | 14 |
| Overall Conclusion on Likelihood of Confusion Measures | 17 |
| Research Project Setting | 18 |
| Participant Recruiting and Resulting Profile | 29 |
| Data Tabulation by “Double Blind” Interview Script Question and Research Task | 32 |
| Expert Qualifications | 63 |




Case 3:20-cv-00710-MOC-DSC Document 135-1 Filed 12/26/18/23 Page 4 of 25 of 84

## INTRODUCTION

The objective of this study is to investigate the cookware trade dress infringement issues claimed by Meyer Corporation US against Belk's private label Biltmore Estate brand cookware (Biltmore). The Meyer Corporation US cookware brand is Anolon Advanced cookware (Anolon Advanced). This study briefly examines the issue of secondary meaning for Anolon Advanced based on the claimed unique features and distinctive designs of their cookware, and the study extensively examines the issue of the likelihood of confusion between Anolon Advanced and Biltmore by most consumers and ordinary buyers.

## METHOD

The study uses a combination of several cookware pictures and actual cookware items and their boxes as stimuli for a series of open-end and closed-end questions. The stimuli were the following stainless steel cookware sets and their boxes: Belk Biltmore Estate 10-piece set stainless steel; Anolon Advanced Clad 10-piece set; Calphalon Tri-Ply Stainless; Farberware Advantage Stainless 10pc set; and, Revere 7-piece 18/10 Stainless Steel set.

Multiple measures are particularly used to assess the likelihood of confusion between Anolon Advanced and Biltmore. The study uses a double-blind interview format wherein neither the interviewer nor the participants know the sponsor or purpose of the study.

One single interviewer was personally selected, trained, and supervised on site by the researcher during the duration of the study. The study was conducted on August 18 and 19, 2008, using facilities at L&E Research in Raleigh, NC. L&E Research staff knew only that this was a study about cookware.

44 study participants were professionally recruited by L&E Research using screener questions specific to this study, as well as being screened by standard consumer research questions. Recruiting was done using quasi-random selection of potential participants from L&E Research's company database of about 55,000 adults who live in the Raleigh, NC, area. Participants were screened to best describe themselves as generally shop at stores like Macy's, Belk, and Linens N Things; adult head of household; and either



CaseCase 3:20-cv-00710-MOC-DSC Document 135-1 Filed 12/26/23 Page 5 of 28 / 3:08-cv-00168 Document 13-1 Filed 09/03/08 Page 6 of 84

had purchased cookware in the past two years or so, or were considering purchasing cookware in the next two years or so.

42 of the recruited 44 potential participants showed up to participate in the study. Each participant was paid an honorarium of $45 for being in the study. Participants were scheduled for one-on-one interviews at 30 minute intervals from 9:00 a.m. to 9:00 p.m. on August 18 and 19. Most interviews lasted about twenty-five minutes. Each entering participant was kept isolated from each exiting participant to avoid any contamination across participants.

The one-on-one interviews were conducted by a single interviewer throughout the study. She was selected, trained, and supervised by the researcher throughout the study. The interviewer strictly followed the script with each participant, reading each question sitting next to each participant and indicating their answer, including recording verbatims. The interviewer did not deviate from the interview script she was provided. The interview script with data tabulation is presented later in this report.

The study was conducted in a large room at L&E Research that is often used for focus groups and hence has a viewing mirror from an adjacent room with speakers to enable the researcher to view and hear the conduct of the study by the interviewer. The researcher personally observed and listened to each interview from behind the viewing mirror.

The interview room was arranged with a small work table for the interviewer and each participant, a large table on which four cookware sets and their boxes (Anolon Advanced, Calphalon, Farberware Advantage, and Revere) were displayed similar to the merchandising practices of several leading retailers in the area and a fifth cookware set (Belk Biltmore) and its box was initially covered on the large table, and a long table against one of the walls of the room.

Detail on the research project setting, participant recruiting and resulting profile, and data tabulation by double-blind interview script question and research task is provided later in this report.

**SUMMARY OF FINDINGS**

**Secondary Meaning Measures**

**Questions 4-6**

Questions 4 and 5

In question 4 of the interview survey each participant was asked which brands of cookware they could name. There was no unaided awareness of Biltmore brand cookware. Three participants named "Anolon" brand cookware. These three participants with unaided awareness of Anolon brand cookware were then asked in question 5:

*Does **Anolon** cookware have unique features or distinctive designs that particularly identify it and its maker to most consumers and ordinary buyers?*

**0% (0)** ___ no
**2.4% (1)** ___ don't know
**4.8% (2)** ___ yes

The two participants who said "yes" were then asked:

*If "yes", what features or designs are unique or distinctive, how you would describe them?*

The verbatims of their responses were:

*"Cushioned handles"*

and

*"Grip handles don't slip, won't get hot; positioned like Calphalon – heavy, high quality; glass lids"*

Question 6

Each participant was taken to view four sets of cookware displayed on the large table – Anolon Advanced, Calphalon, Farberware Advantage, and Revere – along with their boxes. The order of presentation of each set of cookware was rotated.

While viewing the Anolon Advanced cookware, each participant was asked question 6:

*Does the Anolon Advanced cookware have unique features or distinctive designs that particularly identify it and its maker to most consumers and ordinary buyers?*

**7.1% (3)** ___ no
**0% (0)** ___ don't know
**92.9% (39)** ___ yes



CaseCase 3:20-3:v-00-707-100-M1OC-DSC Do Document 135-1-1 File Filed 12/06/23 Page Page 7 of 28 of 84

92.9% (39 of 42) participants responded “yes” to this question. Each of the 39 was then asked a follow up question:

*If “yes”, what features or designs are unique or distinctive, how you would describe them?*

97.4% (38 of the 39) of those who answered “yes” said the Anolon Advanced “handles” or “grips” were unique features or distinctive designs that particularly identify it and its maker to most consumers and ordinary buyers.

**<u>Overall Conclusion on Secondary Meaning Measures</u>**

My opinion is that this is evidence of secondary meaning for Anolon Advanced cookware coming from the unique features or distinctive designs of its handles that particularly identify it and its maker to most consumers and ordinary buyers.

## Likelihood of Confusion Measures

**Questions 7-11**

Each participant returned to the small table and sat with their back to the cookware displays on the large table. Without looking back at the large table, each participant was asked to look at a series of six pictures of two paired cookware items – one picture at a time – and answer the following questions while looking at each picture:

*Would most consumers and ordinary buyers think these cookware products are put out by the same company, are put out by different companies, or you don’t know?*

___ put out by the same company
___ put out by different companies
___ don’t know

*Would most consumers and ordinary buyers think they are put out by companies that are affiliated, connected or associated with one another, they are put out by companies that are not affiliated, connected or associated with one another, or you don’t know?*

___ put out by companies that are affiliated, connected or associated with one another
___ put out by companies that are not affiliated, connected or associated with one another
___ don’t know

Two of the six pictures (questions 7 and 10) portrayed a pair of Anolon Advanced products (question 7) and Biltmore products (question 10).

Question 7

95.2% (40 of the 42) of those looking at the picture of two Anolon Advanced products correctly responded that these were put out by the same company and 4.8% (2 of the 42) responded incorrectly that these were put out by different companies. 1 of these 2 respondents then indicated that though put out by different companies, they believed the cookware was put out by companies that were affiliated, connected or associated with one another.

Question 10

95.2% (40 of the 42) of those looking at the picture of two Biltmore cookware products correctly responded that these were put out by the same company, 2.4% (1 of the 42) responded incorrectly that these were put out by different companies, and 2.4% (1 of the 42) responded they did not know. The one participant who indicated the products were put out by different companies believed the cookware was put out by companies that were nonetheless affiliated, connected or associated with one another. One respondent maintained that they did not know.

**Conclusion**

Participants could overwhelmingly correctly identify that the two same brand cookware items pictured in questions 7 and 10 were both put out by the same company for both the Anolon Advanced cookware products and for the Biltmore cookware products. This provides evidence that picture tasks like these are reasonable for participants to process and execute.

Questions 8, 9, and 11

The pictures for questions 8, 9, and 11 contained pairings of one Anolon Advanced cookware product next to one Biltmore cookware product. Each participant was asked the same set of questions while viewing each of these three pictures:

*Would most consumers and ordinary buyers think these cookware products are put out by the same company, are put out by different companies, or you don't know?*

___ put out by the same company
___ put out by different companies
___ don't know

*Would most consumers and ordinary buyers think they are put out by companies that are affiliated, connected or associated with one another, they are put out by companies that are not affiliated, connected or associated with one another, or you don't know?*

___ put out by companies that are affiliated, connected or associated with one another
___ put out by companies that are not affiliated, connected or associated with one another
___ don't know

The survey response standard that indicates no trade dress infringement would be only the second response to each of these questions – that every participant upon viewing the Anolon Advanced and Biltmore products together would be able to discriminate between the two based on the unique features or distinctive designs of each.

Question 8

38.1% (16 of the 42) of those looking at the picture of an Anolon Advanced cookware product beside a Biltmore cookware product incorrectly responded that these were put out by the same company, 57.1% (24 of the 42) responded that these were put out by different companies, and 4.8% (2 of the 42) responded they did not know. In response to the second question, 50% (21 of the 42) responded incorrectly that these two were put out by companies that are affiliated, connected, or associated with one another and an additional 19% (8 of the 42) responded that they did not know, while 31% (13 of the 42) responded correctly that the two cookware products were put out by companies that are not affiliated, connected, or associated with one another. Therefore, the likelihood of confusion by this measure is 50% plus 19% for a total of 69% (29 of the 42).

Question 9

In question 9, 38.1% (16 of the 42) of those looking at the picture of an Anolon Advanced cookware product beside a Biltmore cookware product again incorrectly responded that these were put out by the same company, 57.1% (24 of the 42) responded that these were put out by different companies, and 4.8% (2 of the 42) responded they did not know. In response to the second question, 57.1% (24 of the 42) responded incorrectly that these two were put out by companies that are affiliated, connected, or associated with one another and an additional 9.5% (4 of the 42) responded that they did not know, while 33.3% (14 of the 42) responded correctly that the two cookware products were put out by companies that are not affiliated, connected, or associated with one another. Therefore, the likelihood of confusion by this measure is 57.1% plus 9.5% for a total of 66.7% (28 of the 42).

