**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| HAYWARD INDUSTRIES, INC.,<br><br>Plaintiff, Counterclaim Defendant<br><br>v.<br><br>BLUEWORKS CORPORATION, BLUEWORKS INNOVATION CORPORATION, NINGBO C.F. ELECTRONIC TECH CO., LTD; NINGBO YISHANG IMPORT AND EXPORT CO., LTD.<br><br>Defendants, Counterclaim Plaintiffs. | Civil Action No. 3:20-CV-710 -MOC-DSC |

## HAYWARD'S MEMORANDUM IN SUPPORT
## OF ITS MOTION FOR ATTORNEY'S FEES

Hayward seeks an award of attorneys' fees incurred in prosecuting this lawsuit, as warranted under 15 U.S.C. § 1117(a) ( Lanham Act), N.C. Gen.Stat., § 75-16.1 (UDTPA), and 17 U.S.C. § 505 (copyright). Hayward seeks fees of $4,360,165.34, an amount that reflects 8868.7 hours billed by Hayward's counsel at McCarter & English LLP and 568.7 hours billed by Hayward's local counsel at Womble Bond Dickinson (US) LLP. [1]

An award of Hayward's fees is warranted because Defendants (a) unreasonably dragged out this litigation; (b) failed to settle when they had the chance for far less than the damages award; (c) deceived and cheated Hayward, the public, and this Court; and (d) took no responsibility for their conduct, evading questions on the stand and not telling the truth. Indeed, Defendants continue

---

[1] Hayward was actually billed $4,933,165.24 in legal fees (McCarter's and Womble's combined), but is requesting only $4,360,165.24. Hayward has subtracted $573,000 in fees related to Hayward's defense against Defendants' trade secret counterclaims and on other issues not related to the claims and counterclaims based on Defendants' advertising.

to falsely advertise their salt cells, as seen in Hayward's Motion for a Permanent Injunction (Doc. No. 358), forcing Hayward to pursue Defendants after the jury verdict. In addition, Hayward's legal fees are reasonable and were incurred substantially in support of the winning claims.

## BACKGROUND

### I.      HAYWARD'S SUCCESSFUL CLAIMS

This case centered on Defendants' advertising practices. In their ads (mostly on-line ads on Amazon.com), websites (*e.g.*, www.blueworkspool.com), and solicitation emails (collectively, the "Ads"), Defendants blurred the lines between their non-compatible, foreign-made salt cells and Hayward's genuine, American-made salt cells exactingly calibrated to be compatible with Hayward's controllers. Defendants blurred the lines between themselves and Hayward and deceived consumers, suggesting in the Ads that they manufactured Hayward's salt cells or that their salt cells were the same as Hayward's and thus "compatible with" Hayward's controllers when, in fact, they are not. Defendants advertised their products as "Made in the USA," or variations thereof (*e.g.*, "made by a USA company"), when they were 100% made in China.

Defendants falsely advertised their salt cells as "compatible with" Hayward's controllers; as the "same as" or "equivalent to" or "direct replacements for" Hayward's salt cells; that Defendants' cell plates are from Hayward's supplier; and that Defendants cell plates were "Made in the USA," "Made by a USA Company," "Provided by a USA Manufacturer," and variations thereof. Defendants also falsely advertised that their salt cells were "NSF certified" and that Defendants were the "OEM" for the largest salt cell companies in the US, (read "Hayward").

***None of Defendants statements were true.*** The overwhelming evidence showed that the salt cells are not "compatible" with Hayward's controllers or the same as Hayward's salt cells. For example, Hayward's technical expert, Quinn Horn, Ph.D., testified that he compared and

ME1 47832073v.3

rigorously tested the salt cells and found Defendants' cells to be incompatible with Hayward's controllers. (Trial Tr., Vol 2, 154:21-156:23, 162:11 – 163:12). Defendants did not offer an expert to counter that testimony, or any credible evidence of testing, for that matter.

At trial, Defendants had no good defense to the false advertising. Indeed, Defendants' principal witness, Richard Chen, *admitted* that many of the statements in the Ads are false. For example, Mr. Chen admitted that the plates in the salt cells come from China and thus are not (a) made in the USA and (b) from the same supplier as Hayward's. (Trial Tr., Vol 5, 71:16-18; *see also* Trial Tr., Vol 4, 165:22-24) Mr. Chen also admitted that Defendants' salt cells are not NSF certified, (*Id.*, Vol 4, 195:3-196:5), and that Defendants are not the original equipment manufacturer for Hayward or affiliated with Hayward, contrary to what Defendants present on their own website. (*Id.*, Vol 5, 51:21-24, 103:12-16, 120:24-124:18).

Hayward's consumer behavior and marketing expert, Professor Didow, testified that Defendants' misrepresentations about the quality, compatibility, and origin of their salt cells were material and misled consumers. *See, e.g.*, (Trial Tr., Feb. 27, 2024, Vol 4, 89:5-13)

On Friday, March 1, 2024, following seven days of trial, the jury found Defendants liable to Hayward for false advertising under the Lanham Act and North Carolina's Unfair or Deceptive Trade Practices Act. The jury awarded $4.9 million in damages, which, under the UDTPA, was automatically trebled to $14.7 million. The jury also found Defendants' liable for copyright infringement and awarded $750 in statutory damages to Hayward.

