# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

| | |
|---|---|
| HAYWARD INDUSTRIES, INC., <br><br> Plaintiff, Counterclaim Defendant <br><br> v. <br><br> BLUEWORKS CORPORATION, BLUEWORKS INNOVATION CORPORATION, NINGBO C.F. ELECTRONIC TECH CO., LTD; NINGBO YISHANG IMPORT AND EXPORT CO., LTD. <br><br> Defendants, Counterclaim Plaintiffs. | Civil Action No. 3:20-CV-710-MOC-DSC |

## HAYWARD'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR THE COURT TO EXPEDITE THE SCHEDULING OF THE SHOW-CAUSE/CONTEMPT HEARING

In view of compelling new evidence discovered last week, Hayward urgently seeks the calendaring of the show-cause hearing as soon as the Court can schedule it so that Zefeng "Richard" Chen and Ningbo CF can answer Hayward's allegations that they have violated, and are continuing to violate, the TRO by diverting assets out of this country via shell companies and with the knowing complicity of certain U.S. customers. Such ongoing diversion has obstructed Hayward's ability to collect these assets in satisfaction of the judgment of May 28, 2024. Hayward has already requested a show-cause hearing and has briefed this Court on Defendants' previous violations of the TRO (*see*, *e.g*., Doc. Nos. 469, 535-1, 550-1). The Court confirmed at a status conference on October 23, 2024, that it will hold a show-cause hearing and require Mr. Chen to attend in person. As each day goes by, however, Ningbo CF and Chen are diverting more assets from the United States and will continue to do so absent remedies compelling Chen and Ningbo CF to obey this Court's orders.

Just this past week, Hayward discovered new evidence (*e.g.*, bank statements) showing that Chen and company are devising new schemes to divert assets and hide the money trail from Hayward, in clear disregard of this Court's TRO. Without a show-cause hearing and remedies for their contempt, Mr. Chen and Ningbo CF will continue to set up new bank accounts and shell companies in a game of "whack-a-mole" to hide their covert diversion of US assets.

Hayward thus respectfully requests that this Court expedite the show-cause hearing. At that hearing, Hayward will seek the following remedies, among others, for Chen's and Ningbo CF's contempt of the TRO: (1) return of the US funds diverted by the "Fig Account" (as defined below) and (2) failing that, imprisonment until such time as Chen and Ningbo CF return the funds.

## I. THE NEW EVIDENCE OF TRO VIOLATIONS

### A. Chen and Ningbo CF Use the Hong Kong "Fig Account" to Divert Assets from the US to China and Other Countries

As discussed in Hayward's previous brief, (Doc. No. 550-1), Chen and Ningbo CF set up an account in Hong Kong in the name of Fig Global Ltd. (the "Fig Account"), which is 100% Chen-owned and used to launder Ningbo CF funds.[1] On November 26, a court in Hong Kong, relying on the judgment, ordered a multi-million dollar asset freeze, including a freeze of the Fig Account. which at the time totaled at least $4,909,119.33 (the "Frozen Hong Kong Funds"). The Hong Kong court also ordered the bank in which the Fig Account is held, Hongkong & Shanghai Banking Corp. ("HSBC"), to produce certain financial records related to this account.

---

[1] There is no question that Ningbo CF and Chen set up the Fig Account to receive payments from their US customers. For example, Ningbo CF told its US customers that Fig Global is Ningbo's Hong Kong company and that the customers should send payments to the Fig Account for Ningbo CF's goods. *See* **Exh. A**, Invoices and emails from Ningbo to its customers (filed under seal). Indeed, Ningbo CF instructed its customers to wire payments to the Fig Account as recently as this fall. *See* **Exh. B**, Email to Leslie's Poolmart, dated Sept. 3, 2024. Further, Mr. Chen is the sole shareholder and director of Fig. *See* **Exh. C** (results of company registry search).

