UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20-CV-710 -MOC-DSC

| | |
|---|---|
| HAYWARD INDUSTRIES, INC., <br><br> Plaintiff, Counterclaim Defendant <br><br> v. <br><br> BLUEWORKS CORPORATION, BLUEWORKS INNOVATION CORPORATION, NINGBO C.F. ELECTRONIC TECH CO., LTD; NINGBO YISHANG IMPORT AND EXPORT CO., LTD. <br><br> Defendants, Counterclaim Plaintiffs. | ORDER |

**THIS MATTER** is before the Court on a Motion to Show Cause and related motion papers and evidence filed by Plaintiff Hayward Industries, Inc. (Doc. Nos. 468, 469, 476, 535-1, 550-1, 558-1–559-19, 559, and 559-1). The Court held a show cause hearing on March 3, 2025. For good cause shown, the Motion is **GRANTED**, and Defendants Ningbo C.F. Electronic Tech. Co. Ltd. ("Ningbo C.F."); Ningbo Yishang Import and Export Co., Ltd. ("Ningbo Yishang"); Blueworks Innovation Corporation; and Zefeng "Richard" Chen (collectively, the "Ningbo Parties") are held in civil contempt of this Court and are sanctioned in accordance with the terms of this Order.[1]

## I. BACKGROUND

Plaintiff and Defendants are competitors in the manufacture and sale of equipment for

---

[1] Defendant Blueworks Corporation filed for Chapter 11 bankruptcy on June 11, 2024. While this order focuses on the Ningbo Parties, any impact on Blueworks Corporation is pursuant to this Court's exercise of its police powers to enforce its orders. See 11 U.S.C. § 362(b)(4).

swimming pools, such as saltwater chlorination systems, filters, pumps, and heaters. In December 2020, Plaintiff sued Defendants for trademark infringement, false advertising, unfair or deceptive trade practices, and related causes of action stemming from Defendants' advertising and sale of so-called "salt cells," which are components of saltwater chlorination systems. A jury trial was held from February 22 through March 1, 2024. After trial, a judgment of over $16 million was entered against Defendants. As of March 3, 2025, the judgment, including interest and attorneys' fees, is $17,882,392.42. Plaintiff has spent the past year trying to collect on that judgment, but the Ningbo Parties, especially Mr. Chen, are actively frustrating Plaintiff's collection efforts by hiding and moving funds in violation of this Court's temporary restraining order (TRO), first entered on April 11, 2024, and then continuously extended.

Plaintiff moved for the Ningbo Parties to show cause why they should not be held in contempt. The Court held a show cause/contempt hearing on March 3, 2025, at which the Ningbo Parties were represented by counsel but neither offered evidence in their defense nor denied their contempt of this Court's orders. Defendants' principal, Richard Chen, did not appear at the hearing, despite being ordered to do so and despite being subpoenaed to appear.

## II.　　LEGAL STANDARDS

In contempt proceedings, the moving party must show, by clear and convincing evidence, the following elements: (1) the existence of a valid decree or which the alleged contemnor had actual or constructive notice; (2) the decree was in the movant's favor; (3) the alleged contemnor by its conduct violated the terms of the decree and had knowledge (at least constructive knowledge) of such violations; and (4) the movant suffered harm as a result. Meineke Car Care Centers, LLC v. Asar Inc., LLC, No. 3:14-CV-129-RJC, 2016 WL 820952 (W.D.N.C. Mar. 2, 2016) (quoting Ashcraft v. Conoco, Inc., 218 F.3d 288, 301 (4th Cir. 2000)). Intent is largely

irrelevant; a court focuses only on whether the alleged contemnor's conduct complied with some "unequivocal command" set forth in detail in the order. Id. at *3.

Relevant to this case, a non-party, particularly an officer or director of a party, can be held in contempt of a court order, just the same as a party can. Life Techs. Corp. v. Govindaraj, 931 F.3d 259, 267 (4th Cir. 2019), as amended (Aug. 7, 2019) ("[A] court may treat as contempt of court the failure to obey a court order by an officer or director of a party"); Xfinity Mobile v. D Town Trading Inc., No. 3:20-MC-00083-RJC-DSC, 2022 WL 23166, at *2 (W.D.N.C. Jan. 3, 2022) (finding the individual officers and directors of defendant companies with knowledge of the relevant orders in civil contempt); Capital Source Fin., LLC v. Delco Oil, Inc., 520 F. Supp. 2d 684, 691 (D. Md. 2007) ("[C]ourts have held that a third party may be subject to personal jurisdiction for contempt for knowingly aiding and abetting the violation of a court order, even without other contacts with the forum state.").