Question 11

In question 11, 35.7% (15 of the 42) of those looking at the picture of an Anolon Advanced cookware product beside a Biltmore cookware product incorrectly responded that these were put out by the same company, 61.9% (26 of the 42) responded that these were put out by different companies, and 2.4% (1 of the 42) responded they did not know. In response to the second question, 54.8% (23 of the 42) responded incorrectly that these two were put out by companies that are affiliated, connected, or associated with one another and an additional 14.3% (6 of the 42) responded that they did not know, while 31% (13 of the 42) responded correctly that the two cookware products were put out by companies that are not affiliated, connected, or associated with one another. Therefore, the likelihood of confusion by this measure is 54.8% plus 14.3% for a total of 69% (29 of the 42).

**Conclusion**

These three measures result in likelihood of confusion estimates of 69%, 66.7%, and 69% respectively.

**Questions 12-17**

The next set of questions included pictures in which three cookware items were presented side by side in the picture. While viewing each picture, the participant was asked the following questions:

*Would most consumers and ordinary buyers think that more than one of these cookware items comes from the same company or affiliated companies?*

__ no
__ don't know
__ yes

If *"yes", which ones do you think come from the same company or affiliated companies?*

___ left
___ middle
___ right

The three cookware items in question 14 were all Anolon Advanced items and the three cookware items in question 16 were all Biltmore items. The standard for a correct answer while viewing each of these pictures would be that "yes," most consumers and ordinary buyers would think that each of these comes from the same company or affiliated companies.

Question 14

100% (42 of the 42) of those looking at the picture in question 14 correctly answered that more than one of these cookware items came from the same or affiliated companies and 97.6%, 92.9%, and 97.6% respectively correctly matched these cookware items together as coming from the same company or affiliated companies.

Question 16

97.6% (41 of the 42) of those looking at the picture in question 16 correctly answered that more than one of these cookware items came from the same or affiliated companies, while 2.4% (1 of the 42) said they did not know, and 97.6%, 100%, and 92.7% respectively correctly matched these cookware items together as coming from the same company or affiliated companies.

**Conclusion**

Participants could overwhelmingly correctly indicate that the cookware items pictured in question 14 and question 16 were all from Anolon Advanced and Biltmore respectively. This provides evidence that this picture task is reasonable for participants to process and execute.

Questions 12, 13, 15, and 17

The pictures for questions 12, 13, 15, and 17 contained three cookware items each of a different brand. Question 12 showed cookware by Anolon, Calphalon, and Biltmore. Question 13 included items from Farberware, Biltmore, and Anolon. Question 15 had items from Biltmore, Anolon, and Revere. Question 17 showed cookware items from Anolon, Calphalon, and Farberware.

The survey response standard that indicates no trade dress infringement for these questions would be for each participant to respond "no" to the question as to whether more than one of these cookware items comes from the same company or affiliated companies. Trade dress infringement is indicated to the extent that participants respond "yes" or "don't know" and the follow up question asking which they

think come from the same company or affiliated companies results in a pairwise estimate of likely confusion between the brands in each picture.

<u>Question 12</u>

Question 12 included cookware from Anolon, Calphalon, and Biltmore in the picture. 14.3% (6 of the 42) correctly responded that consumers and ordinary buyers would not think that more than one of these cookware items comes from the same or affiliated companies. 85.7% (36 of the 42) responded "yes" and the resulting pairwise matching of Anolon and Biltmore was 78.6% (33 of the 42).

<u>Question 13</u>

Question 13 included cookware from Farberware, Biltmore, and Anolon in the picture. 33.3% (14 of the 42) correctly responded that consumers and ordinary buyers would not think that more than one of these cookware items comes from the same or affiliated companies. 66.7% (28 of the 42) responded "yes" and the resulting pairwise matching of Anolon and Biltmore was 54.8% (23 of the 42).

<u>Question 15</u>

Question 15 included cookware from Biltmore, Anolon, and Revere in the picture. 21.4% (9 of the 42) correctly responded that consumers and ordinary buyers would not think that more than one of these cookware items comes from the same or affiliated companies. 78.6% (33 of the 42) responded "yes" and the resulting pairwise matching of Anolon and Biltmore was 76.2% (32 of the 42).

<u>Question 17</u>

The picture in question 17 included cookware from Anolon, Calphalon, and Farberware. A cookware item from Biltmore was not included in this picture. 83.3% (35 of the 42) correctly responded that consumers and ordinary buyers would not think that more than one of these cookware items comes from the same or affiliated companies.

**<u>Conclusion</u>**

These three measures result in likelihood of confusion estimates of 78.6%, 54.8%, and 76.2% respectively.

**Questions 18, 19 and 20**

Questions 18, 19 and 20 had each participant look at a picture of two different brand cookware items – one by Anolon and one by Biltmore -- and offer an opinion as to whether the two items were sufficiently similar in appearance as to result in confusion among most consumers and ordinary buyers as to whether they are put out by the same company or by different companies. Each participant was told to assume that the cookware products were put out by two difference companies.

The standard answer that would indicate no likelihood of confusion would be for each participant to respond "no" to the following question as they were asked:

*Assume that these cookware products are put out by two different companies. Are these two cookware products sufficiently similar in appearance as to result in confusion among most consumers and ordinary buyers as to whether they are put out by the same company or by different companies?*

___ yes
___ no
___ maybe
___ don't know

Any other response can be taken to indicate a likelihood of confusion for most consumers and ordinary buyers.

Question 18

In response to the picture for question 18, 28.6% (12 of the 42) responded "no", that the two cookware items were not sufficiently similar as to result in confusion. 71.4% (30 of the 42) responded in a manner that would reflect a likelihood of confusion.

Question 19

In response to the picture for question 19, 21.4% (9 of the 42) responded "no", that the two cookware items were not sufficiently similar as to result in confusion. 78.6% (33 of the 42) responded in a manner that would reflect a likelihood of confusion.

Question 20

In response to the picture for question 20, 23.8% (10 of the 42) responded "no", that the two cookware items were not sufficiently similar as to result in confusion. 76.2% (32 of the 42) responded in a manner that would reflect a likelihood of confusion.

**Conclusion**

These three measures indicate likelihood of confusion estimates of 71.4%, 78.6%, and 76.2% respectively.

**Viewing Biltmore and Anolon Advanced side by side**

Next, the interviewer and each participant moved back to the large display table and the interviewer uncovered the Biltmore cookware display. The interviewer then said:

*Now please look at the Anolon and Biltmore cookware displays on the table. What are your thoughts or impressions seeing the Biltmore and Anolon cookware side by side?*

In response to this open ended question, 61.9% (26 of the 42) of the participants said the Anolon Advantage and Biltmore cookware look identical, similar, very similar or something to that effect, as illustrated by the following verbatims each from a different participant:

*"They have very similar looking handles.   They (the two sets) look very similar."*

*"They look very similar."*

*"Their handles are very similar."*

*"They both have the same handles."*

*"They look like they're from the same company."*

*(Looking from one to the other) "Wow, wow, wow, wow!"*

*"They look like the same exact design, just different brands.   They look about the same.  … They're very close."*

*"The handles are so similar that it is hard to tell the difference between these two."*

*"They do look very similar.   Like if I saw them in a store side by side, I probably wouldn't know they were two different companies."*

*"They do look very similar – the design and the handles look very similar."*

*"They look very similar."*

*"Are they the same company?   Gosh, they are very similar.   If they weren't side by side, I'd have a hard time distinguishing between these."*

*"That's where the handles look very, very similar.   It looks like one is certainly trying to mimic the other."*

*"They look very similar.   If you had them separated, it would be hard to tell the difference."*

*"They look pretty similar…   As far as the grips, they look pretty similar."*

*"I think these could be made by the same company, you know, because of the grip and all."*

*"They look very similar.  …  Overall they look very similar in style."*

Two other spontaneous verbatims from elsewhere in the study are appropriate to note here:

(In response to Q19) *"If it's not the same company, it's a clone."*

(In response to Q8 and Q9) *"I think they are trying to copy each other."*

### Conclusion

This measure indicates a likelihood of confusion estimate of 61.9%. This is probably a lower bound estimate of likelihood of confusion as the two sets of cookware were viewed in close physical proximity. To the extent that the cookware sets are viewed physically or temporally separated – that is, not in close proximity, the likelihood of confusion would be even greater.

**Questions 21-28**

After viewing the two sets of cookware side by side and picking them up and closely inspecting them as many participants did for as long as they wanted to do so, each participant returned to the small table with their back to the display table and viewed another series of cookware pictures. Each picture showed either a Biltmore or an Anolon Advanced cookware item. Each participant was asked the following question:

*Is this cookware made by Biltmore or Anolon, or don't you know?*

___ Biltmore
___ Anolon
___ not sure, could be either

The standard answer that would indicate no likelihood of confusion would be for each participant to correctly identify the cookware item as Anolon Advanced or Biltmore. To the extent that the response is to misidentify the correct maker of the cookware item, or to respond saying "not sure, could be either" is an indication of likelihood of confusion.

Question 21

Question 21 included a picture of an Anolon Advanced cookware item. 61.9% (26 of the 42) of the participants correctly identified this item as Anolon. 14.3% (6 of the 42) incorrectly identified the item as Biltmore and 23.8% (10 of the 42) responded that they were not sure, it could be either. Therefore the likelihood of confusion estimate from this question is 38.1% (16 of the 42).

Question 22

Question 22 showed a picture of a Biltmore cookware item. 76.7% (32 of the 42) of the participants correctly identified this item as Biltmore. 14.3% (6 of the 42) incorrectly identified the item as Anolon and 9.5% (4 of the 42) responded that they were not sure, it could be either. Therefore the likelihood of confusion estimate from this question is 23.8% (10 of the 42).

Question 23

Question 23 showed a picture of a Biltmore cookware item. 31% (13 of the 42) of the participants correctly identified this item as Biltmore. 50% (21 of the 42) incorrectly identified the item as Anolon and 19% (8 of the 42) responded that they were not sure, it could be either. Therefore the likelihood of confusion estimate from this question is 69% (29 of the 42).

Question 24

Question 24 included a picture of an Anolon Advanced cookware item. 26.2% (11 of the 42) of the participants correctly identified this item as Anolon. 64.3% (27 of the 42) incorrectly identified the item as Biltmore and 9.5% (4 of the 42) responded that they were not sure, it could be either. Therefore the likelihood of confusion estimate from this question is 73.8% (31 of the 42).