## II. THE LITIGATION

Before filing suit, Hayward sent two cease and desist letters to Defendants, but Defendants never responded to them. Hayward was thus forced to sue and filed this case in December 2020. *See* Declaration of Erik Belt in Support of Attorneys' Fees ("Belt Fees Decl.") at ¶ 9.) The two

3

Chinese defendants, Ningbo C.F. and Ningbo Import & Export, moved to dismiss for lack of jurisdiction. In May 2021, the Court (per Judge Whitney) denied the motion. (Doc. No. 31.); (Belt Fees Decl., at ¶ 10.) In so doing, the Court found that Defendants' declarants, primarily Mr. Chen, were less then truthful in their denials of any affiliation between Ningbo and Blueworks. For example, the Court observed that "Mr. Chen's affidavit is somewhat contradicted by Blueworks' Answer, which admits Mr. Chen is a non-controlling shareholder in Ningbo Electronics and CEO of Blueworks." (Doc. No. 31, at 3-4.) Likewise, the Court found that Defendants' declarants were "directly contradicted by other affidavits and exhibits in the record." (*Id.* at 9.) That finding is consistent with *this* Court's comments at trial that Mr. Chen's testimony "does not have some of the earmarks of truth." (Trial Tr., Vol 4, 204:17-205:2.) The Court also held that, despite Mr. Chen's denials, all four defendants were alter egos of each other. (Doc. No. 31 at 11-12.), which this Court confirmed with a directed verdict to that effect. (Trial Tr., Vol 7, 14:6-23)

### A. Defendants Delay Tactics Increased the Costs of Litigation

After the initial pleading stage, Defendants dragged out this litigation, adding substantially to Haywards' fees and costs. For instance, there have now been *eight* extensions of the schedule (*see* Doc. Nos. 52, 72, 85, 90, 92, 105, 110, and Text-only order of 3/25/24), all sought by Defendants. Several of those extension requests were prompted by Defendants' substitutions of counsel (usually after Defendants lost a motion).[2] Further, Defendants did not make Mr. Chen

---

[2] At last count, Defendants had retained eight different firms, including two large national firms, Foley & Lardner and Morgan Lewis. Foley originally represented Defendants but was replaced shortly after the Court denied Ninbgo's motion to dismiss. Defendants' next lead counsel, Morgan Lewis, was replaced not long after the Court denied Defendants' motion to compel. (Doc. No. 98). Keeping with tradition, Defendants' lead trial counsel, Turner Boyd Seraphine LLP, recently moved to withdraw after losing at trial. (Doc. No. 357). One wonders whether Defendants fired its law firms (*e.g.*, for losing motions or to avoid paying their high fees) or whether those firms "fired" Defendants (*e.g.*, due to Mr. Chen's mendacity and evasiveness).

4

available for his deposition until the very last day of discovery and produced key documents (many in Chinese) in the middle of that deposition, frustrating Hayward's efforts to depose him.

Defendants' *modus operandi* throughout this litigation has been to delay at all costs. For example, Defendants lured Hayward into agreeing to an extension of certain discovery events to permit court-sponsored mediation under false promises that Defendants would not also seek to extend the then-scheduled June 2023 trial-ready date. (*See* Doc. No. 117-1, at ¶¶ 4-9.) Indeed, as a condition for the extension of certain discovery deadlines, Defendants represented to not just Hayward but also to this Court that "The Ready for Trial date shall remain unchanged and set for June 20, 2023." (Doc. No. 105) (emphasis added); (Doc. 117-1, ¶¶ 5, 13.); (Belt Fees Decl., at ¶ 21.) And yet, as soon as Defendants switched counsel, Defendants moved to extend the trial, using their substitution of counsel as the excuse. (Doc. No. 110); (Belt Fees Decl., at ¶ 23.)

Defendants' mediation request and subsequent substitution of counsel was something of a bait-and-switch because Hayward would no longer be negotiating with the trial counsel, Morgan Lewis, who had represented Defendants throughout discovery and with whom Hayward's counsel had built a relationship. As detailed below, the mediation went nowhere. (Belt Fees Decl., at ¶ 23.)

   **B.**    **Defendants Complicated and Frustrated Discovery**

At the outset of the case, Hayward proposed to make discovery more efficient. Specifically, because there were four defendants (all represented by the same counsel, however, and all alter egos of each other), but only one plaintiff, Hayward proposed limits on discovery requests, with each side (as opposed to each party) getting to serve a certain number of joint discovery requests. Defendants, however, opposed, insisting that each of the four defendants be able to serve separate and extensive discovery requests. That would impose an asymmetrical burden on Hayward. Even after the parties reached an agreement on the discovery plan, Defendants violated that agreement

5

by serving requests that exceeded the limits. (Belt Fees Decl., at ¶ 11 and Exh. A.)

Throughout discovery, Hayward had to press Defendants to produce responsive documents, but Defendants failed to produce documents that any manufacturing company like Ningbo CF should have (*e.g.*, manufacturing costs), despite promising to do so. (Belt Fees Decl. at ¶ 12, 14 and Exh. B.) The parties took 14 depositions, most of which were of Hayward's fact and expert witnesses. Defendants offered only one fact witness—Mr. Chen. Given Defendants lack of witnesses and deficient document production, Hayward sought out third parties (such as Mr. Mikuski, who was Mr. Chen's former business partner) to fill in the gaps in Defendants' productions. Hayward subpoenaed eight third parties, reviewed over 15,000 documents produced in response to those subpoenas, and conducted four third-party depositions. (*Id*. at ¶ 13.)

Defendants' obstructionist tactics did not make the discovery process easy. Defendants did not timely produce many relevant documents and produced hundreds of those documents in Chinese, forcing Hayward to expend time and money to obtain certified translations. Moreover, Defendants never produced several relevant documents at all, including testing documents and financial information. Hayward's damages expert was forced to undertake the time-consuming and costly job of reconstructing Defendants financials and profits to opine on the appropriate damages numbers in this case. Defendants then produced a large tranche of documents on the final day of discovery, in the middle of Mr. Chen's deposition. (*Id*. ¶¶ 14.)

Hayward served three expert reports and a supplemental damages report to account for Defendants' belated production of financial information. Summary judgment included two sets of motions from each side totaling 229 pages. Three *Daubert* motions were filed, two by Defendants. Twenty-three motions *in limine* were filed, including Defendant's motion to exclude the "Made in the USA" issue, which was tantamount to a very belated reconsideration of summary judgment.