2

Indeed, just last week, HSBC produced transaction records showing deposits into, and withdrawals from, the Fig Account since the TRO was entered on April 11. These records show that since April 11, and through November, Chen deposited at least **$6,539,611.22** USD and withdrew **$8,710,347.83** USD. As detailed below, the bank records show that most of the funds deposited into the Fig Account were diverted from the US, in violation of the TRO.

1. **Where Did the Money Come From?**

Of the $6.5 million deposited into the Fig Account since April 11, **$5,494,503.06** came from US companies (including known Ningbo CF customers), as shown in the spreadsheet attached as **Exh D**.[2] In particular, since April 11, Ningbo CF transferred the following amounts into the Fig Account from US customers:

- Pace Research (*d/b/a* CircuPool) - $2,948,034.00
- Asia Connection (*d/b/a* Blue Torrent) - $1,350,867.13
- Stark Group. (*d/b/a* XtremePower) - $336,856.00
- EFBE (*d/b/a* Pool Supply Unlimited) - $155,230.96
- Leslie's Pool Supplies- $19,477.24

All five of these US customers are ones that Hayward subpoenaed or attempted to subpoena for information about payments owed to Ningbo CF. Hayward also attempted to garnish any and all funds that these five customers owed to Ningbo CF so as to help satisfy the judgment. But, with the exception of Leslie's—which is also a Hayward customer and has undertaken to comply with the subpoena by disclosing to Hayward that Ningbo CF instructed it to pay the Fig Account— Ningbo CF's US customers (if they responded at all) denied owing any funds to Ningbo CF and refused to produce documents showing communications with Chen and Ningbo CF. (EFBE produced some documents, but only through 2022. EFBE failed to produce more recent documents,

---

[2] Attached as **Exh. E,** but filed under seal, is the backup for the accounting shown in the **Exh. D** spreadsheet.

although a summary it produced showed that it was buying Ningbo products in 2024.) Because US customers pay Ningbo CF's front company, Fig Global (or another front company, Ningbo Landau, discussed below), rather than Ningbo CF directly, these US customers had a false sense of plausible deniability. But they cannot deny the facts. Documents produced during the underlying litigation and by Leslie's post-judgment in response to a subpoena prove that Ningbo CF and Chen also told their US customer base to pay the Fig Account. *See, e.g.*, **Exh. F** (collection of emails and invoices from Ningbo CF to US customers).

These US customers (*e.g.*, Pace and Asia Connection) are clearly in league with Chen and Ningbo CF and are covering for them. Otherwise, if they had no dog in the hunt, they would have complied with the subpoenas.

As but one example of this non-compliance, the first customer listed above, Pace Research (*d/b/a* CircuPool), transferred $2,948,034.00 to the Fig Account since April 11. Pace is certainly in league with Chen. Indeed, as detailed in Hayward's previous brief, Chen was photographed staffing the Pace Research booth at the recent pool industry trade show in Lyon, France, in November 2024. Ningbo CF literature was distributed at that Pace booth, and Chen deleted the electronic records of his staffing that booth soon thereafter. (*See* Doc. No. 550-1 at 11-20.).

Pace is certainly a Ningbo CF customer and is paying Ningbo CF for its products. First, the U.S. Environmental Protection Agency partner records (*a/k/a* Energy Star database, which identifies, inter alia, brand, models, and manufacturers of products) show that the CircuPool/Pace variable speed pumps for swimming pools are manufactured by Ningbo CF, or, more specifically, that Ningbo CF manufactures the pumps under private label for Pace/CircuPool. (*See* **Exh. G,** search results on "CircuPool" from **https://www.energystar.gov/productfinder/ product/certified-pool-pumps/results**). Second, Ningbo CF has a uniquely assigned Intertek

4

Case 3:20-cv-00710-MOC-SCR    Document 558-1    Filed 01/09/25    Page 4 of 14

Certification Control Number 4007830, (*see* **Exh H**). During the TRO period (*e.g.*, after April 11, 2024), Hayward purchased one of those CircuPool/Pace pumps manufactured by Ningbo CF, as shown by the Ningbo CF's Intertek Certification Control Number marked on the pump. (*See* **Exh. I,** photos of a Pace/CircuPool pump and labeling showing Ningbo's Intertek number)