If the movant makes a prima facie showing of these elements, the burden shifts to the alleged contemnor to justify his non-compliance. Meineke, 2016 WL 820952, at *3. The court must provide notice and the opportunity to be heard. Id. The movant may rest on the papers and then it is up to the alleged contemnor to show up and justify his violations or dispute that there even were violations. Id. at *2. A single violation is sufficient to support a contempt finding. Consumer Fin. Prot. Bureau v. Klopp, 957 F.3d 454, 461 (4th Cir. 2020).

The consequences for violating a court order fall within the district court's discretion, and a court has wide latitude in shaping a remedy for the contempt. Id. at 466. Sanctions may include, for example, incarceration, fines, or both until the contemnor purges the contempt. Meineke, 2016 WL 820952, at *3. Sanctions may be used to encourage compliance with a court's order and/or to compensate the movant for losses sustained. Id.

3

### III. PROCEDURAL HISTORY

#### A. Verdict and Judgment for Hayward

After a week-long trial from February 22 to March 1, 2024, a jury returned a verdict for Plaintiff and against Defendants for false advertising in violation of the Lanham Act and unfair or deceptive trade practices in violation of the North Carolina Unfair or Deceptive Trade Practices Act ("UDTPA"). The jury awarded Plaintiff $4,900,000 in compensatory damages for false advertising under the Lanham Act and, alternatively, for violation of the NC UDTPA. The jury also awarded Plaintiff $750 in statutory damages for copyright infringement. See (Doc. No. 353). Under the UDTPA only, the award of $4,900,000 was automatically trebled, bringing the verdict amount to $14,700,750. On May 28, 2024, the Court entered judgment for Plaintiff against all Defendants in the amount of $16,027,736.30, which included both the verdict amount and mandatory pre-judgment interest at the North Carolina statutory rate. (Doc. No. 448).

In August 2024, the Court found that Hayward was the "prevailing party" and that the case was "exceptional" under the Lanham Act because Defendants litigated the case in an unreasonable manner, thus entitling Hayward to an award of attorneys' fees. (Doc. No. 522 at 8). The Court rested its finding that Defendants litigated the case unreasonably "chiefly on Defendants' reliance on flagrant misrepresentations of material fact," and on Defendants' delay tactics and "generally obstructionist approach during discovery." Id. As such, the Court awarded Hayward $1,195,000.28 in attorneys' fees. Id. at 13.

As of the date of the show-cause hearing, March 3, 2025, the judgment (including pre- and post-judgment interest and attorneys' fees) stood at $17,882,392.42. Post-judgment interest continues to accrue daily.

#### B. The TRO and Other Relevant Court Orders

4

On April 11, 2024, the Court granted Plaintiff's motion for a temporary restraining order ("TRO") barring, *inter alia*, "Defendants and their agents, employees, and representatives . . . from facilitating or allowing any withdrawal, transfer, or disposition of assets presently held in any bank accounts owned or controlled by Defendants." (Doc. No. 393 at 7). In the TRO, the Court warned that "Defendants' violation of any term of this Order could result in a finding of contempt." In response to Plaintiff's motions, the Court has extended the TRO in 14-day increments through the date of this order.

The Court also provided a means for judicial oversight by which Defendants could seek relief from the TRO so that Defendants could pay ordinary business expenses without violating the TRO. More specifically, the Court ordered as follows: "Defendants are instructed that the Court will consider requests for relief from the TRO on a case-by-case basis. Any such request shall identify the payee, amount to be paid, and reason why payment cannot be delayed until after the [hearing on the TRO]." (Doc. No. 404).