Question 25

Question 25 included a picture of an Anolon Advanced cookware item. 66.7% (28 of the 42) of the participants correctly identified this item as Anolon. 16.7% (7 of the 42) incorrectly identified the item as Biltmore and 16.7% (7 of the 42) responded that they were not sure, it could be either. Therefore the likelihood of confusion estimate from this question is 33.3% (14 of the 42).

Question 26

Question 26 showed a picture of a Biltmore cookware item. 71.4% (30 of the 42) of the participants correctly identified this item as Biltmore. 19% (8 of the 42) incorrectly identified the item as Anolon and 9.5% (4 of the 42) responded that they were not sure, it could be either. Therefore the likelihood of confusion estimate from this question is 28.6% (12 of the 42).

Question 27

Question 27 included a picture of an Anolon Advanced cookware item. 69% (29 of the 42) of the participants correctly identified this item as Anolon. 19% (8 of the 42) incorrectly identified the item as Biltmore and 11.9% (5 of the 42) responded that they were not sure, it could be either. Therefore the likelihood of confusion estimate from this question is 31% (13 of the 42).

Question 28

Question 28 showed a picture of a Biltmore cookware item. 81% (34 of the 42) of the participants correctly identified this item as Biltmore. 11.9% (5 of the 42) incorrectly identified the item as Anolon and 7.1% (3 of the 42) responded that they were not sure, it could be either. Therefore the likelihood of confusion estimate from this question is 19% (8 of the 42).

**Conclusion**

These eight measures result in likelihood of confusion estimates of 38.1%, 23.8%, 69%, 73.8%, 33.3%, 28.6%, 31%, and 19%.

## Overall Conclusion on Likelihood of Confusion Measures

Using different multiple measures of likelihood of confusion in this study results in eighteen different numerical estimates of likelihood of confusion. These eighteen different numerical estimates of likelihood of confusion are summarized in the table below. For each of the eighteen estimates, the table indicates the specific question and estimate resulting from that question. This study therefore provides a distribution of estimates of likelihood of confusion. In this study the observed distribution ranges from a low of 19% likelihood of confusion to a high of 78.6% likelihood of confusion. It is possible to calculate a point estimate or mean using the average of the distribution, as well as a standard deviation to enable the calculation of confidence intervals for the mean. The mean or average of these eighteen estimates is 56.6% likelihood of confusion and one standard deviation is 21.1%. One can calculate a 95% confidence interval for the true or population mean estimate of likelihood of confusion by adding +/- 1.96 times the standard deviation of 21.1% to the 56.6% observed sample mean found in this study.

**Summary of Likelihood of Confusion Estimates**

| **Question number** | **Likelihood of confusion estimate** |
|---|---|
| 8 | 69% |
| 9 | 66.7% |
| 11 | 69% |
| 12 | 78.6% |
| 13 | 54.8% |
| 15 | 76.2% |
| 18 | 71.4% |
| 19 | 78.6% |
| 20 | 76.2% |
| Viewing side by side | 61.9% |
| 21 | 38.1% |
| 22 | 23.8% |
| 23 | 69% |
| 24 | 73.8% |
| 25 | 33.3% |
| 26 | 28.6% |
| 27 | 31% |
| 28 | 19% |
| | |
| **Average** | **56.6%** |
| **Std dev** | **21.1%** |

**RESEARCH PROJECT SETTING**
**L&E Research Focus Group Room**
**Raleigh, NC**





Case 3:20-cv-00710-MOC-MTO Document 193-1 Filed 06/13/23 Page 20 of 84
Case 3:07-cv-00168-DSC Document 135-1 Filed 12/29/08 Page 19 of 28


ADVANCED CLAD


ADVANCED CLAD
VANTAGE


ADVANCED CLAD
ADVANCED CLAD


ADVANCED CLAD





Case 3:20-cv-00710-MOC-MTO Document 193-1 Filed 06/13/23 Page 25 of 84




ADVANCED CLAD


DVANCED CLAD
1
2
3
4



# Exhibit 1, Part B



**PARTICIPANT RECRUITING AND RESULTING PROFILE**

Participants were professionally recruited by L&E Research using the following screener questions specific to this study, as well as being screened by standard consumer research questions (excluded were any who work for a manufacturer or retailer who markets cookware as were any who work in market research also excluded). 44 participants were recruited and scheduled for 30-minute one-on-one interviews to be held Monday and Tuesday, August 18 and 19, 2008, from 9 am to 9 pm at the L&E Research facility in Raleigh, NC. 42 of the 44 recruited participants actually showed up to participate in the study.

<u>**Cookware Study Screener Questions**</u>

1. Which of the following statements best describes you – "I generally shop at stores like Macy's, Belk, and Linens N Things," or "I only shop at stores like Wal-Mart, K-Mart, and Big Lots"?
    a. "I generally shop at stores like Macy's, Belk, and Linens N Things"
    b. "I only shop at stores like Wal-Mart, K-Mart, and Big Lots" **TERMINATE**
    c. Other response **TERMINATE**

2. Are you an adult head of your household?
    a. Yes
    b. No **TERMINATE**

3. Have you purchased cookware – pots and pans – or cookware sets in the past 2 years or so?
    a. Yes **RECRUIT FOR "RECENT COOKWARE PURCHASERS 1X1"**
    b. No

4. Are you considering purchasing cookware – pots and pans – in the next 2 years or so?
    a. Yes or maybe **RECRUIT FOR "POTENTIAL COOKWARE PURCHASERS 1X1"**
    b. No or don't know **TERMINATE**

Let me get some basic demographic information from you for classification purposes only.

5. **MALE OR FEMALE BY NAME AND VOICE IDENTIFICATION**
    **a. Male**
    **b. Female**

6. What is your age category? Are you
    a. Under 25 years old
    b. 26-45 years old
    c. 46-60 years old, or
    d. 60+ years old?

7. How many people live in your household? Is it

a. Just yourself
b. 2
c. 3
d. 4 or more?

8. What is your highest level of formal education?
    a. Less than high school graduate
    b. High school graduate
    c. College or community college graduate
    d. Advanced graduate or professional degree

9. Which of the following categories includes your total household yearly pre-tax income from all sources?
    a. Under $20,000
    b. $20,000 to $50,000
    c. $50,000 to $100,000
    d. Over $100,000

**Participant Profile**

The 42 study participants presented the following profile:

Are you a recent purchaser of cookware – pots and pans, or a potential purchaser of cookware in the next two years or so?

**47.6% (20)** ___ recent purchaser
**52.4% (22)** ___ potential purchaser

How knowledgeable are you about cookware? Would you say that compared to most cookware consumers and ordinary cookware buyers your knowledge about cookware is

**9.5% (4)** ___ below average
**69% (29)** ___ average
**21.4% (9)** ___ above average?

Gender

**23.8% (10)** ___male
**76.2% (32)** ___female

Age category

**2.4% (1)** ___under 25 years old
**52.4% (22)** ___26-45 years old
**23.8% (10)** ___46-60 years old, or
**21.4% (9)** ___60+ years old

Number people in household

**19% (8)** ___yourself

**33.3% (14)** ___2
**16.7% (7)** ___3
**31% (13)** ___4 or more

Highest level of formal education
**0% (0)** ___less than high school graduate
**14.3% (6)** ___high school graduate
**50% (21)** ___college or community college graduate
**35.7% (15)** ___advanced graduate or professional degree

Total household yearly pre-tax income from all sources
**0% (0)** ___ under $20,000
**16.7% (7)** ___$20,000 to $50,000
**50% (21)** ___$50,000 to $100,000
**33.3% (14)** ___Over $100,000

**DATA TABULATION BY "DOUBLE BLIND" INTERVIEW SCRIPT QUESTION AND RESEARCH TASK**
**Cookware Study**
**August 2008**
**N=42 Participants**

**Interviewee's name: ________________________________________________**

**SIT WITH THE INTERVIEWEE AT THE SMALL TABLE IN THE CORNER OF THE ROOM.**

1.Are you a recent purchaser of cookware – pots and pans, or a potential purchaser of cookware in the next two years or so?

**47.6% (20)** ___ recent purchaser
**52.4% (22)** ___ potential purchaser

2.How did you go about recently purchasing cookware, or how do you plan to potentially purchase cookware? Describe what that recent purchasing decision process involved, or what your potential purchasing decision will involve.

3.How knowledgeable are you about cookware? Would you say that compared to most cookware consumers and ordinary cookware buyers your knowledge about cookware is

**9.5% (4)** ___ below average
**69% (29)** ___ average
**21.4% (9)** ___ above average?

4. What brands of cookware can you name?

**30 Calphalon**
**16 Farberware**
**11 Revere**
**11 All-Clad**
**8 Circulon**
**7 T-Fal**
**6 Cuisinart**
**3 Anolon**
**3 KitchenAid**
**2 Corningware**
**27 Others**

**No unaided awareness of Biltmore brand cookware.**

5. **FOR EACH BRAND OF COOKWARE NAMED (INSERT BRAND NAME):**

Does _**Anolon**_ cookware have unique features or distinctive designs that particularly identify it and its maker to most consumers and ordinary buyers?

**0% (0)** ___ no
**2.4% (1)** ___ don't know
**4.8% (2)** ___ yes

If "yes", what features or designs are unique or distinctive, how you would describe them?

***Cushioned handles***

***Grip handles don't slip, won't get hot; positioned like Calphalon – heavy, high quality; glass lids***

Does ______ cookware have unique features or distinctive designs that particularly identify it and its maker to most consumers and ordinary buyers?

___ no
___ don't know
___ yes

If “yes”, what features or designs are unique or distinctive, how you would describe them?

Does _______ cookware have unique features or distinctive designs that particularly identify it and its maker to most consumers and ordinary buyers?

- ____ no
- ____ don’t know
- ____ yes

If “yes”, what features or designs are unique or distinctive, how you would describe them?

Does _______ cookware have unique features or distinctive designs that particularly identify it and its maker to most consumers and ordinary buyers?

- ____ no
- ____ don’t know
- ____ yes

If “yes”, what features or designs are unique or distinctive, how you would describe them?