ME1 47832073v.3

### C. Defendants' Meritless Counterclaims

Hayward also was forced to defend against Defendants' ill-founded counterclaims to cancel Haywards's trademarks, for theft of trade secrets, and for intentional interference with contracts. Accordingly, Defendants caused Hayward to engage in unnecessary discovery and lengthy motion practice. Showing the weakness of their counterclaims, Defendants voluntarily dismissed their trademark cancellation counterclaims during trial. (Trial Tr., Vol 5, 5:2-5.) After Defendants rested, this Court directed a verdict against Defendants' interference with contract counterclaim. (Trial Tr., Vol 6, 221:8-9.) Defendants' trade secrets counterclaim was equally meritless.[3] During discovery, Defendants moved to compel privileged documents under the guise of its claims that Hayward somehow stole their trade secrets. (Doc. Nos. 94-96). The Court denied their motion. (Doc. No. 98). Recognizing that their trade secrets claims lacked merit, Defendants promised to withdraw those claims in February 2023. (Belt Fees Decl., ¶¶ 15-16.) But Defendants did not actually withdraw the trade secrets counterclaims until May 16, 2023 (Doc. No. 141), just hours before Hayward was about to move for summary judgment on those counterclaims.[4]

### D. Defendants' Unreasonable Settlement Position

In 2021, after losing the motion to dismiss, Defendants asked Hayward if it would agree to a private mediation. Hayward said it would agree but only if Defendants came prepared to "put money on the table." Defense counsel (at the time, Foley & Lardner) promised that Defendants

---

[3] Ningbo CF also filed a retaliatory trade secrets lawsuit against Hayward in China based on the same allegations supporting the trade secrets counterclaims in this case. Hayward successfully defended against those claims in China. Hayward is not seeking to recoup the additional fees spent in defending against that case or that counterclaim here. (Belt Fees Decl. at ¶ 15.)

[4] Hayward had spent substantial hours preparing a motion for summary judgment on Defendants' counterclaims. After Defendants filed their stipulation of dismissal (Doc. No. 141), Hayward hastily removed the facts and arguments directed to the trade secrets counterclaims and filed the motion just on to the trademark cancellation counterclaim claims. (Belt Fees Decl. at ¶ 17.)

7

would put money on the table. (Belt Fees Decl., at ¶ 18.) At that mediation in November 2021, Hayward told Defendants that it would settle f*or no more than its legal fees and cost*s, along with changes to Defendants' advertising.  At that time, less than a year into the litigation, Hayward's fees and costs were just under ████, and that is what Hayward requested.  But, despite Defense counsel's promise that their clients would put money on the table, and despite the very reasonable amount that Hayward requested (just fees and costs, not damages), Defendants put ***no*** money on the table. (*Id*., ¶ 19.) During that mediation, Hayward's representative, Steve Halpern, told Mr. Chen that Hayward was prepared to spend several million dollars to take the case to trial but that Defendants could settle that day for the reasonable price of Hayward's legal fees and costs (again, less than ████) and changes to their advertising.  Hayward would have foregone any compensation for the damages it had suffered. (*Id*. at ¶ 19.)

As prefaced in Section I.A above, in early 2023, near the conclusion of fact discovery, Defendants (then represented by Morgan Lewis) requested a second mediation, and Hayward agreed *on the condition that the June trial would not be moved*. Before the mediation, Defendants offered ████ and to make certain changes to their advertising. (Belt Fees Decl. ¶¶ 20-21 and Exh. C.)  Of course, Defendants knew that the ████ was only slightly more than the ████ in legal fees and costs that Hayward had requested in the first mediation a year-and-a-half earlier.  By the second mediation, however, those fees and costs had quadrupled.   Further, Hayward had served the expert report of its damages expert, Ms. Saitz, who calculated that Hayward's profits figure at that point, through 2021 (Defendants had not yet produced its sales data for 2022 and 2023) was just under ████, and Defendants' ill-gotten profits were estimated to be just under ████. (Belt Fees Decl. at ¶ 20; Doc. No. 165, Saitz Rpt).  (By trial, Ms. Saitz's good faith damages estimates grew to ████ ***in lost profits*** or ████ in disgorgement profits based

8

on Defendants' ever-increasing sales.)  (Trial Tr., Vol 6, 68:11-16).  The second mediation, with

Magistrate Judge Keesler, took place on March 16, 2023. (*See* Doc Nos. 100, 104). Hayward came

prepared to settle. The mediation, however, was over by 2 pm, wasting not only Hayward's time,

but the Court's as well.  For the second time in a mediation, Defendants did not even counter

Hayward's opening settlement proposal and did not budge from ███████. (Belt Decl., ¶ 22).

Clearly, the mediation was a ruse to give Defendants' new counsel, Turner Boyd (who substituted

in just the week before), more time to transition into the case and to delay the trial.

### E.    Defendants' Deceptions and False Advertising

After the parties rested and the jury was sent home for the day, the Court commented that

Defendants' conduct was wrongful, that Hayward lost money as a result, that the Defendants are

alter egos of each other, and Defendants could be hiding money:

> I believe Mr. Chen has engaged in a course of conduct that's wrong. I think this
> jury is going to find that it's wrong. They may find all of them are wrong, all the
> things that he did were wrong.  I think it's pretty clear. I saw him testify up here
> and -- so I think he engaged in wrong conduct … I think there's evidence that the
> difference -- Hayward lost money, and Blueworks and Company got money. And
> I -- by the way, I do think all these companies are alter egos of each other and are
> tied in together . . .

(Trial Tr., Vol 6, 223:24-224:13)

> And if he lied about -- if that's where he's hidden all his money and he's lied about
> it, he'll probably have to stay in China the rest of his life to keep from being indicted.

(*Id.* at 229:1-4)  At another pause in the proceedings, the Court also commented that Mr. Chen

appeared to be less than truthful:

> It appears that the -- it appears that some of the earmarks of truth-telling are not
> present in what – in the – in Mr. Chen's testimony.  But that's just from the Court.

(Trial Tr., Vol 4, 204:24-205:3)

> it's pretty clear to the Court that we're getting a bit of a two-step here and that, you
> know, if there's any -- if we've cheated and done something wrong, it's because we

9

didn't understand the language and on and on and on and on. And I don't know whether the jury's picking up on that but I'm getting irritated.

 (*Id.*, at 202:12-18).  The Court's observation of Mr. Chen is consistent with the observation of Mr. Chen's former business partner, Mr. Mikuski, who testified that Mr. Chen's "made in the USA" statement was "just basically a flat-out lie." (Doc. No. 316, Mikuski Depo. Tr. at 69:19-70:8; 70:14-22 (video played at trial)).