Hayward has initiated garnishment proceedings against several of the customers listed above, including a garnishment proceeding in Texas against Pace Research d/b/a CircuPool. *See, e.g.*, *Hayward Industries, Inc. v. Pace Research Ltd.*, Cause No. 24-07-1152 (County Court, Waller County Texas). In post-judgment discovery, Hayward subpoenaed Pace d/b/a CircuPool for information relevant to the Fig Account, Ningbo CF, and the like, but Pace stonewalled Hayward with zero documents and 40 pages of objections. See **Exh. J,** *Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in Civil Action;* **Exh. K**, *Non-Party Pace Research, Ltd.'s Objections and Responses to Plaintiff's Subpoena to Produce Documents*.

Pace also specifically denies any record of Intertek Certification Control Number 4007830, notwithstanding the clear prominence of that number as printed on the Pace/CircuPool pump purchased by Hayward. (*See* Exh. K at Response Nos. 23, 26, 29, and 32.) Also - notwithstanding that HSBC Records clearly demonstrate that Pace was transferring money to Chen's Fig Account for Ningbo CF funds, Pace stonewalled Hayward on any questions relating to the Fig Account. (*Id*. at Response No. 37.) The only inference, therefore, is that Chen and Ningbo CF are directing Pace and other customers of its salt cells and variable speed pumps to stonewall Hayward's post-judgment discovery and collection efforts.[3]

---

[3] Pace is not unique in its Energy Star and Intertek Control Number connections to Ningbo CF. The variable speed pumps sold by other Ningbo CF customers (which Hayward has also obtained in 2024) have the same Energy Star database and Intertek information linking Ningbo CF to EFBE (Calimar and Pool Supplies Unlimited), Stark (XtremePower), Asia Connection (Blue Torrent), and others. Hayward can provide the evidence if needed.

In any event, the Fig Account records are clear and undeniable on their face. Since entry of this Court's TRO on April 11, Ningbo and Chen have had Ningbo CF funds diverted into his 100%-owned Fig Account from the United States in the amount of at least $5,494,503.06.

2. **Where Did the Money Go?**

The recently-received transaction records from HSBC also show that, after this Court entered the TRO on April 11, Chen withdrew **$8,710,347.83** in Ningbo CF funds from the Fig Account and paid various entities around the world, including entities tied to Chen in China, Singapore, and Thailand. *See* **Exh. L**, Spreadsheet of withdrawals and deposits (based on **Exh. E,** transaction records from HSBC). In particular, two payments in November 2024 totaling $851,800 were made to a company called SIGP PTE LTD in Singapore. A search of company information reveals that the sole shareholder of SIGP PTE LTD is Peifeng Chen (Richard Chen's brother and owner of co-defendant Ningbo Yishang Import & Export) and that two of the four directors of SIGP PTE LTD are Peifeng and Richard Chen. *See* **Exh. M**, Business Profile of SIGP PTE LTD, dated Jan. 2, 2025. In effect, Richard Chen is paying himself from the Fig Account, which received most of its funds from US customers of Ningbo CF.

There is also one payment of $50,796.45 to co-defendant Ningbo Trade Ease Import and Export Co (*aka* Ningbo Yishang). There are also seven transfers out of the Fig Account to Ningbo China Base Landau Foreign Trade Co. ("Ningbo Landau") totaling $5,560,434.80. What is interesting about this recipient is that Ningbo Landau also appears to be a front for Chen and Ningbo CF. For example, in some instances, Ningbo CF told its US customers to pay Ningbo Landau as well as Fig Global. (*See* **Exh. N**, Bill of Lading.) Indeed, in the co-pending bankruptcy case, the limited powers trustee, Mr. Bowers, on behalf of Blueworks Corp., testified under oath that Ningbo Landau is one and the same as Ningbo CF. (**Exh. O**, *In re Blueworks Corp.*, Transcript

6

of Sept. 23, 2024, 341 Meeting of Creditors, at 5:8 – 9:13). In other words, Ningbo Landau is just another front company that Chen and Ningbo CF use to hide the money trail and divert US assets.