Defendants had notice of the TRO and related orders. Defendants had the opportunity to argue against the TRO at a hearing on April 23, 2024, and were represented by counsel at that hearing. Defendants and Mr. Chen and his wife (in their personal capacity) also filed a petition for writ of mandamus seeking to overturn the TRO, which the Court of Appeals for the Fourth Circuit denied. See In re Zefeng "Richard" Chen, Zhuoging Lu, Ningbo C.F. Electronic Tech Co., Ltd., Ningbo Yishang Import and Export Co., Ltd., Blueworks Innovation Corp., and Blueworks Corp., No. 24-1319 (4th Cir. 2024). Defendants sought clarification of the TRO as well. (Doc. No. 394). The Court denied that motion but, as discussed above, provided a means for Defendants to seek relief from the TRO on a case-by-case basis. (Doc. No. 404).

The purpose of the TRO was to prevent Defendants from dissipating assets, which "could

5

prevent Plaintiff from collecting on the judgment in this matter." (Doc. No. 393 at 3); see also (Doc. No. 419) ("Plaintiff's concern—that Defendants will leverage this latest withdrawal [of counsel] to delay enforcement of the jury's verdict, potentially allowing Defendants to hide or move assets—is well-taken"); (Doc. No. 449) ("The Court will therefore grant Plaintiff's motion and dissolve the automatic Rule 62(a) stay due to the significant risk that Defendant's assets will dissipate . . . . If Defendants truly desire a stay, they can mitigate dissipation risk by providing a bond or other security . . . in an amount that would 'permit full satisfaction of the judgment together with costs and interests,' or at least $16,021,736.30.'"). Defendants declined to provide a bond.

It was clear from these and other statements the Court made during hearings that the Court was concerned that Defendants and Mr. Chen would dissipate their assets and thus prevent Plaintiff from collecting on its judgment. Indeed, the Court warned Defendants and Mr. Chen at several hearings and status conferences that the Court wanted to ensure that Defendants pay their judgment debt to Plaintiff. The Ningbo Parties have received fair warning repeatedly over the past year. As just one example, at a status conference on January 14, 2025, the Court warned Defendants and their principal, Mr. Chen, as to the possible consequences of their conduct:

> THE COURT: . . . I'm not going to let – the defendant is not going to dodge the Court with all these global games that he's [Mr. Chen's] playing, to the extent that this Court can do anything about it, to the extent that this Court can do anything about it. And it may not have power to run everything down in other countries, but his [Mr. Chen's] contempt will stop him from selling anything in this country at some point. He'll be barred or all the money that comes from that will go to somebody else, because the Court is not going to be fooled by moving money around internationally.

(Doc. No. 565-2 at 15:7–17).

> THE COURT: . . . But one thing the Court can do is make sure that Mr. Chen doesn't do any business in the United States if he doesn't pay bills, and the Court

will end up having to do that if these things don't get settled. He's not going to be able to play games.

If he wants to be able to sell his product –the lawsuit and the way it was settled, he can still do business as long as he pays this judgment. If he doesn't pay this judgment, get done with what he owes these folks, he's going to have a hard time doing business here.

(Id. at 20:9–23).

THE COURT: So Mr. Chen can get – pass the word to all of the Chen companies and whoever they're putting in charge of it that this Court is involved in making sure that the judgment is paid. It's not going to get in the way of Mr. Chen's legal business in this country if he will pay his debts.

(Id. at 33:12–16).

### C. The Contempt Proceedings

On June 7, 2024, Plaintiff filed its first Motion to Show Cause (Doc. No. 468), alleging that Defendants operate a large factory in China with 200 employees and are continuing to make and sell various products. As such, Plaintiff alleged, Defendants must be paying their employees, suppliers, taxes, rent, and other ordinary business expenses from accounts that they own or control but without first seeking relief from the continuing TRO and were thus in contempt of the TRO. Plaintiff supplemented its original motion with additional evidence it had been gathering during post-judgment discovery in an attempt to collect on the judgment. See (Doc. Nos. 535-1, 550-1, and 558-1). In particular, Plaintiff alleged that it had attempted to garnish payments owed to Defendants by their U.S. customers (distributors and/or retailers of swimming pool equipment who bought and resold products manufactured by Defendants) but that those customers denied owing money to Defendants.