Case 3:20-cv-00771-MCC-DSC Document 135-2 Filed 12/20/22 Page 37 of 84
Case 3:07-cv-00108-DSC Document 19-1 Filed 10/08/2? Page 3 of 38

**GO TO THE LARGE TABLE AND LOOK AT THE SETS OF COOKWARE ON DISPLAY, THEN CONTINUE QUESTIONNAIRE WHILE AT THE DISPLAY.**



Case 3:20-cv-07710-MMC Document 135-2 Filed 12/08/23 Page 38 of 84

6.Let's look at one set of cookware at a time. **(ROTATE ORDER OF COOKWARE.)**

6A. Does the Anolon Advanced cookware have unique features or distinctive designs that particularly identify it and its maker to most consumers and ordinary buyers?

**7.1% (3)** ___ no
**0% (0)** ___ don't know
**92.9% (39)** ___ yes

If "yes", what features or designs are unique or distinctive, how you would describe them?

**97.4% (38 of the 39) of those who answered "yes" said the Anolon Advanced "handles" or "grips" were unique or distinctive**

6B. Does the Calphalon cookware have unique features or distinctive designs that particularly identify it and its maker to most consumers and ordinary buyers?

**7.1% (3)** ___ no
**4.8% (2)** ___ don't know
**88.1% (37)** ___ yes

If "yes", what features or designs are unique or distinctive, how you would describe them?

**75.7% (28 of the 37) said some form of "lids" or "glass lids" and 54% (20 of the 37) said something about the handles as unique and distinctive aspects of the Calphalon cookware.**

6C. Does the Farberware Advantage cookware have unique features or distinctive designs that particularly identify it and its maker to most consumers and ordinary buyers?

**16.7% (7)** ___ no
**7.1% (3)** ___ don't know
**76.2% (32)** ___ yes

If "yes", what features or designs are unique or distinctive, how you would describe them?

**43.8% (14 of the 32) said something about the Farberware Advantage handles being unique or distinctive.**

6D. Does the Revere cookware have unique features or distinctive designs that particularly identify it and its maker to most consumers and ordinary buyers?

**9.8% (4)** ___ no
**4.8% (2)** ___ don't know
**87.8% (36)** ___ yes

If "yes", what features or designs are unique or distinctive, how you would describe them?

**77.7% (28 of the 36) said something about the Revere handles being unique or distinctive.**

**RETURN TO THE SMALL TABLE IN THE CORNER OF THE ROOM. BE SURE THE INTERVIEWEE SITS WITH THEIR BACK TO THE COOKWARE DISPLAYS ON THE LARGE TABLE.**

**SHOW EACH OF THE FOLLOWING PAGES TO THE INTERVIEWEE ONE AT A TIME. HELP THEM LOOK AT EACH PICTURE AND ANSWER THE QUESTIONS ON EACH PAGE AS BEST AS THEY CAN. DO NOT ALLOW THEM TO LOOK BACK AT THE COOKWARE DISPLAYS ON THE TABLE.**

**SAY:**

The following pages have a picture of cookware items and some questions. Without looking back at the display table, please look at each of the following pictures and answer the questions one page at a time. Do not look back or forward to other pages.



CaseC3a2s0e-3c:v2-007-0c7v1-0M1C6E8-D-DMCC Document 135-2-1 Filed 12/26/23 Page 11 of 40 of 84



7A. Would most consumers and ordinary buyers think these cookware products are put out by the same company, are put out by different companies, or you don't know?

**95.2% (40)** ___ put out by the same company
**4.8% (2)** ___ put out by different companies
**0% (0)** ___ don't know

7B. Would most consumers and ordinary buyers think they are put out by companies that are affiliated, connected or associated with one another, they are put out by companies that are not affiliated, connected or associated with one another, or you don't know?

**97.6% (41)** ___ put out by companies that are affiliated, connected or associated with one another
**0% (0)** ___ put out by companies that are not affiliated, connected or associated with one another
**2.4% (1)** ___ don't know

**(They are both Anolon.)**



8A. Would most consumers and ordinary buyers think these cookware products are put out by the same company, are put out by different companies, or you don't know?

**38.1% (16)** ___ put out by the same company
**57.1% (24)** ___ put out by different companies
**4.8% (2)** ___ don't know

8B. Would most consumers and ordinary buyers think they are put out by companies that are affiliated, connected or associated with one another, they are put out by companies that are not affiliated, connected or associated with one another, or you don't know?

**50% (21)** ___ put out by companies that are affiliated, connected or associated with one another
**31% (13)** ___ put out by companies that are not affiliated, connected or associated with one another
**19% (8)** ___ don't know

**(The one on the left is Anolon, the one on the right is Biltmore.)**



9A. Would most consumers and ordinary buyers think these cookware products are put out by the same company, are put out by different companies, or you don't know?

**38.1% (16)** ___ put out by the same company
**57.1% (24)** ___ put out by different companies
**4.8% (2)** ___ don't know

9B. Would most consumers and ordinary buyers think they are put out by companies that are affiliated, connected or associated with one another, they are put out by companies that are not affiliated, connected or associated with one another, or you don't know?

**57.1% (24)** ___ put out by companies that are affiliated, connected or associated with one another
**33.3% (14)** ___ put out by companies that are not affiliated, connected or associated with one another
**9.5% (4)** ___ don't know

**(The one in front is Biltmore, the one in the rear is Anolon.)**



10A. Would most consumers and ordinary buyers think these cookware products are put out by the same company, are put out by different companies, or you don't know?

**95.2% (40)** ___ put out by the same company

**2.4% (1)** ___ put out by different companies

**2.4% (1)** ___ don't know

10B. Would most consumers and ordinary buyers think they are put out by companies that are affiliated, connected or associated with one another, they are put out by companies that are not affiliated, connected or associated with one another, or you don't know?

**97.6% (41)** ___ put out by companies that are affiliated, connected or associated with one another

**0% (0)** ___ put out by companies that are not affiliated, connected or associated with one another

**2.4% (1)** ___ don't know

**(They are both Biltmore.)**



11A. Would most consumers and ordinary buyers think these cookware products are put out by the same company, are put out by different companies, or you don't know?

**35.7% (15)** ___ put out by the same company
**61.9% (26)** ___ put out by different companies
**2.4% (1)** ___ don't know

11B. Would most consumers and ordinary buyers think they are put out by companies that are affiliated, connected or associated with one another, they are put out by companies that are not affiliated, connected or associated with one another, or you don't know?

**54.8% (23)** ___ put out by companies that are affiliated, connected or associated with one another
**31% (13)** ___ put out by companies that are not affiliated, connected or associated with one another
**14.3% (6)** ___ don't know

**(The one in the front is Biltmore, the one in the rear is Anolon.)**


Case 3:07-cv-00168-DSC Document 135-2 Filed 12/29/08 Page 16 of 43



12. Would most consumers and ordinary buyers think that more than one of these cookware items comes from the same company or affiliated companies?

**14.3% (6)** __ no
**0% (0)** __ don't know
**85.7% (36)** __ yes
If "yes", which ones do you think come from the same company or affiliated companies?
**97% (35)** ___ left
**11.1% (4)** ___ middle
**91.7% (33)** ___ right

**(The one on the left is Anolon, the one in the center is Calphalon, the one on the right is Biltmore.)**



13. Would most consumers and ordinary buyers think that more than one of these cookware items comes from the same company or affiliated companies?

**33.3% (14)** __ no

**0% (0)** __ don't know

**66.7% (28)** __ yes

If "yes", which ones do you think come from the same company or affiliated companies?

**25% (7)** ___ left

**82.1% (23)** ___ middle

**100% (28)** ___ right

**(The one on the left is Farberware, the one in the center is Biltmore, the one on the right is Anolon.)**


Case 3:07-cv-00168-DSC Document 135-2 Filed 12/29/08 Page 18 of 18

**Exhibit 1, Part C**



14. Would most consumers and ordinary buyers think that more than one of these cookware items comes from the same company or affiliated companies?

**0% (0)** __ no

**0% (0)** __ don't know

**100% (42)** __ yes

If "yes", which ones do you think come from the same company or affiliated companies?

**97.6% (41)** ___ left

**92.9% (39)** ___ middle

**97.6% (41)** ___ right

**(They are all Anolon.)**



15. Would most consumers and ordinary buyers think that more than one of these cookware items comes from the same company or affiliated companies?

**21.4% (9)** __ no

**0% (0)** __ don't know

**78.6% (33)** __ yes

If "yes", which ones do you think come from the same company or affiliated companies?

**97% (32)** ___ left

**100% (33)** ___ middle

**3% (1)** ___ right

**(The one on the left is Biltmore, the one in the center is Anolon, the one on the right is Revere.)**



16. Would most consumers and ordinary buyers think that more than one of these cookware items comes from the same company or affiliated companies?

**0% (0)** __ no

**2.4% (1)** __ don't know

**97.6% (41)** __ yes

If "yes", which ones do you think come from the same company or affiliated companies?

**97.6% (40)** ___ left

**100% (41)** ___ middle

**92.7% (38)** ___ right

**(They are all Biltmore.)**



17. Would most consumers and ordinary buyers think that more than one of these cookware items comes from the same company or affiliated companies?

**83.3% (35)** __ no
**0% (0)** __ don't know
**16.7% (7)** __ yes

If "yes", which ones do you think come from the same company or affiliated companies?

**66.7% (4)** ___ left
**100% (6)** ___ middle
**50% (3)** ___ right

**(The one on the left is Anolon, the one in the center is Calphalon, the one on the right is Farberware.)**



18. Assume that these cookware products are put out by two different companies. Are these two cookware products sufficiently similar in appearance as to result in confusion among most consumers and ordinary buyers as to whether they are put out by the same company or by different companies?

**59.5% (25)** ___ yes
**28.6% (12)** ___ no
**9.5% (4)** ___ maybe
**2.4% (1)** ___ don't know

**(The one in the front is Anolon, the one in the rear is Biltmore.)**



19. Assume that these cookware products are put out by two different companies. Are these two cookware products sufficiently similar in appearance as to result in confusion among most consumers and ordinary buyers as to whether they are put out by the same company or by different companies?