Defendants' main witness, Mr. Chen, lacked credibility. When shown advertisement after advertisement with inaccurate and misleading statements, Mr. Chen's best answer was to blame the language barrier, even though he speaks English. (*See* Trial Tr. Vol 5, 98:11-12 )("That's true, but English is not our mother tongue, so we may not express that very good"); (Trial Tr., Feb. 27, 2024, Vol. 4, 177:25-178:1) ("I think it's probably a language issue from our employees.") Mr. Chen would deflect and blame his employees for writing the false statements. (Trial Tr. Feb. 28, 2024, Vol 5, 97:22-24) ("I was not the one who wrote this email and I think the first part of this may not be accurate, but later it did say all cell plate."). And when shown the contents of Blueworks' website from January 2024 claiming that Defendants made Hayward's TURBO CELL® salt cells, Mr. Chen again deflected, blaming the web designer.  (*Id.,* at 119:22-124:18.) The Court quickly caught onto Mr. Chen's evasiveness, as seen above.

Most glaring was Defendants' attempt to explain its false statement that the cell plates were "Made in USA." As Mr. Chen admitted on the stand, since 2018, Defendants have purchased the metal sheets from Magneto in China. Defendants cut up the metal sheets and processed them in their own factory in China to make the individual cell plates used in their products. (Trial Tr., Feb. 27, 2024, Vol 4, 157:16-18) Defendants only response was that Magneto was a subsidiary of Evoqua, a company based in Pittsburg. When confronted with the facts on the stand, Mr. Chen admitted that Defendants blades ***were not*** provided by a USA company:

10

Q: Okay. So the blades were not provided by a USA company, correct? It's a yes-or-no question?

A: Correct.

(Trial Tr., Feb. 28, 2024, Vol 5, 71:16-18). The "Made in the USA" statements were blatantly false.

## III. HAYWARD'S LEGAL FEES ARE REASONABLE

Hayward's counsel spent a combined 9,437.4 hours prosecuting Hayward's claims and defending against Defendants' counterclaims, delay tactics, deceitfulness, failure to settle for reasonable sums, and frequent changes of counsel. Through trial, and not counting post-trial briefing, Hayward's attorneys' fees ran to $4,933,165.24. Hayward, however, has subtracted fees spent in defending against Defendants' trade secrets counterclaims and on other issues not directly connected to the claims based on Defendants' advertising and copyright infringement. As such, Hayward is deducting $573,000 in attorneys' fees attributable to those other issues. Thus, the total requested legal fees are $4,360,165.24. (Belt Fees Decl., ¶¶ 24-27 and Exh. D.)

The requested attorneys' fees are reasonable. Hayward's lead counsel, McCarter & English, has represented Hayward for over 20 years, and thus has institutional knowledge of Hayward's intellectual property, business, products, and proprietary technologies. Lead trial counsel Erik Belt has represented Hayward since early 2019 and has managed a number of Hayward's intellectual property enforcement efforts against numerous infringers, including in particular other cases involving salt cells. (Belt Fees Decl., ¶ 28.) Mr. Belt is an experienced intellectual property litigator and has been practicing for over 32 years, since 1991. Mr. Belt summarizes his other qualifications, honors, and experience, as well as the experience of his litigation team, in his accompanying declaration, (*Id.* at ¶¶ 1-8.) Further, Mr. Belt managed the litigation leanly, starting the case with just one associate and then bringing in more attorneys and paralegals on an as-needed basis, as discovery and motion practice ramped up. (*Id.* at ¶¶ 29-31.)

11

McCarter's hourly rates were also reasonable. For instance, given the long-standing relationship with Hayward, McCarter locked in its 2021 hourly rates through trial (*i.e.*, not raise rates each year) and also agreed to give Hayward an additional ██ discount on those fees throughout the litigation and also gave further discounts from time to time. (*Id*. at ¶¶ 32-33.)

McCarter also enlisted Russ Ferguson of Womble Bond Dickinson as its local counsel. Womble's fees through trial were $335,140.50. As this Court saw during trial, Mr. Ferguson took a leading role, examining witnesses, arguing motions, and working late into the night to hammer out the jury instructions and verdict form. (Declaration of Russ Ferguson, ¶¶ 3-4, 11.)

Driving up the fees, Hayward's counsel was litigating against two very large national firms, Foley & Lardner and Morgan Lewis, which have high billing rates and can throw lots of lawyers and paralegals into the fray. Moreover, according to AIPLA's most recent economic survey, the hourly rates that McCarter and Womble charged Hayward were reasonable for the complex intellectual property litigation that this case turned out to be. For example, for equity partners like Mr. Belt practicing in intellectual property litigation in 2022 in Boston, the mean hourly rate was ██ and the third quartile was ██. Lead trial counsel Mr. Belt's effective hourly rate, as actually billed to Hayward, falls within this range. (Belt Fees Decl. at ¶ 34-35 and Exh. E.) By comparison, the same range of hourly rates for equity partners in San Francisco, where both the Morgan Lewis and Turner Boyd Seraphine lawyers are based, was ██ to ██. (*Id*. at ¶ 34.) Especially when compared with Defendants' San Francisco based lawyers, McCarter's fees are reasonable.

## ARGUMENT

## I. RECOVERY OF ATTORNEYS' FEES IS PROPER UNDER THE LANHAM ACT

The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party" on a claim for either trademark infringement or false

12

advertising/unfair competition. 15 U.S.C. § 1117(a). "For the purposes of § 1117(a), a party is 'prevailing' when that party 'succeed[s] on a significant litigated issue that achieves some of the benefits sought by that party in initiating the suit.'" *Irwin Indus. Tool Co. v. Worthington Cylinders Wisc., LLC,* 747 F. Supp. 2d 568, 587 (W.D.N.C. 2010) (citation omitted). Here, Hayward is the prevailing party, the jury having found for Hayward's on its false advertising claim.

An "exceptional" case is simply one that "stands out from the others." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 572 U.S. 545, 554 (2014). A court's finding that a case is exceptional is discretionary and is based on the totality of the circumstances. *Verisign, Inc. v. XYZ.com, LLC,* 891 F.3d 481, 487 (4th Cir. 2018) (vacating denial of motion for attorneys' fees). Factors that inform whether a case is exceptional include whether (i) the non-prevailing party's position was frivolous or unreasonable; (ii) the non-prevailing party litigated in an unreasonable manner; or (iii) there are other circumstances that advance considerations of compensation or deterrence. *Verisign,* at 483–84. The prevailing party need <u>not</u> prove that the losing party acted in bad faith or that the party's defenses were objectively baseless. *Id.* at 482 & 488 n.6. A party must prove a case is "exceptional" only by a preponderance of the evidence. *Id.* at 482.