B. **Chen and Ningbo CF Effectively Admitted to Violating the TRO**

As detailed in previous briefing, the Hong Kong court froze the assets in the Fig Account as of November 26. (*See, e.g.*, Doc. No. 555-1 at 2-4.) The freeze was not limited to the Fig Account, however. Rather, it extends to other assets, known or unknown, of Chen, Fig, and Ningbo CF. Accordingly, the Hong Kong court further required all the Hong Kong defendants to disclose, in writing, all their assets, "whether in or outside Hong Kong, whether in his own name or not and whether solely or jointly owned, giving the value, location and details of all such assets." (**Exh. P**, HK Injunction Order.) In a response dated December 19, 2024, the three Hong Kong defendants (Chen, Ningbo CF, and Fig) told the Hong Kong court that they would ***not*** reveal their assets because doing so would incriminate them in the US contempt proceedings before this Court:

> Accordingly, the Defendants are protected from production under paragraphs 4-5 of the Injunction as doing so would expose them to contempt proceedings. With respect to the 1st Defendant, if it makes production under the Injunction there is a risk that the Plaintiff will use that material to aid its contempt proceedings in the United States, which may result in criminal sanction.17

(**Exh. Q** Defendants' Skeleton Submissions in Hong Kong proceedings, at ¶ 34.) In effect, Chen and Ningbo CF are already anticipating being called into this Court for a contempt hearing.

C. **This Court Stated Its Intent to Order Chen to Appear in Court**

At the status conference and motion hearing on October 23, this Court stated that it would hold a show-cause hearing and require Richard Chen to return from China to answer Hayward's allegations that and Defendants have violated, and are continuing to violate, the TRO:

> MR. FERGUSON: . . . And I think the Court should hold a show-cause motion [hearing] and ask Mr. Chen, are you violating the TRO?

> THE COURT: Oh, we're going to have one. We're going to have a show-cause, and I'm going to go ahead and modify the protective order to allow the requests of the plaintiff in order to be able to use this information . . .

(Doc. No. 538, Hearing Trans., Oct. 23, 2024, at 55:20-25.)

> THE COURT: What I'm probably going to do is set up the hearing, order him [Chen] to be here, have you all still here, and listen to your [the Shumaker firm's] motion to withdraw and see if he can find other counsel to represent or whether he'll be able to pay you.
> If he's making all that kind of money, he's got the money, he just doesn't want to pay folks in the United States any money. He wants people in the United States to pay him money for his product, but he doesn't want to pay people in the United States.

(*Id*. at 70:3-11.)

The Court is correct in stating that Chen "wants people in the United States to pay him money for this product, but he doesn't want to pay people in the United States," and Hayward thus urges the Court to intervene to prevent further TRO violations that irreparably injure Hayward, as lawful protections for Hayward's judgment evaporate through shell companies and trans-border financial transactions. By this emergency motion, and in view of the new evidence, Hayward respectfully requests that the calendaring of the show cause/contempt proceeding be expedited. Hayward is in desperate need of relief because Chen and Ningbo CF are continuing to violate this Court's TRO, thus impeding Hayward's rightful collection efforts.

As discussed below, the contempt finding should be accompanied by a monetary remedy that is rooted in principles of equity, fairness, and restitution. But, because Chen will clearly look to circumvent compliance of an appropriate remedy, this Court is respectfully requested to imprison Chen until such time as there is compliance with such remedy, because it is the only incentive for compliance that he will respect.