For example, as Plaintiff alleged, many of the U.S. customers (attempted garnishees) denied owing money to the "Ningbo C.F." entity *per se*, even though Hayward discovered that these U.S. companies were selling private label variable-speed pumps for swimming pools that

7

were manufactured by and purchased from Ningbo C.F.[2] Further correlation between Ningbo C.F. and the private label variable-speed pumps sold by the attempted garnishees is shown by the Intertek certification number found on each pump. Intertek is a standard-setting body. In touting its Intertek certifications, Ningbo C.F. published online its Intertek Certification Authorization to Mark document, which identifies Ningbo C.F.'s unique Intertek Control No. 4007830. Hayward purchased and studied a large number of those Energy-Star certified pumps sold by the attempted garnishees to discover that, not only does the Energy Star database identify them as Ningbo C.F. pumps, but that the pumps themselves are marked with Ningbo C.F.'s unique Intertek Certification No. 4007830. (Doc. No. 558-1 at 3-6 and n.3). These Ningbo C.F.-manufactured pumps include those of attempted garnishees Pace Research (d/b/a CircuPool), Asia Connection (d/b/a Blue Torrent), Stark Group (d/b/a Xtremepower), and EFBE (d/b/a Calimar and PoolSupplyUnlimited).

Thus, Plaintiff alleges that the Ningbo Parties were directing their U.S. customers to pay third parties who were, in reality, shell companies, agents, and/or alter egos of the Ningbo Parties. The Ningbo Parties were then withdrawing funds from these third-party bank accounts (particularly a bank account in Hong Kong held in the name of Fig Global Ltd., but which is actually owned and controlled by Ningbo C.F. and Mr. Chen) and directing the money to other accounts and companies in China, Singapore, and beyond. In short, Plaintiff argues that Defendants are engaged in a long-running money laundering scheme that Ningbo C.F. and Mr.

---

[2] The Environmental Protection Agency's "Energy Star" partner database lists the manufacturer, brand name, model number, etc., of variable-speed pumps that have Energy Star certification. The database lists over 100 pumps of Ningbo C.F. that are Energy-Star certified (*see* https://www.energystar.gov/productfinder/product/certified-pool-pumps/results and sort by "Ningbo C.F."). The database correlates the manufacturer to the product sold, regardless of the brand name or label.

8

Case 3:20-cv-00710-MOC-SCR    Document 588    Filed 03/19/25    Page 8 of 18

Chen have used to avoid the TRO and avoid paying their judgment debt to Plaintiff. On January 9, 2025, Plaintiff asked the Court to expedite the scheduling of a show cause/contempt hearing. (Doc. No. 558). On January 27, 2025, the Court ordered the Clerk to schedule a show cause/contempt hearing. (Doc. No. 568). The next day, January 28, the Clerk noticed the hearing for March 3, 2025.

Mr. Chen and the other Ningbo Parties have been well aware of these contempt proceedings. Indeed, they cited these proceedings in court filings in Hong Kong, where Plaintiff obtained an injunction freezing the Fig Global bank account. In the Hong Kong proceedings, Ningbo C.F. and Mr. Chen refused to disclose their assets to Plaintiff, in response to the Hong Kong court's order requiring such disclosure, on the grounds that the disclosures could incriminate them in the U.S. contempt proceedings. (Doc. No. 558-18, Ex. Q, Defendants' Skeleton Submissions, at ¶ 34).

Further, this Court has previously stated on the record that it would hold a show cause hearing and ordered that Defendants' principal, Mr. Chen, personally appear for this show cause/contempt hearing:

> MR. FERGUSON: But we would ask that he be ordered to personally appear, your Honor.
>
> THE COURT: And I'm going to order it. I'm going to order that. I'll order that, and we'll see how it goes.

See (Doc. No. 538 at 65:13–17).

The show cause/contempt hearing was held on March 3, 2025. Hayward made a prima facie case of contempt through its motion papers and at the hearing, thus shifting the burden to the Ningbo Parties to dispute the contempt allegations. But Mr. Chen did not appear at the hearing or offer any testimony. Nor did the Ningbo Parties present any witness in their defense.

9

The Ningbo Parties were, however, represented by counsel. Plaintiff presented evidence of the Ningbo Parties alleged violations and offered additional exhibits into the record, which were admitted without objection. The Court will refer to some of that evidence below.

## IV. FINDINGS OF FACT

1. Defendants and Mr. Chen had notice of all relevant court orders. The Ningbo Parties were represented by counsel at all hearings and at trial, and Mr. Chen attended many of those hearings and was Defendants' principal witness at trial, which Mr. Chen attended every day.