**69% (29)** ___ yes
**21.4% (9)** ___ no
**9.5% (4)** ___ maybe
**0% (0)** ___ don't know

**(The one on the left is Anolon, the one on the right is Biltmore.)**


Case 3:07-cv-00168-DSC Document 135-3 Filed 12/08/08 Page 7 of 11



20. Assume that these cookware products put out by two different companies. Are these two cookware products sufficiently similar in appearance as to result in confusion among most consumers and ordinary buyers as to whether they are put out by the same company or by different companies?

**61.9% (26)** ___ yes
**23.8% (10)** ___ no
**14.3% (6)** ___ maybe
**0% (0)** ___ don't know

**(The one on the left is Biltmore, the one on the right is Anolon.)**

**Move back to the large display table and uncover the Biltmore cookware display.**

**Say:**

Now please look at the Anolon and Biltmore cookware displays on the table. What are your thoughts or impressions seeing the Biltmore and Anolon cookware side by side?

**61.9% (26 of 42) say the Anolon Advantage and Biltmore cookware look identical, similar, very similar or something to that effect, as illustrated by the following verbatims:**

***"They have very similar looking handles. They (the two sets) look very similar."***
***"They look very similar."***
***"Their handles are very similar."***
***"They both have the same handles."***
***"They look like they're from the same company."***
**(Looking from one to the other)** ***"Wow, wow, wow, wow!"***
***"They look like the same exact design, just different brands. They look about the same. … They're very close."***
***"The handles are so similar that it is hard to tell the difference between these two."***
***"They do look very similar. Like if I saw them in a store side by side, I probably wouldn't know they were two different companies."***
***"They do look very similar – the design and the handles look very similar."***
***"They look very similar."***
***"Are they the same company? Gosh, they are very similar. If they weren't side by side, I'd have a hard time distinguishing between these."***
***"That's where the handles look very, very similar. It looks like one is certainly trying to mimic the other."***
***"They look very similar. If you had them separated, it would be hard to tell the difference."***
***"They look pretty similar… As far as the grips, they look pretty similar."***
***"I think these could be made by the same company, you know, because of the grip and all."***
***"They look very similar. … Overall they look very similar in style."***

**Spontaneous verbatims from elsewhere in the study:**
**(In response to Q19)** ***"If it's not the same company, it's a clone."***
**(In response to Q8 and Q9)** ***"I think they are trying to copy each other."***

**MOVE BACK TO THE SMALL TABLE AND SIT WITH THE INTERVIEWEE'S BACK TO THE DISPLAY TABLE. DO NOT ALLOW INTERVIEWEE TO LOOK BACK AT THE DISPLAY TABLE.**



21. Is this cookware made by Biltmore or Anolon, or don't you know?

**14.3% (6)** ___ Biltmore
**61.9% (26)** ___ Anolon
**23.8% (10)** ___ not sure, could be either

**(Anolon is the correct answer.)**



22. Is this cookware made by Biltmore or Anolon, or don't you know?

**76.7% (32)** ___ Biltmore
**14.3% (6)** ___ Anolon
**9.5% (4)** ___ not sure, could be either

**(Biltmore is the correct answer.)**

**Exhibit 1, Part D**



23. Is this cookware made by Biltmore or Anolon, or don't you know?

**31% (13)** ___ Biltmore
**50% (21)** ___ Anolon
**19% (8)** ___ not sure, could be either

**(Biltmore is the correct answer.)**



24. Is this cookware made by Biltmore or Anolon, or don't you know?

**64.3% (27)** ___ Biltmore
**26.2% (11)** ___ Anolon
**9.5% (4)** ___ not sure, could be either

**(Anolon is the correct answer.)**


Case 3:23-cv-00710-MOC-WCM Document 195-1 Filed 06/13/25 Page 61 of 84



25. Is this cookware made by Biltmore or Anolon, or don't you know?

**16.7% (7)** ___ Biltmore
**66.7% (28)** ___ Anolon
**16.7% (7)** ___ not sure, could be either

**(Anolon is the correct answer.)**



26. Is this cookware made by Biltmore or Anolon, or don't you know?

**71.4% (30)** ___ Biltmore
**19% (8)** ___ Anolon
**9.5% (4)** ___ not sure, could be either

**(Biltmore is the correct answer.)**



27. Is this cookware made by Biltmore or Anolon, or don't you know?

**19% (8)** ___ Biltmore
**69% (29)** ___ Anolon
**11.9% (5)** ___ not sure, could be either

**(Anolon is the correct answer.)**



28. Is this cookware made by Biltmore or Anolon, or don't you know?

**81% (34)** ___ Biltmore
**11.9% (5)** ___ Anolon
**7.1% (3)** ___ not sure, could be either

**(Biltmore is the correct answer.)**

**<u>FOUR BOX TASK – Biltmore or Anolon?:</u> Observing one cookware item at a time under each box.**

**(MASKED BRAND NAME ON ITEMS) LET INTERVIEWEE PICK UP COOKWARE IF THEY WANT TO DO SO.**

**Lift one box at a time, ask the question, then cover with box and go on to next box. For each of four boxes, ask:**

**<u>LOOK UNDER BOX 1</u>**

29A. Is this cookware made by Anolon or Biltmore, or don't you know?

- ____ Anolon
- ____ Biltmore
- ____ not sure, could be either

**<u>LOOK UNDER BOX 2</u>**

29B. Is this cookware made by Anolon or Biltmore, or don't you know?

- ____ Anolon
- ____ Biltmore
- ____ not sure, could be either

**<u>LOOK UNDER BOX 3</u>**

29C. Is this cookware made by Anolon or Biltmore, or don't you know?

- ____ Anolon
- ____ Biltmore
- ____ not sure, could be either

**<u>LOOK UNDER BOX 4</u>**

29D. Is this cookware made by Anolon or Biltmore, or don't you know?

- ____ Anolon
- ____ Biltmore
- ____ not sure, could be either

**SUMMARY FOR FOUR BOX EXPERT JUDGE TASK**

**AFTER SPENDING AN AVERAGE OF 20 MINUTES CUED TO BRAND DIFFERENCES IN PREVIOUS COOKWARE TASKS**

**PARTICIPANTS ALLOWED UNLIMITED TIME TO EXAMINE EACH COOKWARE ITEM TO IDENTIFY BRAND**

**(BRAND NAMES MASKED ON COOKWARE)**

| | | **PARTICIPANT IDENTIFIED AS** | | |
|---|---|---|---|---|
| | | **Anolon** | **Biltmore** | **Not sure, could be either** |
| **ACTUAL COOKWARE** | **Anolon** | **92.9% (78)** | **3.6% (3)** | **3.6% (3)** |
| **UNDER BOX** | **Biltmore** | **4.8% (4)** | **90.5% (76)** | **4.8% (4)** |
| | | | | **4x42=168 TOTAL** |

**Anolon misidentification rate = 7.1% ((3+3)/84)**

**Biltmore misidentification rate = 9.5% ((4+4)/84)**

**Four Box Expert Judge Task**

The final task was an attempt to estimate the likelihood of confusion that would be evidenced not by most consumers and ordinary buyers, but by participants who were by this point in the study strongly and inordinately trained to cue on unique features and distinctive design distinctions between Anolon Advanced and Biltmore. By virtue of the exposure to information, learning and the tasks over the past twenty minutes or so, participants had generally acquired the knowledge and experience to be considered expert judges, rather than typical consumers and ordinary buyers, in their ability to distinguish between Anolon Advanced and Biltmore cookware items.

Participants were taken to a side table in the study room where there were four upside-down boxes each covering either a single Anolon or Biltmore cookware item. The brand name on each item was masked by duct tape. As each covering box was removed, each participant was invited to examine the cookware item, picking it up and handling it if they so desired, and then to indicate whether it was made by Anolon or by Biltmore. Even after having become trained to be more like expert judges rather than like most consumers and ordinary buyers, there was not 100% correct identification of Anolon or Biltmore as the maker of the item.

**Thank you very much. This concludes my questions. You can now return to the lobby and be checked out from the study.**

**EXPERT QUALIFICATIONS**

My name is Nicholas Michael Didow and I am a tenured professor at the University of North Carolina at Chapel Hill's Kenan-Flagler Business School. My academic rank is Associate Professor. A copy of my resume follows.

My formal education includes a BSBA (1970) and MBA (1973) from UNC-Chapel Hill and a Ph.D. in Marketing with a Minor in Evaluation Research from Northwestern University in 1980. Over the years I have published a number of peer referred academic journal articles in marketing, market research, and consumer behavior as well as many other book chapters, white papers, and conference papers. I am frequently contacted by the popular press to offer perspectives, opinions and insights on emerging consumer and marketing issues. My teaching responsibilities include courses in marketing strategy, consumer behavior and consumer research, issues in the global economy, and global marketing. I have served as a consultant to businesses, non-profits, and government agencies on many occasions. Many of these consulting engagements have involved the design, conduct and analysis of original marketing and consumer behavior research, including interviews and surveys.

I have previously been offered and qualified as an expert witness in marketing and consumer behavior in several cases most notably including the action by the NC Attorney General against JC Penney Company concerning consumer response to reference price advertising and pre-holiday price discount sales, the class-action lawsuit by the California Grocers Association against Bank of America over terms of service, and the dispute within the tobacco industry between RJR/ Brown & Williamson/ Lorillard against Philip Morris over retail merchandising plans and restrictive measures to control consumer access to tobacco products. I have also testified in Washington, DC, before the House Committee on Banking, Finance, and Urban Affairs on the effects of emerging bank financial services practices on vulnerable consumer market segments.

I have been engaged with respect to this case to offer considered and thoughtful professional opinions concerning matters in dispute in this case and to design, conduct and interpret some consumer research that will provide evidence and insights into the trade dress infringement issues in this case. I may also offer considered and thoughtful professional opinions about other studies, testimony, and other expert opinion that may be part of the record in this case.

My billing rate is $400 per hour. I keep a time and activities log and submit a copy of my log with my invoice at the end of each month.

Nicholas M. Didow

**NICHOLAS M. DIDOW**

ADDRESS

(residence)
117 Springhill Forest Road
Chapel Hill, NC 27516
(919) 929-6388

(office)
Kenan-Flagler Business School
4516 McColl Building
University of North Carolina
Chapel Hill, NC 27599-3490
(919) 962-3189
nick_didow@unc.edu

**EDUCATION**

NORTHWESTERN UNIVERSITY, Evanston, Illinois, 1976-1979. Doctor of Philosophy, Field of Marketing, 1980. Minor field: Evaluation Research.