The record contains overwhelming evidence that Defendants intentionally or recklessly used false or deceptive advertising that was calculated to confuse customers seeking salt cells compatible with Hayward's controllers. Defendants explanation for their conduct at trial lacked credibility. The discrepancy between the merits of the parties' arguments is significant, and in failing to recognize the strength of Hayward's claims, Defendants litigated this case in an unreasonable manner.

13

## A. Defendants' Deceptive Conduct Makes This Case Exceptional

The jury found that Defendants' "made false or misleading statements in commercial advertising **that deceived consumers or were likely to deceive consumers in a material way that caused harm**." (Doc. No. 353, Jury Verdict at 2) (emphasis added). The evidence at trial showed that Defendants knowingly engaged in various deceptive practices. For instance, Hayward sent cease and desist letters to Defendants in May 2020 and filed the complaint in December 2020, yet Defendants persisted in using misleading listings to sell their replacement salt cells throughout the litigation. Indeed, even now, *after* the jury verdict, Defendants continue to engage in their false "compatible with" advertising. (*See* Doc. No. 358, *et seq.*). Defendants also ignored warning from Amazon.com, which took down several of Defendants misleading advertisements and notified Defendants. (*See* DTX295). Defendants' business partners also questioned Defendants' advertising. (*See* PTX327; *see also* Doc. No. 316, Mikuski Depo. Tr. at 69:19-70:8 (video played at trial.)) But Defendants persisted in their deceptive advertising.

District courts are also able to determine whether a case is "exceptional" by examining the "substantive strength of a party's litigating position." *Verisign*, 891 F.3d at 487 (citation omitted) . The evidence at trial proved Defendants engaged in deceptive practices that were likely to cause confusion in the marketplace. The jury was shown dozens of examples of Defendants' Ads containing the various or false or deceptive statements. Hayward established, and Defendants eventually conceded, that Defendants accused statements were false. Indeed, Mr. Chen admitted that many of these accused statements were false. (Trial Tr., Vol. 52:14-15, 71:12-18, 104:4-9, 119:21-121:15.)

14

**B. Defendants' Explanations Offered at Trial Lacked Credibility**

Defendants' arguments need not have been "objectively baseless" or made in bad faith to warrant an award of fees; rather, what suffices is "an unusual discrepancy in the merits of the positions taken by the parties." *Verisign*, 891 F.3d 483-84 (quoting *Georgia-Pacific Consumer Prods. LP v. von Drehle Corp.*, 781 F.3d 710, 721 (4th Cir. 2015). Such a discrepancy exists here.

A case may be exceptional when a party "refused to recognize the strength" of the opposing party's case. *See LendingTree, LLC v. Zillow, Inc.,* 54 F. Supp. 3d 444, 463 (W.D.N.C. 2014). Here, Defendants persisted up to and through trial (and beyond) without providing any remotely credible explanation for the false statements in their advertisements. Their "explanations" offered at trial were untenable. Indeed, even this Court could not believe Mr. Chen's explanations:

> I'm getting all this stuff -- we got stacks of plates up -- that is bull. I'm just telling you, he's not telling the truth about that in my opinion. I'm not going to tell the jury that obviously. But I think that's a load -- I think that's just a big load, to be able to say, why did you say that? Well, at that point, we just had stacks of stuff in there. Okay. I don't believe it.

(Trial Tr., Vol. 5, 208:14-21.; *see also* Trial Tr., Vol. 4, at 202:12-18).

In sum, Mr. Chen was his own worst enemy. The discrepancy between his evasive testimony and Defendants' arguments is significant. Given Mr. Chen's evasiveness and lack of credibility, and given Defendants' failure to rebut Hayward's evidence that the salt cells are not "compatible with" Haywards' controllers (*e.g.*, by not offering an expert to rebut Dr. Horn), Defendants litigated this case in an unreasonable manner.

## II. RECOVERY OF ATTORNEYS' FEES IS PROPER UNDER THE UDTPA

Under N.C. Gen. Stat. § 75-16.1, attorneys' fees are properly awarded when the party that violated the UDTPA (1) "willfully engaged in the act or practice" and (2) "there was an unwarranted refusal by such party to fully resolve the matter which constitutes the basis of such suit." N.C. Gen. Stat. § 75-16.1. "An act is 'willful' within the meaning of N.C. Gen. Stat. § 75–

16.1(1) if it is 'done voluntarily and intentionally with the view to doing injury to another.'" *Cargill, Inc. v. WDS, Inc.*, No. 3:16-CV-00848, 2018 WL 1525352, at *17 (W.D.N.C. Mar. 28, 2018) (citation omitted). As explained below, both prongs are satisfied here.

## A. Defendants Acted Intentionally

For an act to be "willful," it need not be "fraudulent, malicious, or grossly negligent"—the bar is lower than that. *DENC, LLC v. Philadelphia Indem. Ins. Co.,* 454 F. Supp. 3d 552, 564–65 (M.D.N.C. 2020), a*ff'd in part, rev'd in part on other grounds*, 32 F.4th 38 (4th Cir. 2022). Instead, "if there was no accident or mistake and the defendant's act was intentional, a court is justified in finding those actions to be willful." *Hongda Chem USA, LLC v. Shangyu Sunfit Chem. Co., Ltd.,* No. 1:12-CV-1146, 2020 WL 1891296, at *1 (M.D.N.C. Apr. 16, 2020).

There was no accident or mistake by the Defendants in their advertising; to the contrary, Defendants intentionally misled consumers into buying their products instead of Hayward's. Defendants presented no evidence to prove otherwise. Indeed, as noted above, Mr. Chen *admitted* that the Defendants' statements in their Ads were not true and offered no justification for them.