8

## II. THIS COURT HAS THE POWER TO SANCTION CHEN FOR CONTEMPT

This Court's TRO of April 11 (Doc. No. 393), which this Court has extended numerous times (and which the Fourth Circuit declined to dissolve on writ of mandamus), enjoins "Defendants and their agents, employees, representatives" (which would necessarily include Mr. Chen) from, *inter alia*, dissipating any assets. One of the main purposes of the TRO, as the Court found, was to prevent Defendants from moving assets out of the US, thus irreparably harming Hayward's ability to collect on the judgment. (Doc. 393 at 3-4 and 5). Another purpose was to prevent Ningbo CF and Chen from moving funds without this Court's approval.

As seen above, Chen and Ningbo CF (and also co-defendant Ningbo Yishang), have used the Fig Account and other shell companies to divert payments from its US customers—which Hayward could otherwise have garnished to partially satisfy the judgment. Moreover, notwithstanding the Hong Kong court's order, Chen and Ningbo CF refuse to divulge where their assets are located for fear of incriminating themselves in the anticipated contempt proceedings before this Court. The logical inference is that Chen and Ningbo CF have other assets that they are hiding from Hayward and this Court and are using them to move money to China.

This Court has the power and discretion to remedy contempt of its TRO, including by imprisonment. 18. U.S.C. § 401 (emphasis added). Moreover, "[a] single violation of the injunction is sufficient to support a finding of contempt." *Rainbow Sch., Inc. v. Rainbow Early Educ. Holding LLC*, 887 F.3d 618 (4th Cir. 2018) (granting two of the school's contempt motions for multiple violations of a permanent in junction and awarding damages and fees in contempt proceedings). In this case, however, there were numerous violations of the TRO, including not just the diversion of assets detailed above but also the violations recounted in Hayward's previous briefing on this matter. (*See* Doc. Nos. 469, 535-1, and 550-1).

9

Here, Hayward will seek civil contempt sanctions as follows:

(1) an order requiring Mr. Chen and Ningbo CF to turn over to Hayward the **$5,494,503.06** that was deposited into the FIG account since April 11 from US customers/companies but was diverted to Chen-affiliated accounts;

(2) imprisoning Mr. Chen until such time as Chen and Ningbo CF comply with the TRO and this Court's monetary sanctions.[4]

(3) any further remedies to bring Chen and Ningbo CF into compliance with this Court's TRO.

The return of $5,494,503.06 USD is the smallest amount that Hayward could have sought as a remedy. Since April 11, Chen transferred out of the Fig Account $8,710,347.83. Further, since April 11, at least $6,539.611.22 was transferred into the Fig Account. Because $5,494,503.06 of that $6.5 million most certainly came from the U.S. (e.g., from Ningbo CF's US customer base), however, that is money that Hayward could have garnished to help satisfy the judgment.

Until there is compliance with the requested restitution for the repeated and continuing violation of the TRO, imprisonment is the very likely the only way of compelling Chen's compliance. This Court could also order monetary incentives, such as requiring Chen and Ningbo

---

[4] In this case, the contempt sanctions would be civil in nature because they are intended to get Chen and the Defendants to comply with the letter and spirit of the TRO and to compensate Hayward for its losses. *See, e.g., Buffington v. Baltimore Cty.*, 913 F.2d 113, 133 (4th Cir. 1990) ("when the nature of the relief and the purpose for which the contempt sanction is imposed is remedial and intended to coerce the contemnor into compliance with court orders or to compensate the complainant for losses sustained, the contempt is civil; if, on the other hand, the relief seeks to vindicate the authority of the court by punishing the contemnor and deterring future litigants' misconduct, the contempt is criminal"). <u>While he would be imprisoned, Chen would also have the key to his cell. All he had to do to be released is to comply with the TRO and cause the required restitution to be made, which he can clearly do</u>. For this reason, the Fourth Circuit has found that civil contempt (as opposed to criminal contempt) is not immediately appealable. *Chesapeake Bank v. Berger*, 629 F. App'x 501, 502 (4th Cir. 2015) ("A civil contempt proceeding is in effect a continuance of the main action and therefore a party to a suit may not review upon appeal an order fining or imprisoning him for civil contempt except in connection with appeal from a final judgment of the main claim.") (quoting *Consol. Coal Co. v. Local 1702*, 683 F.2d 827 830 n. 3 (4th Cir. 1982)).