2. The Court ordered Mr. Chen to attend the show cause/contempt hearing, but he failed to do so and offered no excuse for his absence.[3]

3. The Ningbo Parties, including Mr. Chen, violated the TRO and other court orders, as discussed below.

4. Plaintiff was harmed by the Ningbo Parties' conduct because, *inter alia*, it has been unable to collect on the judgment and has spent considerable sums in legal fees and costs attempting to do so.

### A. The Ningbo Parties' Violations of the TRO

5. The Ningbo Parties operate a large factory in China, employ 200 employees, and make and sell millions of dollars of products. Accordingly, the Ningbo Parties must be paying their employees, suppliers, rent, utilities, and other expenses from accounts that they own or control. But the Ningbo Parties have not come to this Court seeking relief from the TRO to pay these expenses.

6. The Ningbo Parties, including Mr. Chen personally, have directed their

---

[3] Plaintiff had also subpoenaed Mr. Chen to appear at the March hearing. (Doc. No. 583).

customers, including U.S. customers, to pay for products manufactured by Ningbo C.F. by sending funds to entities and/or bank accounts held in the name of third parties but that in reality are owned or controlled by, or are alter egos of, Ningbo C.F. and Mr. Chen.

7. In particular, Ningbo C.F. has directed its customers to send payments for its products to a bank account at The Hongkong & Shanghai Bank Corporation Limited (HSBC) in Hong Kong. That bank account is held in the name of Fig Global Ltd. See Exs. A (Doc. No. 559), B (Doc. No. 558-3), F (Doc. No. 558-7), N (Doc. No. 558-15).

8. Fig Global Ltd. is Ningbo C.F.'s *alter ego* and/or a shell company under Ningbo C.F.'s control that Ningbo C.F. uses to hold or launder funds by having its customers pay for products by wiring funds to Fig Global's bank account in Hong Kong (the "Fig Account"). In effect, Ningbo C.F. and Mr. Chen own or control the Fig Account. This Court finds that Fig Global is an *alter ego* of both Ningbo C.F. and Mr. Chen. The following facts, among others, support these findings:

    a. Fig Global is 100% owned and controlled by Mr. Chen, who is its sole director and shareholder. Ex. C (Doc. No. 558-4). Mr. Chen is, in turn, a 49% co-owner of Ningbo C.F. Mr. Chen is also a director of Ningbo C.F. See Ex. U, Ningbo C.F.'s post-judgment discovery responses. Previously, this Court has found that all of the Defendants are *alter egos* of each other. (Doc. No. 31 at 9–12, Doc. No. 569 at 3–4 and n.1).[4]

    b. Ningbo C.F. holds itself out as an *alter ego* of Fig Global and vice versa. For example, Ningbo C.F. directs its customers to pay for products it manufactures by

---

[4] For similar reasons, this Court finds that all four Defendants are alter egos of Mr. Chen.

11

wiring funds to the Fig Account. See Exs. A (Doc. No. 559), B (Doc. No. 558-3), and F (Doc. No. 558-7); see also (Doc. No. 550-6 at 3).

c. Ningbo C.F. tells its customers that Fig Global is Ningbo C.F.'s "Hongkong company name, for receiving goods payments." (Doc. No. 559) at 4–5; see also id. at 2 (Ningbo C.F. invoice specifying that payment be directed to the Fig Account and stating that "Fig Global Limited (please notice not Ningbo C.F., fig is our HongKong company name"); id. at 3 (Ningbo C.F. invoice specifying in the bank transfer information that the beneficiary is "Fig Global Limited NOT Ningbo C.F."); Ex. F, Doc. 558-7 at 58 (Ningbo C.F. invoice directing payment to "Fig Global Limited NOT Ningbo C.F."). Mr. Chen's signature or stamp appears on a number of these invoices. See, e.g., (Doc. No. 558-7 at 2, 3).

d. Documents produced by Ningbo C.F.'s U.S. customers in response to subpoenas show that the customers, at Ningbo C.F.'s direction, have, in fact, paid for goods by wiring funds to this Fig Account. See, e.g., (Doc. No. 558-7 at 28–29, 34, 38).

e. In addition, bank transactions records produced by HSBC show that, from April 11 through November 24, 2024, numerous deposits into the Fig Account were made by Ningbo C.F.'s U.S. customers. See (Doc. No. 559-1); (Doc. No. 558-5); (Doc. No. 558-13).[5] Ningbo C.F. has been directing its customers to wire payments to the Fig Account for at least the length of this litigation, as evidenced by invoices and emails dating back to 2020, when this litigation was filed.