UNIVERSITY OF NORTH CAROLINA, Chapel Hill, North Carolina, 1971-1973. Master of Business Administration, 1973. Electives in marketing, finance, and organizational behavior.

UNIVERSITY OF NORTH CAROLINA, Chapel Hill, North Carolina, 1966-1970. B.S. in Business Administration, 1970. Elective courses stressed business law and marketing.

**ACADEMIC APPOINTMENTS**

KENAN-FLAGLER BUSINESS SCHOOL, UNIVERSITY OF NORTH CAROLINA, Chapel Hill, North Carolina. July 1, 1979 to June 30, 1985: Assistant Professor. July 1, 1985 to present Tenured Associate Professor.

July 1, 1986 to December 31, 1987: Faculty Chairman, MBA Program, Graduate School of Business Administration, University of North Carolina. Responsible for planning and implementation of the MBA Program. Nationally ranked #8 by *Business Week* during this time.

CAROLINA CENTER FOR PUBLIC SERVICE, University of North Carolina, Chapel Hill, North Carolina: Director. September 1, 1999 to July 1, 2001. Established campus-wide Center to support and develop service and outreach mission of the University and to promote partnerships and engagement of UNC students, faculty and staff with the people of North Carolina and beyond. Raised over $10 million in endowment and annual operating funds for ongoing support of the Center. Supported hundreds of new and existing public service activities and projects across campus serving the local community and state. Also provided campus leadership, planning and coordination for University response to Hurricane Floyd devastation in eastern North Carolina.

CHAPEL HILL DOWNTOWN ECONOMIC DEVELOPMENT CORPORATION, Chapel Hill, North Carolina: Interim part time Executive Director August 2004 to May 2005. A collaboration among the University, Town government and downtown merchants, property owners and other downtown stakeholders intended to maintain, enhance and promote downtown as the social, cultural and spiritual center of Chapel Hill through economic development.

FoR ENC-KENAN INSTITUTE-KENAN FLAGLER BUSINESS SCHOOL PARTNERSHIP, Chapel Hill and Greenville, North Carolina: Lead Faculty May 2007 to present. Partnership for economic development, social entrepreneurship, and community development throughout eastern North Carolina.

NORTHWESTERN UNIVERSITY EVENING DIVISIONS, Evanston, Illinois, 1977-1979. Instructor in Marketing Management and Consumer Behavior.

SCHOOL OF BUSINESS ADMINISTRATION, UNIVERSITY OF NORTH CAROLINA, Chapel Hill, North Carolina, 1973-1976. Lecturer and Associate Director of the MBA Program. Responsibilities included daily administration; resource planning; program development; faculty advisor for MBA students; coordinator for combined MBA/JD Program; financial planner for program; Director of Student Financial Aid; UNC recruiter for students in Consortium for Graduate Study in Management.

**PUBLICATIONS**

“Energy Trends: Are American Companies Ready for Deregulation?” White Paper Series, Statoil Energy, Inc., Alexandria, VA, 1997-98 (with FGI).

“Understanding Hybrid Channel Conflict: A Conceptual Model and Propositions for Research,” Journal of Business-to-Business Marketing, Vol. 4, No. 1, 39-78, 1997 (with K. Webb).

"Effects of Relative Power Imbalances and Locus of Control on Channel Cooperation in a Transaction-Specific Context," Journal of Marketing Channels, Vol. 5, No. ¾, 71-94, 1996 (with K. Webb).

"Determining Cross-Cultural Metric Equivalence in Survey Research: A Statistical Test,” Advances in International Marketing, Vol. 8, 145-158, 1996 (with M. Mullen and G. Milne).

"Issues and Insights with Realtime Data," in Stewart and Vilcassim (Eds) Marketing Theory and Applications, Vol. 6, 430, AMA 1995 Winter Educators' Conference, 1995 (with G. David Hughes).

"Never Look Back, Because Sometimes Things are Gaining on You: A Meta-Analysis of Fifty Years of Research on the Meaning of Probability Terms,” 1994 Association for Consumer Research Annual Conference Proceedings, (with R. Starr).

"Caution: Comparing Means May Be Hazardous to Your Business Success," in Park and Smith (Eds) Marketing Theory and Applications, Vol. 5, 53-54, AMA 1994 Winter Educators' Conference Proceedings, 1994 (with M. Mullen and G. Milne).

"Structural Power in Channel Relationships," in Gary Frazier (Ed), Advances in Distribution Channel Research, Vol. 1 No 1, 81-114, JAI Press, Inc., 1992 (with N. Eyuboglu and A. Buja).

"Sample Size Effects on the Stability of Optimal Scaling Estimates - A Preliminary Investigation," in Leone and Kumar (Eds) Enhancing Knowledge Development in Marketing, Vol. 3, 290-295, AMA Educators' 1992 Summer Conference Proceedings, 1992 (with M. Mullen).

"Are Cross-Cultural Survey Data Comparable? Optimal Scaling Provides Useful Evidence," in Gilley et al (Eds), Enhancing Knowledge Development in Marketing, Vol. 2, 608-609, AMA Educators' 1991 Summer Conference Proceedings, 1991 (with M. Mullen).

"Inoculation Theory and Resistance to Persuasion in Marketing," Psychology and Marketing, Vol. 4 No 2, Summer 1987, 157-165 (with G. Lessne).

"Self Coding Versus Independent Judge Coding of Ambiguous Response Measures," in Susan P. Douglas et al (Eds), AMA Educators' 1987 Summer Conference Proceedings, Series No. 53, 237, American Marketing Association, 1987 (with G. Franke).

"A Preliminary Test of the Applicability of Interdependence Theory in Explaining Power and Conflict in Distribution Channels," in Susan P. Douglas et al (Eds), AMA Educators' 1987 Summer Conference Proceedings, Series No. 53, 29, American Marketing Association, 1987 (with N. Eyuboglu).

"Improving Measure Quality by Alternating Least Squares Optimal Scaling," Journal of Marketing Research, XXII, 30-40 (February 1985) (with K. Keller, H. Barksdale, Jr., and G. Franke).

Electric Utility Load Management: Marketing Strategies and Tactics, Totowa, New Jersey: Littlefield, Adams & Company, (1985), (with R.Burby, M. Marsden, C. Hanna, M. Bunn, and S. Johnston).

"Measurement Issues in Time-Series Research: Reliability and Validity Assessment in Modeling the Macroeconomic Effects of Advertising," Journal of Marketing Research, XXI, 12-19 (February 1984) (with G. Franke).

"A Cross-Sectional Optimal Scaling Analysis of the Index of Consumer Sentiment," The Journal of Consumer Research, 10, 339-347 (December 1983) (with W. Perreault, Jr., and N. Williamson).

Managing the Demand for Electricity--Utility Marketing and Consumer Adoption of Residential Load Management, North Carolina Alternative Energy Corporation, 1983, 450 pp. (with R. Burby, M. Marsden, C. Hanna, M. Bunn, and S. Johnston).

Compendium of Electric Load Management Marketing Material, North Carolina Alternative Energy Corporation, 1983, 750 pp. (with C. Hanna and A. Cooper).

"Conjoint Measurement Experiment in Consumer Complaining Behavior," Journal of Business Research, 10, 419-429 (1982) (with H. Barksdale, Jr.).

"New Directions and Maturity in Industrial Buyer Behavior Research," in Proceedings, Southern Marketing Association 1982 Conference.

Marketing Load Management Programs: An Assessment of Current Research Needs, Chapel Hill: Center for Urban and Regional Studies, University of North Carolina at Chapel Hill, 1981, 95 pp. (with R. Burby and M. Marsden).

"The Market Effect of Sweepstakes: A Time-Series Analysis and Methodological Comment," in Kenneth Bernhardt et. al., eds., The Changing Marketing Environment: New Theories and Applications, Series No. 47, 1981, American Marketing Association, 350-353 (with G. Franke).

"Approaches for the Analysis of Categorical Data in Marketing Research," in Gary R. Reeves and James R. Sweigart, eds., American Institute for Decision Sciences Proceedings, Vol. 1, 1981, 251-252, (with W. Dillon, J. Magidson, B. Muthen, and W. Perreault, Jr.).

"Seminar in Marketing Research," in James W. Dean and Richard Schwindt, eds., Marketing I - Marketing Theory, Research, Management and Strategy, Vol. 8, Durham, North Carolina: Eno River Press, 1981, 72-82.

"Bibliography of Theory and Theory Groups in Behavioral Marketing Research 1974-1980," in James W. Dean and Richard Schwindt, eds., Marketing II - Product, Price, Place and Promotion, Vol. 9, Durham, North Carolina: Eno River Press, 1981, 40-72.

"Economic Constraints on Consumer Complaining Behavior," in Jerry C. Olson, ed., Advances in Consumer Research, Vol. VII, 1980, (with C. Fornell).

"A Box-Jenkins Strategy for the Factor Analysis of Multiple Time-Series," Proceedings 1979, Albert Haring Symposium, Indiana University, 1979, 90-108.

"The Aberrant Data Problem in Interrupted Time Series Designs," in Robert S. Franz, Robert M. Hopkins, and Al Toma, eds., Proceedings, Southern Marketing Association 1978 Conference, 37-40.

"A Review of Formal Theories of Consumer Socialization" in H. Keith Hunt, ed., Advances in Consumer Research, Vol. V, 1978, 528-534, (with D. Roedder and B. Calder).

"Quantitative Social Index Theory: The Identification of Moderator and Outcome Variables," in Donald T. Campbell, Andrew C. Gordon, and Nancy Cochran, eds., Bureaucracies, Social Experimentation, and Evaluation, Vol. II, Evanston: Psychology Department, Northwestern University, 1978, 54-75.

**SELECTED POPULAR PRESS INTERVIEWS AND ARTICLES**

“Olympic Torch May Burn Sponsors,” Los Angeles Times, April 10, 2008.

“ACC Tourney Brings Big Bucks,” Metrolina Business, March 10, 2008.

“K MART – A basketball coach manages to sell himself, his school and the lessons of leadership,” Business North Carolina, March 2007.

“UNC grad not hired for Trump gig,” News and Observer, April 16, 2004.

“The urge to splurge,” Charlotte Observer, October 12, 2003.