## B. Defendants Refused to Resolve the Matter

As recounted above, when given the chance, Defendants refused to settle for ███████ (no more than Hayward's legal fees and costs at that time). Later, Defendants refused to negotiate at the court-sponsored mediation in March 2023 after offering ██████ in February 2023, despite the substantial accrual of legal fees since the last mediation in November 2021 and the growing multi-million dollar damages estimates. Defendant did not even counter Hayward's opening demand at the mediation with a single additional dollar above their pre-mediation offer of █████. Belt Decl., ¶ 19.)

Defendants best offer of ██████ was both unreasonable and unwarranted, particularly in

16

light of Ms. Saitz's damages estimate at trial of ███████ in lost profits (exclusive of legal fees), Mr. Chen's performance at this deposition (as evasive as he was at trial), the prospect that an award under the UDTPA would be automatically trebled, and the jury's eventual award of $4.9 million, which was trebled to $14.7 million. "In evaluating whether there was an 'unwarranted refusal to fully resolve the matter which constitutes the basis' of the suit, courts can take the entirety of the circumstances into account." *DENC,* 454 F. Supp. 3d at 562. "For example, courts may look to a defendant's efforts to settle a matter before trial and the reasonableness of those efforts, including whether any settlement offers made were reasonable relative to what was ultimately awarded to the prevailing party." *Id.* Courts in this district have noted that to deny an award of attorneys' fees under N.C. Gen. Stat. § 75-16.1, settlement attempts must be made in time to avoid the "significant time and resources preparing for trial." *Clark Material Handling Co. v. Toyota Material Handling U.S.A., Inc.,* No. 3:12-CV-00510-MOC, 2015 WL 3514339, at *6–7 (W.D.N.C. June 4, 2015) (finding an award of attorneys' fees "appropriate" because, *inter alia,* "by the time Defendant offered any money to settle, the parties had already expended significant time and resources preparing for trial"). Here, Defendants best and last offer came after the parties had already expended significant time and resources on fact discovery, deposition, and expert reports. Defendants have made no post-verdict settlement offer.

Further, Defendants' ███████ offer was also insufficient to compensate Hayward for its injuries. Indeed, the jury awarded $4.9 million to Hayward, which was automatically trebled for a total award of $14.7 million. Courts in the district have found settlement offers to be unreasonable when compared to the ultimate award. For example, in *Clark Material Handling,* the losing defendant offered $800,000 the week before trial, which it raised to $1.5 million and left on the table through closing arguments. After the jury awarded $3 million in compensatory damages, the

17

defendant offered $2 million to settle the matter. *See Clark Material Handling*, *supra* at *6. The Court found that was not enough:

> [I]ts best offer in this case—made after the jury verdict—is still less than the amount of damages awarded by the jury, putting aside Plaintiff's accrued costs and fees. The court thus finds that a reasonable award of attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1 is appropriate.

*Id.* at *7 (citations omitted); *see also Irwin,* 747 F. Supp. 2d at 590.

Here, Defendants offer of ███████ did not approach *even one-eighth* of the $4.9 million the jury award, let alone the $14.7 million after trebling.  Therefore, Defendants' refusal to resolve the claims was unwarranted and justifies the award of attorneys' fees under the UDTPA. *See Irwin*, 747 F.Supp.2d 568 at 590 (because Defendants' settlement offer of $4 million was less than half of the $10.3 million actually awarded, and award of attorneys' fees was justified.)

## III.  RECOVERY OF ATTORNEYS' FEES IS PROPER FOR COPYRIGHT INFRINGEMENT

The Copyright Act authorizes courts "to award a reasonable attorney's fee to the prevailing party as part of the cost." 17 U.S.C. § 505. Courts in the Fourth Circuit consider four factors to determine if attorney's fees are appropriate under the Copyright Act: "(1) 'the motivation of the parties,' (2) 'the objective reasonableness of the legal and factual positions advanced,' (3) 'the need in particular circumstances to advance considerations of compensation or deterrence,' and (4) 'any other relevant factor presented.'" *Diamond Star Bldg. Corp. v. Sussex Co. Builders, Inc.,* 30 F.3d 503, 505 (4th Cir. 1994) (citation omitted).

These factors weigh heavily in favor of granting Hayward's attorneys' fees. First, Hayward's motivation is to guard its intellectual property and goodwill from Defendants' infringing and deceptive activities, as well as to protect its customers from incompatible salt cells that could be a health hazard because they fail to sanitize the pools. (*See* Trial Tr. Feb. 23, 2024,

ME1 47832073v.3

Vol. 2, 93:18-23.) Second, Hayward's legal and factual positions are objectionably reasonable given that the jury found Defendant Ningbo liable for infringement of Hayward's copyrighted manual. Third, as discussed above, Defendants' deceptive activities and passing off remains ongoing and requires deterrence. Therefore, an award of attorneys' fees is appropriate here. *See Thousand Oaks Barrel Co. v. Barrel*s, No. 1:21-CV-848, 2022 WL 3337798, at *13 (E.D. Va. July 11, 2022), *report and recommendation adopted*, No. 1:21CV848, 2022 WL 4378689 (E.D. Va. Sept. 22, 2022) (granting attorneys' fees for copyright infringement).

## IV.    THE FEES SOUGHT BY HAYWARD ARE REASONABLE

The attorney fees incurred in connection with this litigation are reasonable considering the skills of the lawyers, the nature of Hayward's claims, and the ultimate jury award in this case. Those fees are based on a reasonable number of hours and a reasonable hourly rate in the Boston area where McCarter's lead trial counsel reside, as well as in this district. Indeed, Hayward also retained counsel in this district at prevailing market rates. (Ferguson Decl. at ¶¶ 7-9, 13.) *See Depaoli v. Vacation Sales Associates, L.L.C.,* 489 F.3d 615, 622 (4th Cir. 2007) ("The market rate should be determined by evidence of 'what attorneys earn from paying clients for similar services in similar circumstances, which, of course, may include evidence of what the plaintiff's attorney actually charged his client'") (internal alterations omitted)).