CF to pay daily fines and to order them to pay Hayward's attorneys' fees and cost associated with enforcing the TRO and attempting to collect on the judgment. However, it has become clear that monetary fines will not be sufficient to compel compliance in this case. For example, the thousands of dollars in post-judgment interest accruing every day have, apparently, not encouraged Chen to comply or to settle this matter. Ningbo CF and Chen have a demonstrated history of deception, misrepresentation, and exploitation of international boundaries. Indeed, Chen himself has proven to be a flight risk already, having left his wife and child here in Waxhaw to hide in China to avoid the judgment.

In any event, such sanctions and remedies are well within this Court's discretion. S*ee, e.g.*, *Colonial Williamsburg Found. v. Kittinger Co.,* 792 F. Supp. 1397, 1407 (E.D. Va. 1992), *aff'd*, 38 F.3d 133 (4th Cir. 1994) (finding defendants in contempt of consent decree and holding that *disgorgement of profits* was appropriate and that the plaintiff was entitled to attorney fees and costs -- "civil contempt fine, even when compensatory in nature, need "not always [be] dependent on a demonstration of 'actual pecuniary loss'"); *Lambert v. Gift Dev. Grp., LLC*, No. 1:18-CV-00215, 2019 WL 177078, at *2 (M.D.N.C. Jan. 11, 2019) ("The Court may order incarceration pending compliance, and there may be financial consequences such as a fine and attorneys' fees. The court need not hold an evidentiary hearing before granting a civil contempt motion. However, if the alleged contemnor fails to appear for the hearing, the court may issue an order for her arrest to coerce an appearance or may rule on the motion in her absence, and — if the motion for contempt is granted and incarceration is ordered — issue an order for her arrest until or unless she complies with the order") (internal quotes and citations omitted); E*novative Techs., LLC v. Leor*, 622 F. App'x 212, 215 (4th Cir. 2015) (affirming the district court's imposition of a fine of $1,000 per day for civil contempt  See also **Exh. R,** *Gilead Sciences, Inc. v. Safe Chain Sols. LLC*, Case No.

21-CV-4106, slip op. at 24-26 (E.D.N.Y. Aug. 29, 2024) (finding a defendant in contempt for violating an asset freeze order and ordering her to deposit the sums dissipated in violation of the asset freeze order--$400,596.01—into the court's escrow account and warning her that failure to comply could result in incarceration).

## CONCLUSION

Because Chen and Ningbo CF are using deceptive schemes to divert US funds that could have been used to satisfy the judgment, because it would be relatively easy for them to set up new accounts and shell companies to hide the money trail from Hayward's judgment collection efforts, and because Chen and Ningbo CF refused to divulge to the Hong Kong court their assets for fear of contempt sanctions here, Hayward respectfully requests that this Court schedule the show-cause hearing on an expedited basis and order Richard Chen to appear so that he can answer for his violations.

Respectfully submitted this the 9th day of January, 2025,

        *s/ Russ Ferguson*
Russ Ferguson (N.C. Bar No. 39671)
**Womble Bond Dickinson (US) LLP**
One Wells Fargo Center
301 South College Street
Charlotte, NC 28202
Russ.Ferguson@wbd-us.com

Erik Paul Belt (admitted *pro hac vice*)
ebelt@mccarter.com
James Donoian (admitted *pro hac vice*)
jdonoian@mccarter.com
Anne E. Shannon (admitted *pro hac vice*)
ashannon@mccarter.com
Siobhan M. Tolan (admitted *pro hac vice*)
stolan@mccarter.com
Alexander L. Ried (admitted *pro hac vice*)
aried@mccarter.com
**McCarter & English, LLP**
265 Franklin Street
Boston, MA 02110
T: (617) 449-6500

## AI CERTIFICATION

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexus, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

                                                       s/ *Russ Ferguson*