---

[5] Plaintiff obtained court orders in Hong Kong (a) requiring HSBC to produce bank transaction records for the Fig Account and (b) freezing funds in that account and other assets owned by Fig Global. The bank records reflect transactions made from the date of the TRO (Apr. 11, 2024) through the date of the Hong Kong court's order (Nov. 24, 2024).

12

f. Neither Ningbo C.F. nor Mr. Chen offered any evidence to the contrary before or at the hearing and did not deny that Fig Global was their alter ego or shell company used to receive payments for Ningbo C.F. products and that the funds in the Fig Account belong to Ningbo C.F. To the contrary, the Ningbo Parties have requested that the Court allow payment of their attorneys' fees from the Fig Account.

9. Before the Hong Kong court froze the Fig Account, the Ningbo Parties withdrew funds from the Fig Account (which Ningbo C.F. and Mr. Chen own and/or control) without first seeking relief from the TRO. Defendants caused transfers of funds from the Fig Account to other accounts that they own or control in China, Singapore, and elsewhere, and to third parties in the US and abroad. See (Exs. E and L).

10. For example, the Ningbo Parties transferred US $5,560,434.80 from the Fig Account to a company called Ningbo China Base Landhau Foreign Trade Co. ("Ningbo Landhau"). (Doc. No. 558-13 at 3). Ningbo Landhau is also an alias, agent, or *alter ego* of Ningbo C.F., or is otherwise controlled by or affiliated with Ningbo C.F. (Doc. No. 558-16).

11. The Ningbo Parties were clearly moving money into and out of the Fig Account that they control, including substantial funds received from Ningbo C.F.'s U.S. customers that Hayward had attempted to garnish. For example, during the period from the date of the TRO (April 11, 2024) through November 24, 2024, the following transfers into and out of the Fig Account were made:

a. Transfers out of the Fig Account to all recipients globally: $8,710,347.83.

b. Transfers out of the Fig Account to Ningbo Landhau: $5,560,434.80.

c. Transfers into the Fig Account from all sources: $6,539,611.22.

13

d. Transfers into the Fig Account from USA sources: $5,494,503.00.

e. Transfers into the Fig Account from USA customers that Hayward attempted to garnish: $4,866,101.83.

12. Accordingly, for these and other reasons, this Court finds that Fig. Global Ltd. is an *alter ego* of Ningbo C.F., that the funds in the Fig Account are assets of Ningbo C.F., and that Mr. Chen is an *alter ego* of both Fig. Global Ltd. and Ningbo C.F., and that each are jointly and severally responsible for satisfying this Court's judgment against Ningbo C.F. and the other Defendants, such as Ningbo Yishang.

**B.     Other Violations of Court Orders**

13. Mr. Chen failed to appear at the March 3rd show cause/contempt hearing, despite the Court's order that he do so.

14. Previously, Hayward had served on the Ningbo Parties post-judgment discovery requesting, *inter alia*, information about their assets that could be used to satisfy the judgment. The Ningbo Parties, however, refused to answer these requests on the supposed ground that Chinese law prevented them from answering. Hayward moved to compel responses. (Doc. No. 505). This Court granted the motion to compel and ordered the Ningbo Parties to answer the discovery requests within 30 days. (Doc. No. 567). Defendant Ningbo C.F., but no other Defendant, served responses on February 26, 2025, in Chinese without English translations. (Ex. U.). Plaintiff's translations show that Ningbo C.F. was relying on the same defense (Chinese law) that this Court had rejected. By not answering the discovery, particularly requests seeking information on the Ningbo Parties' assets and accounts, the Ningbo Parties further frustrated Plaintiff's judgment collection efforts, which the TRO was designed to prevent.

15. Defendants have used nine different law firms over the course of this case, serially hiring and firing them. This Court warned the Ningbo Parties that it would not look favorably upon further substitutions of counsel made in an effort to frustrate judgment collection. (Doc. No. 419). When one of those firms sought to withdraw, this Court granted it but ordered the Ningbo Parties to hire new counsel within 30 days. (Doc. No. 543). That order was entered on November 19, 2024. Nearly three months have passed since that order and the Ningbo Parties have still not retained new counsel.