“Tar Heel finds he can come home again,” Triangle Business Journal, October 3, 2003.

“Ringing in the sales – Race intensifies for corporate cell phone business,” The Triad Business Journal, May 16, 2003.

“Enron’s collapse raises questions,” The Fayetteville Observer, March 3, 2002.

“College sports need reform, experts say,” News and Observer, March 3, 2002.

“Jordan ponders return to basketball,” News and Observer, April 29, 2001.

“Specialists beat banks,” American Banker, May 2001.

“Old and young find there’s a lot to teach,” The Chapel Hill News, October 3, 2001.

“Nortel network takes next step,” The Herald-Sun, February 17, 1999.

“Made in Vietnam: The American Sneaker Controversy,” ESPN, March 30-April 8, 1998.

“UNC runs its course with Nike,” News and Observer, February 9, 1998.

“Students Challenge Corporate Involvement,” USA Today, January 23, 1998

“NBA Greats Help Kick-off New Sports Marketing Course,” KFBS Update, Winter 1997.

"One shop, one stop," Greensboro News and Record, February 19, 1995.

"Superstores," News and Observer, January 23, 1995.

"Bank Heist," Institute for Southern Studies Research Report, December 1994.

"Marketing Faculty Visit Package Goods Companies," Carolina Marketing, Fall 1988.

"Interstate Banking Studied," News and Observer, March 17, 1988.

"Research Puts Station on Wave Length With Listeners," News and Observer, September 5, 1984.

"Bucking the Megabank Trend," The North Carolina Independent, June 22-July 5, 1984, 9.

"Bank Fees to Rise Past Reach of Poor, Study Says," News and Observer, June 10, 1984, 8D.

"Lower Income People Subsidize Banking For Wealthier Customers," The Carolina Times, June 9, 1984, 13, 16.

"Soaring Banking Fees -- Are They Fair?" Greensboro News and Record, June 3, 1984, E1-E2.

"Should All Bank Customers Pay Service Fees?" Durham Morning Herald, May 20, 1984, 13B.

"Professor: Banks Unfair to Lower-Income People," The Charlotte Observer, May 17, 1984, 10C.

"Problems Shown With Bank Services," The Chapel Hill Newspaper, May 16, 1984, A4.

"Economists Oppose Bank Deregulation," New York Journal of Commerce, April 13, 1984, 25.

"N.C. Banks Raise Service Fees Average of 30% a Year, Professor Says," Winston-Salem Journal, April 13, 1984, 24.

"National Mood Survey: The Verdict on Reagan," U.S. News & World Report, November 9, 1981, 26-30.

**WORKING PAPERS AND CURRENT PROJECTS**

“Barriers to Health Care Access”

“No Where to Hide? Marketing Issues in the Global Economy”

“Time-Series Analysis of Product Scares and Management Response”

"The Construct Validity of the Tripartite Classification of Attitudes -- Findings From Realtime Analysis."

"A Field Experiment in Foot-In-The-Door and Door-In-The-Face Tactics in Social Marketing."

**DISSERTATION RESEARCH**

"A Time-Series Analysis of the Theory of Psychological Economics," Marketing Department, Northwestern University, Evanston, Illinois, 1980. Professor Bobby J. Calder, Chairman.

**U.S. CONGRESSIONAL TESTIMONY**

"The Evolving Marketing Practices of Depository Institutions," before the Committee on Banking, Finance and Urban Affairs, United States House of Representatives, April 12, 1984.

**NORTH CAROLINA LEGISLATIVE TESTIMONY**

"Issues in Bank Marketing Practices in the Age of Interstate Banking," before the Committee on Interstate Banking, Legislative Research Commission, North Carolina General Assembly, March, 16, 1988.

**GRANTS**

Golden LEAF FOUNDATION (2007), $68,000 for regional value-added crop processing community kitchen feasibility study in eastern North Carolina through Food Bank of Central and Eastern North Carolina.

Z. SMITH REYNOLDS FOUNDATION (2003, 2004), $100,000 for the Rural Enrichment Partnership with Food Bank of Central and Eastern North Carolina for leadership, management and organization development and technology infusion to community agencies across central and eastern North Carolina. Portion of grant to continue pilot agency councils, to organize four additional councils and to train and support Food Bank staff in role as community outreach coordinators.

Z. SMITH REYNOLDS FOUNDATION (2001), $100,000 for the Rural Enrichment Partnership with Food Bank of Central and Eastern North Carolina for leadership, management and organization development and technology infusion to community agencies across central and eastern North Carolina. Portion of grant to support two pilot regional councils of agency directors.

EPRI - Electric Power Research Institute (1984-1985), $10,000 for preparation of a Research Design monograph for electric utility industry management.

NCAEC - North Carolina Alternative Energy Corporation (1982-1984), $85,000 for original research in residential customer adoption of electric utility load management programs (with Raymond Burby, Mary Ellen Marsden, and Stephen Johnston).

NCAEC - North Carolina Alternative Energy Corporation (1981), $2,500 for preparation of a monograph reviewing consumer behavior research related to electric utility load management strategies (with Raymond Burby and Mary Ellen Marsden).

**TEACHING EXPERIENCE**

NORTHWESTERN UNIVERSITY EVENING DIVISIONS, Evanston, Illinois.
- Undergraduate
  - Principles of Marketing
  - Consumer Behavior

KENAN-FLAGLER BUSINESS SCHOOL, UNIVERSITY OF NORTH CAROLINA, Chapel Hill, North Carolina.
- Undergraduate
  - Principles of Marketing
  - Advertising
  - Consumer Behavior
  - Retailing and Distribution
  - Administrative Policy and Strategic Planning
  - Sports Marketing

Seminar in Economics, Ethics and Marketing Issues in the Global Economy: The Nike Example
Global Marketing: Doing Business in the Americas and the Pacific Rim
Field Projects in Marketing and Consumer Research

MBA
Product Management
Marketing Management
Sports Marketing
Seminar in Economics, Ethics and Marketing Issues in the Global Economy: The Nike Example
Field Projects in Marketing and Consumer Research

PhD
Seminar in Marketing Theory and Research
Seminar in Philosophy of Science, Psychometric Theory, and Issues in the Design and Analysis of Research

Management Programs and Executive Development
"Marketing Program Suite: Value Creation, Value Delivery and Value Management"
"A Marketing Perspective on Health Care Services," Executive Workshop for Health Administrators, Duke University Department of Health Administration and UNC School of Public Health, cosponsors.
"Trends in Consumer Behavior," Women + Business 1980 Conference, General Services Administration and the North Carolina Department of Commerce, cosponsors.
NCDOT Program for Minority Contractors
The Southeastern Savings and Loan School of Marketing.
The North Carolina School of Banking.
Managing the Arts.
Program for Technical Managers.
The American Financial Services Association Management Development Program.
National Credit Union Sales and Marketing School (Director).

**CHAIRED DISSERTATION COMMITTEES**

"Inoculation Theory in Marketing Communications," Greg Lessne.

"Issues in the Use of Fear Appeals in Marketing," George R. Franke.

"Attitudes in an Industrial Buying Context: A Balance Theory/ Cognitive Response Theory Approach," Hiram C. Barksdale, Jr.

"Measurement of Interfirm Power and Analysis of the Relationship Between Power and Conflict in Marketing Channels: An Interdependence Theory Approach," Nermin Eyuboglu.

"Environmental Uncertainty, Internal Flexibility, and Performance: An Integrative, Process Model," Llewellyn G. Brown.

"Toward a Conceptualization and Theory of Hybrid Channel Conflict," Kevin Webb.

**PROFESSIONAL MEMBERSHIPS AND ACTIVITIES**

American Marketing Association
Association for Consumer Research
Southern Marketing Association

**SELECTED PROFESSIONAL SEMINARS, SPEECHES AND WORKSHOPS**

"CSR: The Nike Example," Business and Society Symposium, Creighton University, April 2005.

"Marketing , Advertising and PR," PTA Thriftshop, Annual School Representative Retreat, March 10, 2004.

"Leadership Challenges in a Dynamic Political Environment," Chapel Hill- Carrboro Kiwanis Club, November 4, 2003.

"Education Reform," East Chapel Hill Rotary Club, July 22, 2003.

"Major Challenges Facing Schools, Colleges and Universities," World View Residential Leadership Program in Global Education, June 26, 2003.

"Local Challenges, Local Solutions," Peer Learning, Carolina Speakers, UNC- Chapel Hill, March 19, 2002.

"Higher Education and Intercollegiate Athletics," First Annual Undergraduate Conference, The Johnston Center for Undergraduate Excellence, March 2, 2002.

"Board and Director Roles and Responsibilities for Effective Community Organizations," Coastal Community Hunger Council, Food Bank of North Carolina, February 13, 2002.

"Effective Boards and Advisory Boards in Community Organizations," Eastern Community Hunger Council, Food Bank of North Carolina, January 9, 2002.

"Building Community Capital in Coastal North Carolina," Coastal Community Hunger Council, Food Bank of North Carolina, November 14, 2001.

"Some Comments on the State of Public Service by the University of North Carolina at Chapel Hill," Emerging Leaders Series, UNC, October 16, 2001.

“Economic Development Issues in Eastern North Carolina,” Eastern Community Hunger Council, Food Bank of North Carolina, October 10, 2001.

“The Role of Public Service in Major Research Universities,” Emerging Leaders Series, UNC, April 25, 2001.

“Campus and Community Issues and the UNC Greek Community,” Greek Leadership Retreat, UNC-CH Office of Greek Affairs, February 10, 2001.

“Customer Service in the New Century,” Haywood EMC Annual Meeting, May 2000.

“Ethics in Multinational Corporations,” Mobile International Speaker Series, Kenan Center, UNC, March 1999.

"Major U. S. Demographic Trends," Coastal Federal Credit Union Board of Directors, Coastal Federal Credit Union, Raleigh, NC, January 18, 1995.

"From the Madonna Generation to Mature Markets," South Carolina Credit Union League Management Association, Columbia, SC, February 11, 1994.

"Sample Size Effects on the Stability of Optimal Scaling Estimates - A Preliminary Investigation," AMA Educators' 1992 Summer Conference, August, 1992.

"Are Cross-Cultural Survey Data Comparable?" AMA Educators' 1991 Summer Conference, August 1991.