### A.  The *Johnson* Factors Support an Award of Hayward's Requested Fees

To determine the amount of reasonable fees, courts typically calculate the "lodestar figure –the product of reasonable hours times a reasonable rate." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565 (1986). In deciding what constitutes a "reasonable" number of hours and hourly rates, courts in the Fourth Circuit consider the twelve *Johnson* factors:

ME1 47832073v.3

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Robinson v. Equifax Info. Servs., LLC,* 560 F.3d 235, 243–44 (4th Cir. 2009) (citations omitted). Courts in this district have observed, however, that "in the wake of the Supreme Court's decision in *Perdue,* at least eight of the *Johnson* factors have been subsumed in the initial lodestar analysis." *Page v. Va. State Bd. of Elections,* No. 3:13-CV-678, 2015 WL 11256614, at *2 (E.D. Va. Mar. 11, 2015) (citing *Perdue v. Kenny A. ex rel. Winn,* 559 U.S. 542, 552 (2010)).

Specifically, Factors (3), (4), (5), (6), (9), and (12) all bear on the reasonableness of the rates, while Factors (1), (2), and (7) bear on the number of hours reasonably expended. *Page,* 2015 WL 11256614, at *3 (citation omitted). The remaining factors are Factor (8) (the results obtained), which, as explained below, favors an award of the lodestar; Factor (10) (the undesirability of the case), which is not relevant here; and Factor (11) ( the nature and length of the relationship between Hayward and counsel), which has been long and mutually productive and supports the conclusion that the rates charged and paid were reasonable.

Further, "[a]lthough the Court considers all of the factors, they need not be strictly applied in every case inasmuch as all of the factors are not always applicable." *Earls v. Forga Contracting, Inc.,* No. 1:19-CV-00190-MR-WCM, 2020 WL 3063921, at *2 (W.D.N.C. June 9, 2020) (citations omitted). Of these factors, "the most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *In re Int'l Home Fashions, Inc.,* No. 1:09CV206, 2010 WL 3895730, at *2 (W.D.N.C. Sept. 29, 2010) (emphasis added) (citation omitted); *see also Doe*

ME1 47832073v.3

*v. Chao*, 435 F.3d 492, 506 (4th Cir. 2006); *B.P. v. Charlotte-Mecklenburg Bd. of Educ.,* No. CIV. 3:06CV445, 2010 WL 1418334, at *7 (W.D.N.C. Apr. 2, 2010). As explained below, the lodestar analysis supports the requested attorneys' fees award to Hayward.

### 1. The amount in controversy and the results obtained favor an award of attorneys' fees

As argued above, "the most critical factor" in determining the reasonableness of fees is the degree of success obtained. Hayward obtained a favorable jury verdict on its claims for false advertising under the Lanham Act and unfair and deceptive practices under the UDTPA and was awarded over $4.9 million in damages, which was trebled to $14.7 million. This Court has found attorneys' fees to be reasonable even when such fees exceeded the total compensatory damages. *Legacy Data Access, LLC v. MediQuant, Inc.*, No. 3:15-CV-00584, 2017 WL 6001637, at *20, 22, n.16 (W.D.N.C. Dec. 4, 2017) (awarding $719,881.50 in attorneys' fees following award of $702,000 in compensatory and punitive damages). Here, the fees requested are less than the jury's award and only a fraction of the total award of $14.7 million.

### 2. Hayward's counsel's hourly rates were reasonable for this type of work

The hourly rates charged by Hayward's lead counsel, McCarter & English, were reasonable given (a) the complex nature of the case (Factors 1-3); (b) the skill and experience of the attorneys (Factors 3 and 9); (c) the long relationship between Hayward and its counsel (Factor 11); (d) the results obtained (Factor 12); and (e) hourly rates for like cases (Factor 5).

First, courts have observed that "[t]rademark litigation is a particularly difficult field of specialization and is recognized as meriting greater than average rate of pay." *Choice Hotels Int'l, Inc. v. A Royal Touch Hosp., LLC (NC)*, No. 7:17-CV-381, 2019 WL 4781879, at *5 (W.D. Va. Sept. 30, 2019) (citing 5 *McCarthy on Trademarks and Unfair Competition* § 30:102). This case involved not just conventional trademark infringement but also other Lanham Act claims,

ME1 47832073v.3

including false advertising, passing off, and unfair competition that required more specialized attention. Indeed, because the false advertising included the false "compatible with" statements, the litigation was akin to a patent case in that it involved testing of the salt cells by a technical expert, Dr. Horn, and fluency in the operation of salt water chlorination systems and their effect on public health. The "made in USA" statements also required knowledge of how the blades are made and assembled into the salt cells.

Second, Defendants' lead counsel, Mr. Belt, is an experienced IP litigator with over 30 years of experience litigating and trying cases involving trademark infringement, false advertising, copyright infringement, and other kinds of IP disputes. Given that Mr. Belt has represented Hayward for five years, he also had the requisite experience with salt cell technology and an understanding of the pool industry generally. (Belt Fees Decl., ¶¶ 1-7.) Hayward's local counsel, Mr. Ferguson, is also an experienced trial lawyer and is very familiar with the local custom and practice in this Court. (Ferguson Decl., ¶3).

Third, McCarter has represented Hayward for over 20 years. Given that long relationship and the volume of work that McCarter handles for Hayward, McCarter extended to Hayward certain concessions on its standard rates. McCarter locked in its 2021 rates throughout the litigation, without raising them each year. McCarter also discounted the fees by an additional ██. (Belt Decl., ¶¶ 6, 33). By selecting McCarter as counsel in this matter and promptly paying McCarter's invoices, Hayward has determined that McCarter's fees are reasonable. As the Fourth Circuit explained, "market rates may be provided by the rate which clients normally and willingly pay the petitioning attorneys." *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994); *see also Cargill, Inc v. WDS, Inc*., No. 1:16-cv-00848, 2018 WL 1525352, at *18 (W.D.N.C. Mar. 28, 2018) ("Counsel's fee rates were agreed to, billed, and paid by [Plaintiffs]. Fee rates for

ME1 47832073v.3

out-of-state counsel were the ordinary and customary rate charged to their long-standing client"); *Imgarten v. Bellboy Corp*., 383 F. Supp. 2d 825, 836 (D. Md. 2005) ("The invoices submitted by Imgarten's attorneys represent marketplace billing decisions, and Imgarten, by paying them, has attested to their reasonableness").

Fourth, as argued in Section A.1 above, the damages award of $14.7 million in relation to the requested $4.3 million in fees further show the reasonableness of the fees.