## V. CONCLUSIONS OF LAW

1. This Court has previously found that it has jurisdiction over Ningbo C.F. and Ningbo Yishang. (Doc. No. 31). Further, Mr. Chen, in addition to being an owner, director, and/or managing agent of Ningbo C.F., co-owns a family home with his wife in Waxhaw, North Carolina. Mr. Chen testified under oath at trial that he resides there with his family.

2. The Ningbo Parties, including Mr. Chen, had notice of the TRO and related Court orders.

3. The TRO and related Court orders are in favor of Plaintiff and were intended to ensure that Plaintiff could collect on the judgment.

4. The TRO bars not just Defendants but also "their agents, employees, and representatives . . . from facilitating or allowing any withdrawal, transfer, or disposition of assets presently held in any bank accounts owned or controlled by Defendants." (Doc. No. 393). Mr. Chen is an agent, employee, or representative of Defendants. Indeed, as this Court previously found, Defendants are *alter egos* of each other and of Mr. Chen and his family.

5. The Ningbo Parties, including Mr. Chen, violated the TRO and other Court orders as detailed above.

6. The Ningbo Parties, including Mr. Chen, have failed at every opportunity to offer any justification for their violations of the TRO and other Court orders.

7. The Ningbo Parties' violations have harmed Plaintiff by frustrating its attempts to collect on its judgment.

8. The Ningbo Parties, including Mr. Chen, are thus in contempt of this Court's orders.

**IT IS, THEREFORE, ORDERED** that:

1. Unless and until the Ningbo Parties pay the judgment (presently at $17,882,392.42 through the date of the contempt hearing, March 3, 2025), the Ningbo Parties—including all agents, employees, officers, directors, shareholders, affiliates, subsidiaries, assignees, and anyone acting for or through them—shall be barred from importing or selling any product in the United States, including, but not limited to, salt cells, salt water chlorination systems, pumps, heaters, any other equipment for swimming pools, and any components thereof, including the products shown in Appendix A—including, but not limited to, any and all Energy Star certified pumps and any and all pumps bearing Intertek Certification Control No. 4007830. The Ningbo Parties shall not use any shell companies, agents, subsidiaries, affiliates, successors in interest, assignees, corporate restructuring, rebranding, or third parties to evade this import and sales ban.

2. For the avoidance of any doubt, unless and until the Ningbo Parties pay the judgment, all Ningbo Parties shall be barred from inducing, facilitating, contributing to, or otherwise causing, another natural or juristic person(s) (entity) from importing or selling any of the aforementioned products in or into the United States. As a non-limiting example, the Ningbo Parties shall not use any means to evade the import ban, including, for example, by selling

products to a middleman, distributor, import/export agent, or any other person(s) or entit(ies) outside of the United States who will then import or sell those products in or into the United States.

3. A copy of this order shall be sent to United States Customs and Border Patrol. (USCBP), which is respectfully requested and ordered to stop at the border and impound any such products.

4. To the extent that this sales and import ban impacts Blueworks Corporation, which is currently in Chapter 11 bankruptcy, the ban does not violate the automatic stay of 11 U.S.C. § 362(a) because the ban is issued pursuant to this Court's policy power to enforce its orders, including the TRO. See 11 U.S.C. § 362(b)(4).

**IT IS FURTHER ORDERED THAT:**

5. The Ningbo Parties shall pay to Hayward the attorneys' fees and costs that Plaintiff has incurred from April 11, 2024, through the date of this order in attempting to collect on the judgment. Plaintiff shall file an affidavit within ten (10) days of this order itemizing its fees and costs. Plaintiff shall not count any fees on which it previously relied when it presented its fees petition to the Court in the spring of 2024 and which the Court considered in awarding attorneys' fees to Hayward. See (Doc. No. 522).

**IT IS FURTHER ORDERED THAT:**

6. The Ningbo Parties shall answer in full Hayward's post-judgment discovery requests, including identification of their assets, or risk further sanctions.[6]

---

[6] The Court notes, and reminds Defendants, that it has the authority to issue a bench warrant for Mr. Chen's arrest and incarceration as a remedy for civil contempt. It elects not to do so at this time.

Signed: March 19, 2025

Max O. Cogburn Jr
United States District Judge