"Close Encounters of the Service Kind," EMC Credit Union Annual Conference, Raleigh, NC, April 10, 1991.

"New Products for the '90s," League of IBM Credit Unions, Annual Spring Conference 1991, Lexington, KY, May 18, 1991.

"Effective Demand-Side Management Strategies and Tactics," ElectriCities of NC, Inc., Raleigh, NC, June 5, 1991.

"Major Population Cohorts of the '90s -- Credit Union Workforce and Member Implications," Association of Credit Union League Executives' Annual Meeting, Quebec, Canada, July 22-25, 1991.

"Conjoint Measurement Workshop," FG*I/Imageworks, Chapel Hill, NC, March 14, 1990.

"Marketing Financial Services," Southwest Credit Union National Association, Houston, Texas, July 24-25, 1990.

"Credit Unions and the New Customer Service Challenge," South Carolina Credit Union League Annual Meeting, Columbia, SC, August 30, 1990.

"Credit Union Marketing Strategies for the '90s," Texas Credit Union League Member Services Conference, San Antonio, TX, September 25, 1990.

"Pricing Credit Union Products and Services," Bridging Marketing Horizons, CUNA's 1989 Marketing Communications Conference Proceedings, No. 9, 1989, Credit Union National Association.

"Bank Marketing Issues in the Year 2000," Triangle Bankers' Forum, Anchor Financial Services, Research Triangle Park, NC, March 27, 1990.

"Expectations and Customer Satisfaction Issues in Public Health Clinic Management", Wake County AHEC, Raleigh, NC, July 1988.

"Adding Value in Financial Service Relationships," Southeastern Jurisdiction of Credit Union Board Chairmen, North Carolina Credit Union League, Asheville, NC, July 1988.

"Methodological Issues in Psychological Reactance Theory Research," Association for Consumer Research, 1988.

"Self Coding Versus Independent Judge Coding of Ambiguous Response Measures," AMA Summer Educators' Conference, 1987.

"Building Brand Equity," Credit Union Executive Society, North Carolina Credit Union League, October 1, 1987.

"Effective Marketing Plans," Member Agency Marketing Workshop, United Way of North Carolina, September 9, 1987.

"The Hare and the Tortoise -- A Contemporary Marketing Fable (With Appropriate Apologies to Aesop)," Tarheel Chapter of the North Carolina League of Credit Unions, Raleigh, NC, March 24, 1987.

"The Challenges of Change," EMC Employees Credit Union 18th Annual Meeting, Raleigh, NC, March 18, 1987.

"A Preliminary Test of the Applicability of Interdependence Theory in Explaining Power and Conflict in Distribution Channels," American Marketing Association, 1987.

"Marketing In Rural Electric Cooperatives," National Rural Electric Cooperative Association, 1986 National Member Services and Communications Conference, Forth Worth, Texas, August 24, 1986.

"What Have You Done For Me Lately?" 1986 Georgia EMC Member Services Conference, St. Simons Island, Georgia, June 26, 1986.

"Ticks, Kudzu, and Other Unpleasant Experiences," Tarheel Chapter of the North Carolina League of Credit Unions, Raleigh, NC, April 22, 1986.

"Demarketing Electricity: Consumer Participation in Utility-Sponsored Residential Load Control Programs," Southern Sociological Association, 1984.



CaseCase 3:20-cv-00710-MOC-DSC Document 135-1 Filed 12/06/23 Page 21 of 29 of 84

"Composite Measures in Macromarketing Time-Series Research Designs," Eighth Annual Macromarketing Seminar, University of Rhode Island, 1983.

"Normal Science versus Creative Approaches to Industrial Buyer Behavior Research," Southern Marketing Association, 1983.

"On the Difference Between a Manager and a Leader," Leaders of the Future Day, Monroe High School, Monroe, North Carolina, April 27, 1982.

"Three Major Threats to Bank Marketing Success in the 1980's," Central North Carolina Chapter, National Association of Women Bankers, March 9, 1982.

"Alternating Least Squares Approaches for the Principal Components Analysis of Mixed Metric Data," American Institute for Decision Sciences, 1981.

"The Market Effect of Sweepstakes: A Time-Series Analysis and Methodological Comment," American Marketing Association, 1981.

"Economic Constraints on Consumer complaining Behavior," Association for Consumer Research, 1979.

"A Box-Jenkins Strategy for the Factor Analysis of Multiple Time-Series," Albert Haring Symposium, Indiana University, 1979.

"The Aberrant Data Problem in Interrupted Time-Series Designs," Southern Marketing Association, 1978.

"A Review of Formal Theories of Consumer Socialization," Association for Consumer Research, 1977.

**REVIEWER EXPERIENCE**

American Marketing Association, Educator's Conference
American Marketing Association Dissertation Competition
Southern Marketing Association
Journal of Marketing Research (ad hoc)
Journal of Macromarketing (ad hoc)
Journal of the American Planning Association (ad hoc)
Journal of Consumer Research (ad hoc)

**CAMPUS SERVICE ACTIVITIES**

University of North Carolina Faculty Council, 1984 - 1987.

MBA Program Committee, 1984 - 1987.

MBA Admissions Committee, 1980-1981, 1983-1984.

PhD Program Committee, 1981-1984, 1988-1990.

University Food Service Advisory Committee, 1981-1984.

Carolina Students Credit Union, Board of Advisors, 1987-1993

Alliance of Minority Business Students, Faculty Advisor, 1988 to 1989.

Wesley Foundation, Faculty Advisor, 1987 to 1995.

Carolina Campus Cares, founding member 1991.

Phi Beta Lambda Professional Fraternity, Advisor 1994 to 1998.

Community Citizenship Day Planning Committee, Kenan-Flagler Business School, 2001 to 2003.

Faculty Committee on Athletics, 1999 to 2004.

Chancellor's Task Force on Code for Labor Practices Related to Licensing, 1998-1999.

Edward Kidder Graham Awards Selection Committee, April 2003.

Kenan-Flagler Business School GLBTA Association faculty advisor, 2003 to present.

Carolina Speakers, 1999 to present.

Licensing Labor Code Advisory Committee for the Chancellor, 1999 to present.

UNC Dance Marathon Advisory Board, 2000 to present.

Ackland Art Museum Administrative Advisory Committee, 2001 to present.

World View Advisory Board, 2000 to 2006.

Environmental Resource Program Advisory Board, School of Public Health, 2001 to present.

Morehead Final Selection Weekend, The John Motley Morehead Foundation, 2000 to present.

Chair, Truman Scholarship Nomination Committee, Office of Distinguished Scholarships and Intellectual Life, 2001 to present.

Faculty Council Nominating Committee, 2004.

Alpha Phi Omega national service fraternity, faculty advisor, 2003 to 2006.

**COMMUNITY SERVICE ACTIVITIES, COMMUNITY FOUNDATIONS, AND COMMUNITY BOARD MEMBERSHIPS**

Chapel Hill Drug Action Committee, Chapel Hill, NC. Board of Directors, 1973-1976; Chairman, 1975-1976.

University United Methodist Church, Chapel Hill, NC. Administrative Board, 1986 to 1993; Trustees, 1994 to 1995. Annual Conference Delegate 2004, North Carolina Conference.

University United Methodist Preschool, Chapel Hill, NC. Founding Member, Board of Directors, 1986 to 1991.

Wesley Foundation, Chapel Hill, NC. Board of Directors, 1985 to 1989, 2006 to present.

Chapel Hill Literary Society, 1987 to present.

Chapel Hill-Carrboro Public School Foundation Board of Directors, 1991 to 1995.

Methodist Foundation Board of Directors, North Carolina Conference United Methodist Church, 1992 to 1998.

Pension Board of Directors, North Carolina Conference United Methodist Church, 1991 to 1998.

Frank Porter Graham Elementary School Governance Committee, 1991 to 1994.

Eno Triangle Pony Club, Parent Sponsor, 1994 to 2003.

Council on a Sustainable Community task force, Chapel Hill- Carrboro Chamber of Commerce, 2003-2004.

**STATEWIDE SERVICE**

The Rural Enrichment Partnership, eight regional councils of community agencies across Eastern and Central North Carolina, partnership between Food Bank of North Carolina and UNC-Chapel Hill, 2000 to present.

**ELECTED PUBLIC OFFICE**

Board of Education, Chapel Hill-Carrboro City Schools, three elected terms, 1995 to 2005, two annual rotations as Vice-Chair and two annual rotations as Chair (1998, 2001).

**HONORS**

Delta Sigma Pi, Honorary Faculty Member.
Beta Gamma Sigma, Northwestern University
Rendleman Award for Contributions to the PhD Program
Who's Who in Business Higher Education
North American Academy of Arts and Sciences, Fellow of the Academy

**SELECTED CONSULTING CLIENTS**

American Marketing Association
Beatrice/Hunt-Wesson Inc.
Broyhill Furniture Industries
California Grocers' Association
CargoLifter
Carmichael and Company Advertising and Public Relations
Carolina Power and Light Company
Cellular One, Carolina Metronet, Inc.
Channel Master, Inc.
Communication Properties, Inc.
CONXUS Communications, Inc.
City of Evanston, Evanston, Illinois
Dial Call, Inc.
Dial Page, Inc.
Duke CE
Duke Power Company, Inc.
Eastern Group/ Statoil
Electric Power Research Institute
Food Bank of Central and Eastern North Carolina
iBAHN
IBM
JC Penny, Inc.
Leadership Forum Incorporated
McNeil Consumer Products/ Tylenol
Metronet, Inc.
Montessori School of Raleigh
Mtel, Inc.
Navistar



CaseCase 3:20-cv-07721-00168-DMTCO Document 135-1 Filed 12/06/23 Page 25 of 83 of 84

Nextel
North Carolina Alternative Energy Corporation
North Carolina Electric Membership Corporation
North Carolina Electricities
PCS Development Corporation
Peracom Networks Inc.
Philip Morris
Pines of the Carolinas Girl Scout Council
Planter's Bank
Sanford, Adams, McCullough and Beard, Attorneys at Law
Sara Lee Corporation
Seminole Electric Corporation
Sophia Communications
SkyTel, Inc.
Smith, Helms, Mullis and Moore, Attorneys at Law
Smith Moore LLP
STSN
Vermont Foodbank
Whittle Communications, Inc.

2008