Fifth and finally, the rates charged by counsel at McCarter and Womble were well within the range typically charged for complex intellectual property litigation. As seen in the *AIPLA 2023 Report of the Economic Survey*, lead counsel Mr. Belt's hourly rate was well within the range for equity partners in Boston who practice in the IP field. (Belt Decl. ¶ 34 and Exh. E.) His litigation team were all billed at lesser rates. Further, McCarter's and Womble's rates pale in comparison to typical rates of San Francisco lawyers like the San Francisco-based team from Morgan Lewis and Turner Boyd Seraphine. (*Id*. at ¶ 34.)

Moreover, this Court, courts in the Fourth Circuit, and courts in other jurisdictions have approved attorneys' fees in the range of $2-5 million in similarly complex cases in which the prevailing party achieved a favorable result. *See Cargill, Inc.*, *supra,* at *19 (awarding $2,494,796.49 in attorneys' fees); *Dewberry Engineers, Inc. v. Dewberry Grp., Inc.*, No. 1:20-CV-00610, 2022 WL 20804194, at *8 (E.D. Va. July 29, 2022), *aff'd*, 77 F.4th 265 (4th Cir. 2023) (awarding $3,762,088.25 in attorneys' fees); *Clark v. Duke Univ.*, No. 1:16-CV-1044, 2019 WL 2579201, at *1, *3 (M.D.N.C. June 24, 2019) (awarding $3.55 million in fees where settlement resulted in $10.65 million gross settlement fund); *Super Duper, Inc. v. Mattel, Inc.*, 382 Fed. Appx. 308, 318 (4th Cir. June 10, 2010) (unpublished) (affirming an award of attorneys' fees for $2,643,844.15); *Merck Eprova AG v. Brookstone Pharms., LLC*, No. 09 CIV. 9684 RJS, 2013 WL

ME1 47832073v.3

3146768, at *7 (S.D.N.Y. June 10, 2013) (awarding $2,488,073.70 in attorneys' fees and $811,661.77 in costs in false advertising case); *see also* M*onster Energy Co. v. Vital Pharms., Inc.*, No. ED-CV-181882, 2023 WL 9419597, at *9 (C.D. Cal. Dec. 14, 2023) (awarding $16,778,363.10 in attorneys' fees after jury verdict of false advertising).

3. **The number of hours expended were reasonable, given the complexity and intensity of the litigation**

This was a lengthy and complex case. At the outset of the litigation, Defendants retained the services of two large, highly competent and well-respected law firms with considerable resources—namely, Foley & Lardner and Morgan Lewis. Defendants have been represented by at least eight different firms over the course of this litigation, which could not have been cheap (unless, of course, Mr. Chen didn't pay his firms). Further, as recounted above, this case involved extensive discovery, motion practice, numerous substitutions of counsel, eight extensions of the litigation, and extensive briefing of summary judgment motions and motions *in limine*.

The factual complexity inherent in uncovering and understanding Defendants' deceptive conduct and reviewing thousands of documents produced in this matter justifies the time that Hayward's counsel invested in this case. Courts have recognized that building a case where a defendant acted intentionally or deceptively requires significant effort on the part of a plaintiff's counsel. *Irwin* 747 F. Supp. 2d 568 at 595 (plaintiff's false advertising and Lanham Act claims required plaintiff to search searching through thousands of documents and deposing numerous employees and former employees of the defendants to uncover relevant evidence),

Finally, Defendants cannot be heard to complain that the number of hours were unreasonable when its litigation tactics forced Hayward's counsel to incur many of those hours. *See Va. Academy of Clinical Psychologists v. Blue Shield of Va.*, 543 F. Supp. 126, 134 (E.D. Va. 1982); *accord Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) (citation omitted) (instructing

24

that a litigant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the [other party] in response"). To recap, Defendants' asserted meritless counterclaims and forced Hayward to defend against them before Defendants ultimately dropped them late in the litigation or during trial. (Trial Tr., Vol. 5, 5:2-5), (withdrawal of cancellation claims); (Doc. No. 141), (stipulation of dismissal of trade secrets counterclaims).

## B. Apportionment of Attorneys' Fees is Unnecessary

While in some cases it is appropriate to apportion attorneys' fees on a claim-by-claim basis, "where all of plaintiff's claims arise from the same nucleus of operative facts and each claim was 'inextricably interwoven' with the other claims, apportionment of fees is unnecessary." *Whiteside Estates, Inc. v. Highlands Cove, LLC*, 146 N.C. App. 449 (2001); *see also Legacy Data Access, Inc.*, 2017 WL 6001637, at *20 (Apportionment of fees is not necessary in cases where all claims, although different, arise out of "same intertwined nucleus of operative facts" and are "inextricably interwoven'"). Here, all of Hayward's claims arose from the same intertwined nucleus of operative facts, namely, Defendants' deceptive advertising. Defendants' Ads were the centerpiece of the trial and contained both the accused false advertising and trademark infringement. Further, Defendants' counterclaims to cancel Hayward trademarks arose out of the same set of facts. That said, Hayward has apportioned out fees associated with its defense of Defendants' trade secrets counterclaims and some other matters not directly connected to the claims and counterclaims based on Defendants' advertising. (Belt Decl., ¶ 27.)

## CONCLUSION

For the foregoing reasons, Hayward respectfully requests that this Court grant its request for attorneys' fees in the sum of <u>$4,360,165.24.</u>

25

Respectfully submitted this 29th day of March, 2024

HAYWARD INDUSTRIES, INC.

_s/ Russ Ferguson_
Russ Ferguson (N.C. Bar No. 39671)
**Womble Bond Dickinson (US) LLP**
One Wells Fargo Center
301 South College Street
Charlotte, NC 28202
Russ.Ferguson@wbd-us.com

Erik Paul Belt (admitted _pro hac vice_)
ebelt@mccarter.com
James Donoian  (admitted _pro hac vice_)
jdonoian@mccarter.com
Anne E. Shannon (admitted _pro hac vice_)
ashannon@mccarter.com
Alexander L. Ried (admitted _pro hac vice_)
aried@mccarter.com
**McCarter & English, LL**P
265 Franklin Street
Boston, MA 02110
T: (617) 449-6500

26